## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JIM CHAPMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>FENNEC PHARMACEUTICALS INC., ROSTISLAV RAYKOV, and ROBERT ANDRADE,<br><br>　　　　　　　　Defendants. | Case No. 1:20-CV-812<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Jim Chapman ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Fennec Pharmaceuticals Inc. ("Fennec" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Fennec; and (c) review of other publicly available information concerning Fennec.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Fennec securities between February 11, 2020 and August 10, 2020, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Fennec is a biopharmaceutical company that purportedly focuses on the development of PEDMARK, a sodium thiosulfate anhydrous injection, for the prevention of platinum-induced ototoxicity in pediatric cancer patients.

3.      On August 11, 2020, before the market opened, Fennec disclosed that it had received a Complete Response Letter ("CRL") from the U.S. Food and Drug Administration ("FDA") regarding the Company's New Drug Application ("NDA") for PEDMARK. According to the CRL, "after recent completion of a pre-approval

inspection of the manufacturing facility of [Fennec's] drug product manufacturer, the FDA identified deficiencies resulting in a Form 483, which is a list of conditions or practices that are required to be resolved prior to the approval of PEDMARK."

4. On this news, the Company's share price fell $3.51, or 34%, to close at $6.66 per share on August 11, 2020, on unusually heavy trading volume.

5. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the manufacturing facilities for PEDMARK, the Company's sole product candidate, did not comply with current good manufacturing practices; (2) that, as a result, regulatory approval for PEDMARK was reasonably likely to be delayed; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

2

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Jim Chapman, as set forth in the accompanying certification, incorporated by reference herein, purchased Fennec securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Fennec is incorporated under the laws of British Columbia, Canada with its principal executive offices located in Research Triangle Park, North Carolina. Fennec's common stock trades on the NASDAQ exchange under the symbol "FENC."

13.    Defendant Rostislav Raykov ("Raykov") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14.    Defendant Robert Andrade ("Andrade") was the Company's Chief Financial Officer ("CFO") at all relevant times.

15.    Defendants Raykov and Andrade (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Fennec is a biopharmaceutical company that purportedly focuses on the development of PEDMARK, a sodium thiosulfate anhydrous injection, for the prevention of platinum-induced ototoxicity in pediatric cancer patients.

### Materially False and Misleading
### Statements Issued During the Class Period

17.     The Class Period begins on February 11, 2020. On that day, Fennec announced that it had completed its rolling submission of its NDA for PEDMARK. Specifically, in a press release, the Company stated, in relevant part:

> Fennec Pharmaceuticals Inc. (Nasdaq:FENC; TSX: FRX), a specialty pharmaceutical company, today announced it has completed its rolling submission of a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) for PEDMARKTM (a unique formulation of sodium thiosulfate) for intravenous use and submitted a Marketing Authorization Application (MAA) to the European Medicines Agency (EMA) for sodium thiosulfate (tradename to be determined). The PEDMARKTM indication requested is for the prevention of ototoxicity induced by cisplatin chemotherapy in patients one month to < 18 years of age with localized, non-metastatic, solid tumors.

> Fennec's PEDMARK regulatory submissions follow: a pre-NDA meeting with the FDA in December 2018 after which Fennec initiated a rolling NDA; and pre-submission meetings with the EMA and an approved pediatric investigation plan (PIP). Both applications are based upon clinical results from two pivotal Phase 3 clinical trials:

> - SIOPEL 6 conducted by the International Childhood Liver Tumor Strategy Group (SIOPEL) with results published in the New England Journal of Medicine in June 2018

> and

5

- ACCL0431 conducted by the Children's Oncology Group (COG) with results published in Lancet Oncology in 2016.

"At Fennec, we are dedicated to the development of PEDMARK for the prevention of ototoxicity in children. The completion of these regulatory submissions to the FDA and EMA are the culmination of many years of hard work, bringing us one step closer to achieving our mission," said Rosty Raykov, chief executive officer of Fennec.

18. On February 14, 2020, Fennec provided a business update and announced its fiscal 2019 financial results in a press release that stated, in relevant part:

> *NDA (New Drug Application) and Marketing Authorization Application (MAA) completed in February 2020*
>
> *Commercial readiness activities in U.S. underway for potential launch of PEDMARKTM, if approved, in the second half of 2020*
>
> *Solid financial position with $13.7 million and no debt and the option to access $12.5 million in debt financing upon NDA approval of PEDMARK*
>
> \* \* \*
>
> "Fennec made great progress in 2019 preparing for some important milestones in 2020 including the recent announcement of regulatory submissions in both the U.S. and EU for PEDMARK" said Rosty Raykov, chief executive officer of Fennec. "During the year we also made solid progress in preparing for the potential launch of PEDMARK including the hiring of a chief commercial officer and the preparation and execution of our commercial readiness plan. We look forward to a number of significant milestones throughout 2020. If PEDMARK is granted a Priority Review, the Prescription Drug User Fee Act (PDUFA) action date is expected in the third quarter of 2020."

19. The same day, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2019 (the "2019 10-K"). Therein, Fennec stated, in relevant part:

6

***Regulatory approval of our product candidate is time-consuming, expensive and uncertain, and could result in unexpectedly high expenses and delay our ability to sell our product.***

Development, manufacture and marketing of our product is subject to extensive regulation by governmental authorities in the United States and other countries. This regulation could require us to incur significant unexpected expenses or delay or limit our ability to sell our product candidate. . . .

*     *     *

***We and our third-party manufacturers are also required to comply with the applicable current FDA Good Manufacturing Practices regulations, which include requirements relating to quality control and quality assurance, as well as the corresponding maintenance of records and documentation.*** Further, manufacturing facilities, which we outsource to third parties, must be approved by the FDA before they can be used to manufacture our product, and they are subject to additional FDA inspection. If we fail to comply with any of the FDA's continuing regulations, we could be subject to reputational harm and sanctions, including:

- delays, warning letters and fines;

- product recalls or seizures and injunctions on sales;

- refusal of the FDA to review pending applications;

- total or partial suspension of production;

- withdrawals of previously approved marketing applications; and

- civil penalties and criminal prosecutions.

In addition, identification of side effects after a drug is on the market or the occurrence of manufacturing problems could cause subsequent withdrawal of approval, reformulation of the drug, additional testing or changes in labeling of the product.

(Emphasis added.)

20. Moreover, the 2019 10-K stated, with respect to manufacturing:

***If our third-party manufacturers breach or terminate their agreements with us, or if we are unable to secure arrangements with third party manufacturers on acceptable terms as needed in the future, we may suffer significant delays and additional costs.***

We have no experience manufacturing products and do not currently have the resources to manufacture any products that we may develop. We currently have agreements with contract manufacturers for clinical supplies of PEDMARK™, including drug substance providers and drug product suppliers, but they might not perform as agreed in the future or may terminate our agreements with them before the end of the required term. Significant additional time and expense would be required to effect a transition to a new contract manufacturer.

We plan to continue to rely on contract manufacturers for the foreseeable future to produce quantities of products and substances necessary for research and development, preclinical trials, human clinical trials and product commercialization, and to perform their obligations in a timely manner and in accordance with applicable government regulations. If we develop any product with commercial potential, we will need to develop the facilities to independently manufacture such product or products or secure arrangements with third parties to manufacture them. We may not be able to independently develop manufacturing capabilities or obtain favorable terms for the manufacture of our product. While we intend to contract for the commercial manufacture of our product candidate, we may not be able to identify and qualify contractors or obtain favorable contracting terms. ***We or our contract manufacturers may also fail to meet required manufacturing standards, which could result in delays or failures in product delivery, increased costs, injury or death to patients, product recalls or withdrawals and other problems that could significantly hurt our business.*** We intend to maintain a second source for back-up commercial manufacturing, wherever feasible. However, if a replacement to our future internal or contract manufacturers were required, the ability to establish second-sourcing or find a replacement manufacturer may be difficult due to the lead times generally required to manufacture drugs and the need for FDA compliance inspections and approvals of any replacement manufacturer, all of which factors could result in production delays and additional commercialization costs. Such lead times would vary based on the situation but might be twelve months or longer.

(Emphasis added.)

21.     Specifically, with respect to the impact of manufacturing compliance on FDA approval, the 2019 10-K stated, in relevant part:

> ***The marketing approval processes of the FDA and comparable foreign authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain marketing approval for our product candidate, our business will be substantially harmed.***
>
> Our current product candidate has not gained marketing approval for sale in the United States or any other country, and we cannot guarantee that we will ever have any marketable products. Our business is substantially dependent on our ability to complete the development of, obtain marketing approval for, and successfully commercialize our product candidate in a timely manner. We cannot commercialize our product candidate in the United States without first obtaining approval from the FDA to market each product candidate. Similarly, we cannot commercialize our product candidate outside of the United States without obtaining regulatory approval from comparable foreign regulatory authorities. Our product candidate could fail to receive marketing approval for many reasons, including the following:
>
> - . . .
>
> - the FDA or comparable foreign regulatory authorities may find inadequate the manufacturing processes or facilities of third-party manufacturers with which we contract for clinical and commercial supplies; and
>
> - . . .
>
> ***Before obtaining marketing approval for the commercial sale of any drug product for a target indication, we must demonstrate in preclinical studies and well-controlled clinical trials and, with respect to approval in the United States, to the satisfaction of the FDA, that the product is safe and effective for its intended use and that the manufacturing facilities, processes, and controls are adequate to preserve the drug's identity, strength, quality and purity***. In the United States, it is necessary to submit and obtain approval of a New Drug Application, or NDA, from the FDA. An NDA must include extensive preclinical and clinical data and supporting information to establish the product's safety and efficacy for each desired indication. The NDA must also include significant information

9

regarding the chemistry, manufacturing, and controls for the product. ***After the submission of an NDA, but before approval of the NDA, the manufacturing facilities used to manufacture a product candidate generally must be inspected by the FDA to ensure compliance with the applicable Current Good Manufacturing Practice, or cGMP, requirements. The FDA and the Competent Authorities of the Member States of the European Economic Area, or EEA, and comparable foreign regulatory authorities, may also inspect our clinical trial sites and audit clinical study data to ensure that our studies are properly conducted in accordance with the IND regulations, human subject protection regulations, and good clinical practice, or cGCP.***

. . . If the FDA requires additional studies or data, we would incur increased costs and delays in the marketing approval process, which may require us to expend more resources than we have available. In addition, the FDA might not consider any additional information to be complete or sufficient to support the filing or approval of the NDA.

(Emphases added.)

22. On April 13, 2020, the Company announced that the FDA has accepted Fennec's NDA and granted priority review. Specifically, Fennec's press release stated, in relevant part:

Fennec Pharmaceuticals Inc. (Nasdaq: FENC; TSX: FRX), a specialty pharmaceutical company, announced today that the U.S. Food and Drug Administration (FDA) has accepted for filing and granted Priority Review for the company's New Drug Application (NDA) for PEDMARK™ (a unique formulation of sodium thiosulfate). PEDMARK is an investigational drug for the prevention of ototoxicity induced by cisplatin chemotherapy in patients one month to <18 years of age with localized, non-metastatic, solid tumors.

"The FDA filing acceptance of our NDA and granting of Priority Review represents a significant milestone in the development of PEDMARK and we look forward to working closely with the Agency during this review process," said Rosty Raykov, chief executive officer of Fennec.

The FDA grants Priority Review to applications for medicines that treat a serious condition, and, if approved, would demonstrate the potential to be a significant improvement in the safety or effectiveness of the treatment,

diagnosis, or prevention of a serious condition. Priority Review designation shortens the review period from the standard ten months to six months from the submission of the NDA. The FDA set a Prescription Drug User Fee Act (PDUFA) target action date of August 10, 2020 for the completion of FDA's review.

23. On May 14, 2020, the Company issued a press release announcing its first quarter 2020 financial results and providing a business update, which stated, in relevant part:

"We continue our strong momentum across our operations throughout early 2020," said Rosty Raykov, chief executive officer of Fennec Pharmaceuticals. "Following the recent announcement of regulatory submission in the U.S. in February, we were pleased to have been granted Priority Review and a PDUFA date of August 10, 2020. Further, we continue to make progress on our commercial readiness plan in preparation for the potential launch of PEDMARK, if approved, in the second half of 2020. Finally, we significantly strengthened our balance sheet with an over-subscribed follow-on public offering that will allow us to support the commercial launch of PEDMARK and the potential growth period ahead."

24. On August 5, 2020, Fennec announced its second quarter 2020 financial results and provided a business update, stating in a press release, in relevant part:

"We continue to work with the FDA as a part of their review process in advance of the pending PEDMARK$^{TM}$ PDUFA date of August 10," said Rosty Raykov, chief executive officer of Fennec Pharmaceuticals. "Our organization and commercial team have been actively preparing for launch readiness, and, as we await the FDA's decision, we believe that we are well positioned to commercialize PEDMARK, if approved, during the third quarter of 2020."

25. The above statements identified in ¶¶ 17-24 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the manufacturing facilities for PEDMARK, the Company's sole product candidate,

did not comply with current good manufacturing practices; (2) that, as a result, regulatory approval for PEDMARK was reasonably likely to be delayed; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

26.     On August 11, 2020, before the market opened, Fennec disclosed that it had received a CRL from the FDA regarding the Company's NDA for PEDMARK. According to the press release:

> According to the CRL, after recent completion of a pre-approval inspection of the manufacturing facility of our drug product manufacturer, the FDA identified deficiencies resulting in a Form 483, which is a list of conditions or practices that are required to be resolved prior to the approval of PEDMARK™. The Company plans to request a Type A meeting to discuss the issues and other matters that were described in the CRL pertaining to the steps required for the resubmission of the NDA for PEDMARK™. Importantly, no clinical safety or efficacy issues were identified during the review and there is no requirement for further clinical data.

27.     On this news, the Company's share price fell $3.51, or 34%, to close at $6.66 per share on August 11, 2020, on unusually heavy trading volume.

### CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Fennec securities between February 11, 2020 and August 10, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant

12

times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Fennec's common shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Fennec common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Fennec or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Fennec; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

34.     The market for Fennec's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Fennec's securities traded at artificially inflated prices during the Class Period.   Plaintiff and other members of the Class purchased or otherwise

acquired Fennec's securities relying upon the integrity of the market price of the Company's securities and market information relating to Fennec, and have been damaged thereby.

35.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Fennec's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Fennec's business, operations, and prospects as alleged herein.

36.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Fennec's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other

members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

37. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

38. During the Class Period, Plaintiff and the Class purchased Fennec's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

39. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Fennec, their control over, and/or receipt and/or modification of Fennec's allegedly materially misleading misstatements and/or

Case 1:20-cv-00812-UA-JLW   Document 1   Filed 09/03/20   Page 17 of 27

their associations with the Company which made them privy to confidential proprietary information concerning Fennec, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

40.     The market for Fennec's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Fennec's securities traded at artificially inflated prices during the Class Period.  On August 10, 2020, the Company's share price closed at a Class Period high of $10.17 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Fennec's securities and market information relating to Fennec, and have been damaged thereby.

41.     During the Class Period, the artificial inflation of Fennec's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Fennec's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Fennec and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period

17

resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

42.     At all relevant times, the market for Fennec's securities was an efficient market for the following reasons, among others:

(a)     Fennec shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Fennec filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Fennec regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Fennec was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

43.     As a result of the foregoing, the market for Fennec's securities promptly digested current information regarding Fennec from all publicly available sources and reflected such information in Fennec's share price. Under these circumstances, all purchasers of Fennec's securities during the Class Period suffered similar injury through

their purchase of Fennec's securities at artificially inflated prices and a presumption of reliance applies.

44. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

45. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially

from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Fennec who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

46.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

47.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Fennec's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

48.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of

business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Fennec's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Fennec's financial well-being and prospects, as specified herein.

50.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fennec's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fennec and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

51.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level

executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

52. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Fennec's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such

knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Fennec's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Fennec's securities during the Class Period at artificially high prices and were damaged thereby.

54.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Fennec was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Fennec securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

57. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58. Individual Defendants acted as controlling persons of Fennec within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and

had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.     As set forth above, Fennec and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 3, 2020                    **BLUE LLP**

/s/ *Dhamian A. Blue*
Dhamian A. Blue
N.C. Bar No. 31405
Daniel T. Blue, III
N.C. Bar No. 27720
205 Fayetteville Street, Suite 300
Raleigh, NC 27601
dab@bluellp.com
T: (919) 833-1931
F: (919) 833-809

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Jim Chapman*

26