**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JIM CHAPMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   v.<br><br>FENNEC PHARMACEUTICALS INC., ROSTISLAV RAYKOV, ROBERT ANDRADE, CHRIS A. RALLIS, MARCO BRUGHERA, ADRIAN J. HAIGH, KHALID ISLAM, and JODI COOK,<br><br>        Defendants. | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**<br><br>Case No. 1:20-cv-00812-LCB-JLW<br><br>Judge Loretta Copeland Biggs<br>Magistrate Judge Joe L. Webster<br><br><u>Oral Argument Requested</u> |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

NATURE OF THE MATTER .............................................................................. 3

QUESTIONS PRESENTED ................................................................................ 3

REGULATORY SCHEME ................................................................................. 4

STATEMENT OF ALLEGED FACTS ............................................................... 5

LEGAL STANDARDS ....................................................................................... 7

ARGUMENT ...................................................................................................... 9

I.   THE PSLRA SAFE HARBOR PRECLUDES LIABILITY FOR
     DEFENDANTS' FORWARD-LOOKING STATEMENTS ................................. 9

     A.   Defendants' Forward-Looking Statements Were Identified and
          Accompanied by Meaningful Cautionary Language .................................. 10

     B.   Defendants' Forward-Looking Statements Were Not Made with
          Actual Knowledge of Falsity .................................................................... 12

II.  PLAINTIFF FAILS TO PLEAD WITH PARTICULARITY A FALSE OR
     MISLEADING STATEMENT OR ACTIONABLE OMISSION ........................ 13

     A.   Plaintiff Fails To Plead with Particularity a False or Misleading
          Statement ................................................................................................ 13

          1.   Statements About Drug Substance Manufacturing ........................... 13

          2.   Statements About Commercial Readiness ....................................... 15

          3.   Statement About FDA Acceptance of NDA and Priority
               Review Being Significant Milestone .............................................. 16

          4.   Statements About Risks Faced by Fennec ...................................... 17

          5.   SOX Certifications ...................................................................... 18

i

B.     Plaintiff Fails To Plead with Particularity an Actionable Omission ........... 19

    1.    No Actionable Omission about Drug Substance Manufacturer in 2018 ................................................................................................ 19

    2.    No Actionable Omission About Drug Product Manufacturer in 2019 and 2020 ................................................................................ 21

III.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ................................................................................................ 23

    A.    No Particularized Allegations as to State of Mind of Defendants .............. 23

    B.    Allegations of Negligence Do Not Support a Strong Inference of Scienter ................................................................................................... 25

    C.    Fraud by Hindsight Does Not Support a Strong Inference of Scienter ....... 25

    D.    Lack of Motive Undermines An Inference of Scienter .............................. 26

    E.    The Non-Culpable Inference Is More Compelling ..................................... 26

IV.    PLAINTIFF FAILS TO STATE A CLAIM AGAINST ANY DIRECTOR ......... 27

V.    PLAINTIFF'S SECTION 20(a) CLAIM SHOULD BE DISMISSED .................. 28

CONCLUSION ......................................................................................................... 28

APPENDIX – CHART OF ALLEGEDLY FALSE AND MISLEADING STATEMENTS FROM CONSOLIDATED AMENDED COMPLAINT ......... A-1

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ................................................................. 25

*Ash v. PowerSecure Int'l, Inc.*,
No. 4:14-CV-92-D, 2015 WL 5444741
(E.D.N.C. Sept. 15, 2015) .............................................................. 10, 11

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988) ....................................................................... 8, 19

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) ........................................................................... 2

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ................................................. 17, 18

*Cozzarelli v. Inspire Pharm. Inc.*,
549 F.3d 618 (4th Cir. 2008) ..................................... 2, 7, 24, 26, 28

*Elec. Workers Pension Tr. Fund of IBEW Local Union No. 58 v.
CommScope, Inc.*, No. 5:10-CV-0062-RLV,
2013 WL 4014978 (W.D.N.C. Aug. 6, 2013) ................................... 10

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015) ............................................................ 22

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ...................................................... 27, 28

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004) ............................................................ 10

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) .......................................................... 11

*Higginbotham v. Baxter Int'l Inc.*,
495 F.3d 753 (7th Cir. 2007) ........................................................... 23

*Hillson Partners Ltd. P'ship v. Adage, Inc*,
42 F.3d 204 (4th Cir. 1994) ............................................................. 26

*Hirtenstein v. Cempra, Inc.*,
348 F. Supp. 3d 530 (M.D.N.C. 2018),
*aff'd*, 816 F. App'x 747 (4th Cir. 2020) ........................................... 25

iii

*In re Administaff, Inc. Sec. Litig.*,
No. CIV.A. H-03-2082, 2006 WL 846378
(S.D. Tex. Mar. 30, 2006) ...................................................................... 11

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018) ..................................................... 24

*In re Conventry Healthcare, Inc. Sec. Litig.*,
No. 08:09-CV-2337-AW, 2011 WL 1230998
(D. Md. Mar. 30, 2011) ......................................................................... 24

*In re Discovery Labs. Sec. Litig.*,
No. 06-1820, 2006 WL 3227767 (E.D. Pa. Nov. 1, 2006).............................. 22, 25

*In re Discovery Labs. Sec. Litig.*,
No. 06-1820, 2007 WL 789432 (E.D. Pa. March 15, 2007),
*aff'd*, 276 F. App'x 154 (3d Cir. 2008) ............................................. 13, 24

*In re Elan Corp. Sec. Litig.*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008) ..................................................... 23

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001)................................................. 16, 26

*In re Foundry Networks, Inc.*,
No. C00-4823 MMC, 2002 WL 32354617 (N.D. Cal. June 6, 2002).................... 18

*In re Genzyme Corp. Sec. Litig.*,
754 F.3d 31 (1st Cir. 2014) ................................................................... 22

*In re Lab. Corp. of Am. Holdings Sec. Litig.*,
No. 1:03CV591, 2006 WL 1367428 (M.D.N.C. May 18, 2006) ..................... 11, 16

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014),
*aff'd*, 604 F. App'x 62 (2d Cir. 2015) ................................................... 17

*In re Maximus, Inc. Sec. Litig.*,
No. 117-CV-0884-AJT-IDD, 2018 WL 4076359
(E.D. Va. Aug. 27, 2018), *aff'd*, 771 F. App'x 238 (4th Cir. 2019) ..................... 18

*In re Novan, Inc.*,
No. 1:17CV999, 2018 WL 6732990 (M.D.N.C. Nov. 30, 2018)......................... 21

*In re Rigel Pharma., Inc. Secs. Litig.*,
697 F.3d 869 (9th Cir. 2012)................................................................. 19

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
No. CV CCB-18-2445, 2020 WL 571724 (D. Md. Feb. 4, 2020) ...................... 15

iv

*In re Trex, Co., Inc. Sec. Litig.*,
    454 F. Supp. 2d 560 (W.D. Va. 2006)......................................................................... 20

*In re Under Armour Sec. Litig.*,
    342 F. Supp. 3d 658 (D. Md. 2018) ........................................................................... 23

*Inst. Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) .............................................................................. 12, 20

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ........................................................................................... 27, 28

*Longman v. Food Lion, Inc.*,
    197 F.3d 675 (4th Cir. 1999) ...................................................................................... 7

*Maguire Fin. LP v. Powersecure Int'l, Inc.*,
    876 F.3d 541 (4th Cir. 2017) .................................................................................... 24

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) .............................................................................................. 8, 19

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010) .................................................................................................. 25

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016) ...................................................................................... 9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) .................................................................................................. 16

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
    353 F.3d 338 (4th Cir. 2003) .............................................................................. 8, 26

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) .................................................................................... 14

*Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*,
    966 F. Supp. 2d 525 (M.D.N.C. 2013) ................................................................... 11

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) .................................................................................. 16

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) .................................................................................................. 25

*Shah v. GenVec, Inc.*,
    No. CIV.A. DKC 12-0341, 2013 WL 5348133
    (D. Md. Sept. 20, 2013) ............................................................................................. 17

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
  552 U.S. 148 (2008) ...................................................................................................... 7

*Teachers' Ret. Sys. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ........................................................................................ 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................... 8, 23, 26

*TransEnterix Inv'r Grp. v. TransEnterix, Inc.*,
  272 F. Supp. 3d 740 (E.D.N.C. 2017) ........................................................................ 10

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ..................................................................................... 17

*Yates v. Mun. Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) ........................................................................ 8, 9, 19, 23, 27

## STATUTES

15 U.S.C. § 78j(b) .............................................................................................................. 3, 28

15 U.S.C. § 78t(a) ............................................................................................................. 3, 28

15 U.S.C. § 78u-4(b) .......................................................................................................... 7, 8

15 U.S.C. § 78u-5(c) .......................................................................................................... 9, 11

15 U.S.C. § 78u-5(e) ............................................................................................................... 9

15 U.S.C. § 78u-5(h) ............................................................................................................. 10

## REGULATIONS

17 C.F.R. § 240.10b-5 ...................................................................................................... 3, 7, 8

21 C.F.R. § 314.100 ................................................................................................................ 5

## RULES

Fed. R. Civ. P. 9(b) ......................................................................................................... 3, 7, 28

## MISCELLANEOUS

Thompson's FDA Enforcement Manual, § 339 (D. Tosh, ed. 2021) ................................. 4

Defendants Fennec Pharmaceuticals Inc. ("Fennec" or "Company"), Rostislav Raykov, Robert Andrade, Chris A. Rallis, Marco Brughera, Adrian J. Haigh, Khalid Islam, and Jodi Cook[1] ("Individual Defendants"; with Fennec, "Defendants"), through undersigned counsel, respectfully submit this memorandum of law in support of their Motion to Dismiss Consolidated Amended Complaint, filed currently herewith.

## INTRODUCTION

Fennec is a pharmaceutical company that focuses on developing and commercializing PEDMARK™, a drug designed to prevent hearing loss in children undergoing chemotherapy. Because it treats a serious condition, fills an unmet medical need, and is supported by strong clinical evidence, the FDA granted PEDMARK™ Breakthrough Therapy and Fast Track designations. Fennec does not manufacture PEDMARK™ itself, but instead relies on third-party manufacturers.

On August 11, 2020, in connection with its New Drug Application ("NDA") for PEDMARK™, Fennec disclosed that it had received a Complete Response Letter ("CRL") from the FDA on August 10 that identified some deficiencies in its third-party drug manufacturer's production facility that needed to be corrected before the FDA would approve the PEDMARK™ NDA. The FDA observed these deficiencies during an inspection of the facility concluded not long before the CRL was issued. The CRL did not identify any clinical safety issues and did not request any further clinical data.

---

[1] Raykov is Fennec's CEO and Andrade its CFO. ¶¶18-19. Rallis, Brughera, Haigh, Islam, and Cook are members of the Fennec Board of Directors ("Board"), ¶¶20-24, and referred to herein as "Directors."

Plaintiff's Consolidated Amended Complaint ("Complaint" or "¶") alleges that Defendants knew or should have known as far back as December 20, 2018, nearly 20 months before the CRL, the ultimate results of the FDA's July 2020 inspection of its third-party drug manufacturer's facility. It is temerarious for Plaintiff to predicate a fraud claim on such presumed prescience, particularly with regard to third-party operations. Because securities fraud class actions "present a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general," *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975), Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which created "[e]xacting pleading requirements" and charged federal courts with being "vigilant in preventing meritless securities fraud claims from reaching the discovery phase of litigation." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008) (citation omitted).

Plaintiff's Complaint falls far short of these heightened standards. It challenges forward-looking statements protected by the PSLRA safe harbor. It fails to plead with particularity that any challenged statement was false or misleading when made, and fails to plead actionable omissions, *i.e.*, omissions that Defendants had a duty to disclose. The Complaint also fails to plead a strong inference of scienter, because it does not provide particularized facts showing that Defendants knew, or were severely reckless in not knowing, prior to the conclusion of the FDA's inspection of a third-party drug manufacturer, that the FDA would observe deficiencies and issue a CRL that would delay approval of PEDMARK™. The Complaint should be dismissed with prejudice.

## NATURE OF THE MATTER

Plaintiff alleges in the Complaint that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) (¶¶164-74), and SEC Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5 (¶¶164-74), as well as Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (¶¶175-79).

## QUESTIONS PRESENTED

1.      Whether the Complaint states a claim under Section 10(b) or Rule 10b-5 for statements[2] protected by the PSLRA's statutory safe harbor for forward-looking statements.

2.      Whether the Complaint states a claim under Section 10(b) or Rule 10b-5 where it fails to plead with particularity that the Defendants made a false or misleading statement or omitted material information that they had a duty to disclose.

3.      Whether the Complaint states a claim under Section 10(b) or Rule 10b-5 where it fails to plead a strong inference of scienter as to any Defendant under the heightened pleading requirements of the PSLRA and Rule 9(b).

4.      Whether the Complaint states a claim under Section 10(b) or Rule 10b-5 against the Directors for statements they did not make.

5.      Whether the Complaint states a claim under Section 20(a) where no predicate Section 10(b) violation is pled.

---

[2] Attached as an Appendix to the end of this Memorandum is a Chart of Allegedly False and Misleading Statements, which lists the 20 challenged statements.

**REGULATORY SCHEME**

The distribution and marketing of pharmaceutical drugs in the U.S. is regulated by the FDA. ¶¶31-32. The FDA must review and approve new pharmaceutical drugs through its NDA process, ¶¶32, 90, which includes the FDA's pre-approval inspection ("PAI") of the manufacturing facility's compliance with current Good Manufacturing Practices ("cGMP"), ¶¶54-57. The inspectional observations of a PAI are communicated at the conclusion of an inspection during an exit interview and reported on a Form 483. ¶¶8, 57, 59, 99. Almost half of FDA domestic facility inspections (45%) result in the issuance of a Form 483, *see* Thompson's FDA Enforcement Manual, § 339 (D. Tosh, ed. 2021), and FDA's published figures on Form 483s show that at least 2,788 issued in 2020, including 349 in the drug program category alone, Ex. 1 (FDA Inspectional Observations) at 3.[3] A Form 483 "does not constitute a final [FDA] determination of whether any condition is in violation of the FD&C Act or any of its relevant regulations." Ex. 2 (FDA Form 483 FAQs) at 1-2. Every Form 483 includes the following disclaimer:

> THIS DOCUMENT LISTS OBSERVATIONS MADE BY THE FDA REPRESENTATIVE(S) DURING THE INSPECTION OF YOUR FACILITY. THEY ARE INSPECTIONAL OBSERVATIONS, AND DO NOT REPRESENT A FINAL AGENCY DETERMINATION REGARDING YOUR COMPLIANCE.

Ex. 3 (FDA Investigations Operations Manual) at 5-107. Indeed, the FDA "considers all [] information," including "responses made by the company," before determining what

---

[3] References to "Ex." are to the Declaration of John C. Roberts Jr. in Support of Defendants' Motion to Dismiss Consolidated Amended Complaint, submitted herewith.

4

further action, if any, is appropriate.  Ex. 2 (FDA Form 483 FAQs) at 1-2.  If a Form 483 is issued, facility management has 15 days to respond.  ¶59.  The FDA ultimately evaluates the NDA and (a) approves the drug, (b) issues a CRL identifying deficiencies and asking for more information, ¶60, or (c) denies the NDA.  *See* 21 C.F.R. § 314.100.  If the FDA issues a CRL, a drug sponsor can remedy the issues and re-submit its NDA.  ¶60.

**STATEMENT OF ALLEGED FACTS**

**Fennec's Business**.  Located in the Research Triangle Park, Fennec is a pharmaceutical company that focuses on developing and commercializing PEDMARK™.  ¶¶3, 17, 62.  In October 2017, Fennec's clinical trial showed PEDMARK™'s main compound, Sodium Thiosulfate, ¶3, "significantly reduced" hearing loss in children undergoing chemotherapy, ¶68, and Fennec announced it would seek FDA approval.  In March 2018, the FDA granted PEDMARK™ Breakthrough Therapy and Fast Track designations.  ¶¶51-52, 69.  Fennec does not manufacture PEDMARK™'s Active Pharmaceutical Ingredients ("API" or "drug substance"), ¶55, or its finished drug product, but instead uses third-party manufacturers, ¶¶2, 4, 91.  Fennec disclosed this to investors, ¶¶85, 151, including the risks associated therewith, ¶¶115-116; Ex. 4 (FY19 10-K) at 13; Ex. 5 (FY18 10-K) at 13; Ex. 6 (FY17 10-K) at 10.

**Fennec Initiates Rolling NDA and Targets 2H19 Approval**.  On December 20, 2018, Fennec issued a press release announcing the initiation of its rolling NDA for PEDMARK™ and stated that it was "targeting" U.S. approval in the second half of 2019.  ¶¶4, 70, 78, 111 (Statement 1).

**Fennec Later Targets 2H20 Approval**. On March 13, 2019, Fennec issued a press release announcing a delay in its timeline for possible commercialization of PEDMARK™ due to its third-party drug substance manufacturer being acquired, prompting a manufacturing site transition, which required the submission of additional data. ¶¶6, 85 (Statements 2 and 3). As a result, Fennec changed its guidance and stated that it "expect[ed]" submission in late 2019 or early 2020, with possible commercialization in the second half of 2020. ¶¶6, 113-14. Fennec again cautioned investors of the risks and uncertainties associated with an NDA. Ex. 7 (3/13/19 PR) at 3-4.

**Fennec Completes NDA Submission**. In February 2020, Fennec completed its rolling NDA submission, and in April 2020, the FDA accepted the NDA and granted Priority Review status with a target action date of August 10, 2020. ¶¶95-96, 135, Ex. 8 (4/13/20 PR) at 1. On May 14, 2020, Fennec stated that it "continue[d] to make progress on our commercial readiness plan in preparation for the potential launch of PEDMARK, if approved, in the second half of 2020." ¶137 (Statement 17), and made similar statements on August 5, 2020, ¶139 (Statements 18, 19, 20).

**The FDA Issues a CRL**. On August 11, 2020, Fennec announced receipt of a CRL, which outlined some deficiencies that the FDA discovered during a "recent" inspection of Fennec's third-party drug product manufacturer's facility. ¶¶9, 100, 146. The CRL identified "no clinical safety or efficacy issues" and did not request any further clinical data regarding PEDMARK™. Ex. 9 (08/11/2020 PR) at 1. Fennec stated it would work closely with the FDA and its product manufacturer to address the issues raised. *Id*.

6

**This Litigation Follows**. On September 4, 2020, a federal securities complaint was filed in this Court by plaintiff Jim Chapman. ECF No. 1. On February 1, 2021, after appointment as lead plaintiff, Plaintiff filed the Complaint. ECF No. 30.

## LEGAL STANDARDS

**Elements of a Section 10(b) or Rule 10b-5 Claim**. To state a claim under Section 10(b), a plaintiff must plead six elements, two of which are relevant to the instant Motion— the making of "a material misrepresentation or omission," and "scienter." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

**Heightened Pleading Requirements**. A Section 10(b) claim must satisfy not only Rule 9(b)'s particularity requirements, *see* FED. R. CIV. P. 9(b), but also the heightened requirements of the PSLRA, *see* 15 U.S.C. § 78u-4(b)(1)-(2), which "establishe[d] strict requirements for pleading falsity," *Cozzarelli*, 549 F.3d at 625, and "significantly strengthen[ed] the requirement for pleading … scienter," *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007).

**Material Misrepresentation or Omission**. Rule 10b-5b provides that "[i]t shall be unlawful for any person ... [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make ... statements made ... not misleading," 17 C.F.R. § 240.10b-5b. To plead a material misrepresentation, Plaintiff must allege that the challenged statement was "factual," "misleading," and "material" when made. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999).

7

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). Where relying on alleged omissions, a securities plaintiff must show that disclosure of the omitted information was necessary "to make ... statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 563 U.S. at 44.

**Scienter**. "Scienter" is the "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). When inferring scienter from alleged omissions, a plaintiff must plead "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003). "Such 'severe recklessness' is, in essence, 'a slightly lesser species of intentional misconduct.'" *Id*. at 344.

The PSLRA requires a "strong inference" of scienter, 15 U.S.C. § 78u-4(b)(1)-(2), *i.e.*, one that is "cogent" and "compelling" and "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. In making this determination, the reviewing court engages in a holistic analysis of all reasonable inferences, including the "plausible, nonculpable explanations" for defendants' conduct. *Id.* at 323-24. A complaint survives dismissal only if "the malicious inference is at least as compelling as any opposing innocent inference." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014) (citation omitted).

**Statutory Safe Harbor**. The PSLRA includes a safe harbor provision that precludes liability for forward-looking statements if either (a) they are "identified [as such and], accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements," or (b) plaintiff fails to allege that the statements were made "with actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1)(A)-(B). The two prongs are applied "disjunctive[ly]." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 502 (3d Cir. 2016). The safe harbor was designed to apply at the pleading stage. 15 U.S.C. § 78u-5(e).

**Confidential Witnesses**. Where it relies on confidential witnesses, a securities complaint "must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide some other evidence to support their allegations." *Yates*, 744 F.3d at 885.

<u>**ARGUMENT**</u>

## I. THE PSLRA SAFE HARBOR PRECLUDES LIABILITY FOR DEFENDANTS' FORWARD-LOOKING STATEMENTS

Plaintiff challenges as false and misleading Fennec's December 20, 2018 statement that it was "targeting U.S. approval of PEDMARK™ in the second half of 2019," ¶111 (Statement 1), its March 13, 2019 statement that it "expect[ed]" a commercial launch "in the second half of 2020," ¶113 (Statement 3), its August 9, 2019 statement that it "plan[ned] to launch ... in the second half of 2019," ¶122 (Statement 9), its May 14, 2020 statement about "prepar[ing]" for "a potential launch" in the "second half of 2020," ¶137

9

(Statement 17), and its August 5, 2020 statement about potential commercialization in the "third quarter of 2020," ¶139 (Statement 20). These forward-looking statements are not actionable under the PSLRA safe harbor.

## A. Defendants' Forward-Looking Statements Were Identified and Accompanied by Meaningful Cautionary Language

**Statements Were Forward-Looking**. Statements 1, 3, 9, 17 and 20 were clearly forward-looking, as they employ forward-looking language ("targeting," "expect[ing]," "plan[ning]," "prepar[ing]"), and make predictions about future time periods and future events, ¶¶111, 113, 122, 137, 139. *See Elec. Workers Pension Tr. Fund of IBEW Local Union No. 58 v. CommScope, Inc*., No. 5:10-CV-0062-RLV, 2013 WL 4014978, at \*14 (W.D.N.C. Aug. 6, 2013) (statement about "significant benefits in the second half of the year" forward-looking); *Ash v. PowerSecure Int'l, Inc*., No. 4:14-CV-92-D, 2015 WL 5444741, at \*9 (E.D.N.C. Sept. 15, 2015) (similar); *TransEnterix Inv'r Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 757 (E.D.N.C. 2017) (similar). As statements of future operations, they are "classic[ally] forward-looking," *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 242 (3d Cir. 2004), and clearly qualify under the statute, *see* 15 U.S.C. § 78u-5(h)(i)(1).

**Statements Were Identified as Forward-Looking**. Statements 1, 3, 9, 17 and 20 contain a section entitled "Forward Looking Statements" stating that, except for historical statements, "all other statements are forward-looking." Ex. 10 (12/20/18 PR) at 2-3; Ex. 7 (3/13/19 PR) at 3-4; Ex. 11 (8/9/19 PR) at 3; Ex. 12 (5/14/20 PR) at 4-5; Ex. 13 (8/5/20 PR) at 4. *See In re Administaff, Inc. Sec. Litig.*, No. CIV.A. H-03-2082, 2006 WL 846378,

10

at \*7 (S.D. Tex. Mar. 30, 2006) (speaker need not identify individual statements as forward-looking).

**Statements Were Accompanied by Meaningful Cautionary Language**.  To be meaningful, cautionary statements must include language "identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(i); *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) (need only be similar, not identical to those actually realized); *In re Lab. Corp. of Am. Holdings Sec. Litig.*, No. 1:03CV591, 2006 WL 1367428, at \*4-5 (M.D.N.C. May 18, 2006) (same).  The cautionary language need not be appended to the statement itself so long as the statement incorporates it by reference, typically by pointing to a recent SEC filing.  *See* 15 U.S.C. § 78u-5(c)(3); *Ash*, 2015 WL 54444741, at \*8 (considering cautionary language referenced in press release but contained in 10-K); *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 550 (M.D.N.C. 2013) (similar).

Here, Statements 1, 3, 9, 17 and 20 were accompanied by meaningful cautionary language because the press releases expressly warned that Fennec might not "meet regulatory standards" or obtain "required regulatory clearances or approvals" and directed investors to comprehensive risk factors outlined in the then-most-recent 10-K filed with the SEC.  *See* Ex. 10 (12/20/18 PR) at 2-3; Ex. 7 (3/13/19 PR) at 4; Ex. 11 (8/9/19 PR) at 3; Ex. 12 (5/14/20 PR) at 4-5; Ex. 13 (8/5/20 PR) at 4.  Fennec's FY17 10-K warned that PEDMARK™ was subject to "inherent" "risks of failure" associated with innovative drugs and "[r]egulatory approval ... [that] is time-consuming, expensive and uncertain" that could

11

cause Fennec to incur "unexpected ... delay." Ex. 6 (FY2017 10-K) at 8-10. Fennec also cautioned that its third-party "manufacturing facilities must be approved by the FDA before they can be used to manufacture our product," and that a failure "to meet required manufacturing standards [] could result in delays[.]" *Id*. at 10, 12. Fennec's FY18 and FY19 10-Ks repeated these warnings. *See* Ex. 5 (FY18 10-K) at 11, 13, 15; Ex. 4 (FY19 10-K) at 12, 13, 15. ¶¶115-16, 130-31.

**B.      Defendants' Forward-Looking Statements Were Not Made with Actual Knowledge of Falsity**

Even if Plaintiff could satisfy the first prong of the safe harbor, he cannot satisfy the second—actual knowledge of falsity. Actual knowledge is a standard even higher than the near-intentional recklessness required for non-forward-looking statements. *See Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009) (scienter requirement for forward-looking statements "stricter than that for statements of current fact"). As explained below, *see infra* at 23-27, Plaintiff fails to plead a strong inference of scienter with respect to any statement, and thus cannot possibly satisfy the actual knowledge requirement for Statements 1, 3, 9, 17 and 20. Plaintiff pleads no facts showing that the Individual Defendants knew on December 20, 2018 that a merger transaction involving Fennec's drug substance manufacturer—a merger that would not even close until January 2019, ¶84, let alone cause the post-merger entity to decide and then communicate consolidation plans to customers like Fennec—would necessitate a site transition that would delay PEDMARK™ approval beyond the targeted second half of 2019. Plaintiff pleads no facts showing that the Individual Defendants knew the results of the FDA's PAI of Fennec's third-party

12

finished drug product manufacturer before the inspection occurred or the contents of a Form 483 or CRL before they issued. *See In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2007 WL 789432, at *6 (E.D. Pa. March 15, 2007) (plaintiff must allege defendants "did not actually believe … FDA inspection would be successful"), *aff'd*, 276 F. App'x 154 (3d Cir. 2008). The Complaint concedes the absence of actual knowledge when it resorts to "knew or should have known" allegations. ¶¶5-6, 78, 83, 85, 97.

## II. PLAINTIFF FAILS TO PLEAD WITH PARTICULARITY A FALSE OR MISLEADING STATEMENT OR ACTIONABLE OMISSION

### A. Plaintiff Fails To Plead with Particularity a False or Misleading Statement

#### 1. Statements About Drug Substance Manufacturing

Plaintiff challenges three statements about Fennec's drug substance manufacturer made in March, May and August 2019, ¶¶113, 120, 122 (Statements 2, 7, 8), in which it disclosed and discussed an API or substance manufacturing site transition that, due to a related requirement for new substance stability data, caused a delay to Fennec's targeted timeline for approval and commercialization of PEDMARK™. ¶¶5, 38-42, 85. These statements were not false when made.

Plaintiff alleges that Fennec misled investors by stating on March 13, 2019 that its drug substance manufacturer (allegedly Avista) had been acquired by a new company (allegedly Cambrex), requiring a move to a "new facility of the acquiring company" that had "large scale commercial capabilities and a proven and extensive track record of successful FDA inspection and product launches." ¶113 (Statement 2). Plaintiff does not

allege that the manufacturing of PEDMARK™'s substance was staying at the current facility, that the new facility was too small for commercial capabilities, or that the substance manufacturer had a poor FDA inspection and product launch track record. Indeed, Plaintiff acknowledges that Fennec's substance manufacturer was compliant with cGMP, ¶114 (product manufacturer allegedly non-compliant "unlike the substance manufacturer"), and there is no allegation that it ever failed an inspection. Instead, Plaintiff curiously alleges Statement 2 is false because Fennec's finished product manufacturer failed to comply with cGMP well over a year later. ¶114.

Plaintiff's challenge to Statements 7 and 8 fail for the same reason. Plaintiff alleges nothing from which to infer that on May 9, 2019 Defendants were not "pleased with the production transition of PEDMARK™ API to the new commercial drug substance manufacturing site during the first quarter." ¶120 (Statement 7) (emphasis added), or that on August 9, 2019 Fennec had not successfully manufactured PEDMARK™ after transitioning to the new substance manufacturing facility (Statement 8), ¶122. Again, Plaintiff alleges that these statements were false because Fennec's finished product manufacturer failed to comply with cGMP over a year later. ¶¶121, 123. Fennec's statements of confidence in its substance manufacturer in 2019 were not false or misleading due to cGMP deficiencies discovered in 2020 with its product manufacturer. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir. 1999) (statement not false in "context").

### 2. Statements About Commercial Readiness

Even more strained is Plaintiff's challenge to seven statements about Fennec's commercial readiness (Statements 10-12, 17-20). None pleads with particularity the existence of a statement that was false or misleading when made.

Plaintiff claims that Defendants misled investors by stating on November 12, 2019 that Fennec was "focused" on "building" the necessary "team" and "infrastructure" to support a rapid commercial launch of PEDMARK™. ¶124 (Statement 10). But Plaintiff does not allege that Fennec was not "focused" on "building" them. Instead, Plaintiff concedes that Fennec made regulatory submissions in the E.U. and U.S., ¶95 n.35, secured a $12.5 million senior debt facility for commercial activities after NDA approval, ¶87, and hired a Chief Commercial Officer in anticipation of a commercial launch, ¶128. Fennec's statements regarding its commercial readiness were "accurate statements of historical fact," which are "not actionable under [Section] 10(b)." *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, No. CV CCB-18-2445, 2020 WL 571724, at *6 (D. Md. Feb. 4, 2020).

Plaintiff claims that CEO Raykov misled investors by stating on February 11, 2020 that Fennec was "well underway with commercialization readiness activities to support the potential launch of PEDMARK and [its] transition to becoming a commercial-stage organization," ¶126 (Statement 11), and on February 14, 2020 that Fennec had "made solid progress [in 2019] in preparing for the potential launch of PEDMARK, including the hiring of a chief commercial officer and ... execution of our commercial readiness plan." ¶128 (Statement 12). Plaintiff does not allege how commercialization efforts were not "well

underway," at the time or how Fennec had not made "solid progress" in 2019, even if it was still in "transition," given the regulatory submissions, ¶¶126, 128, debt facility, ¶¶87, and new CCO, ¶128. Plaintiff's challenges to Statement 17, about "mak[ing] progress" on commercial readiness, ¶137, Statement 18, about being "well positioned" to commercialize "if approved," ¶139, Statement 19, about "actively preparing" for commercialization, ¶139, and Statement 20, about being "well positioned to commercialize PEDMARK™, if approved," ¶139, fail for the same reasons.

Regardless, all of the statements about efforts being "well underway," Fennec being "well positioned" or showing "solid progress" are far too vague to be actionable. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015) (heightened requirements to plead falsity of opinions); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 891 (W.D.N.C. 2001) ("very pleased with our progress" inactionable puffery); *In re Lab. Corp.*, 2006 WL 1367428, at *10 (similar); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058, 1060 (9th Cir. 2014) (similar).

### 3. Statement About FDA Acceptance of NDA and Priority Review Being Significant Milestone

Plaintiff claims that Fennec misled investors by stating on April 13, 2020 that "[t]he FDA filing acceptance of our NDA and granting of Priority Review represents a significant milestone in the development of PEDMARK™." ¶135 (Statement 16). Such events clearly are significant milestones for a pharmaceutical company. Moreover, characterizing something as a "significant milestone" is too vague to be actionable. *Shah v. GenVec, Inc.*, No. CIV.A. DKC 12-0341, 2013 WL 5348133, at *7 (D. Md. Sept. 20, 2013).

16

### 4. Statements About Risks Faced by Fennec

Four of the statements challenged in the Complaint (Statements 4, 5, 13, 14) were warnings issued by Fennec in the "Risk Factors" section of its annual reports. ¶¶115-16, 130-131. Plaintiff does not dispute that these risk factors reflected important risks faced by Fennec. Instead, Plaintiff claims, in conclusory fashion, that the risk factors were misleading because the risks had already materialized to some unknown degree. ¶¶117, 132. Plaintiff is wrong for two reasons.

First, Plaintiff's premise is mistaken: risk factors are inherently prospective, and no reasonable investor would interpret a prospective warning as a guarantee that the risk had not yet materialized. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021) ("no explicit or implicit representation that [the company] had *not* already experienced such issues"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 578 (S.D.N.Y. 2014) ("unreasonable" to read risk factors as "guarantees"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). In the words of the Sixth Circuit:

> [C]autionary statements are not actionable to the extent plaintiffs contend defendants should have disclosed risk factors "are" affecting financial results rather than "may" affect financial results. … Risk disclosures like the ones accompanying 10-Qs and other SEC filings are inherently prospective in nature. … They are not meant to educate investors on what harms are currently affecting the company .... [A] reasonable investor would be unlikely to infer anything regarding the current state of a corporation's … operations from a statement intended to educate the investor on future harms.

*Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (internal quotations and citation omitted). Nor do the risk factors cease to be valid risk factors just because they materialize to some degree.

17

Second, regardless of the actionability of risk factors as a general matter, Plaintiff's challenge to Statements 4, 5, 13 and 14 should still be dismissed because the Complaint fails to plead with particularity that the risk factors had materialized at the time they were issued in March 2019 or February 2020, respectively. *See Bondali*, 620 F. App'x at 491 (dismissing on alternate grounds that it failed to allege materialization); *In re Foundry Networks, Inc.*, No. C00-4823 MMC, 2002 WL 32354617, at *7 (N.D. Cal. June 6, 2002) (similar); *In re Maximus, Inc. Sec. Litig.*, No. 117-CV-0884-AJT-IDD, 2018 WL 4076359, at *15 (E.D. Va. Aug. 27, 2018) (similar), *aff'd*, 771 F. App'x 238 (4th Cir. 2019).  The challenged risk factors address the risk of "delays," ¶¶115, 130, and the risk that the FDA would find inadequate "the manufacturing processes or facilities of third-party manufacturing manufacturers," ¶¶116, 131.  But the FDA did not find the cGMPs of Fennec's final drug product manufacturer inadequate until July/August 2020, ¶¶103-107, long after these risk factors were issued.

### 5.   SOX Certifications

Plaintiff alleges that the SOX certifications signed by CEO Raykov and CFO Andrade attesting to the material accuracy of Fennec's Form 10-Ks were misleading.  ¶¶118-119, 133-134 (Statements 6, 15).  For the reasons stated herein, the Complaint does not allege with particularity a false or misleading statement or actionable omission, and therefore fails to plead the falsity of the certifications.

18

### B. Plaintiff Fails To Plead with Particularity an Actionable Omission

Plaintiff's claims fare no better when recast as omissions. To plead an actionable omission, Plaintiff must plead the omission of material information that Fennec had a duty to disclose to prevent some "statement made" from being false or misleading. *See supra* at 8. Plaintiff has two basic omissions theories. ¶¶78-88, 89-110. Neither states a claim.

#### 1. No Actionable Omission about Drug Substance Manufacturer in 2018

On December 20, 2018, Fennec originally stated that it was "targeting" PEDMARK™ approval "in the second half of 2019,"[4] ¶111, and then, due to a site transition by its drug substance manufacturer, Fennec updated investors on March 13, 2019 that it was pushing back its commercial launch target "to the second half of 2020." ¶113. Plaintiff alleges that these statements were misleading because Defendants omitted that Fennec's drug substance manufacturer (allegedly Avista) never had the ability to manufacture PEDMARK™, ¶¶78-88, or at least not on a "large scale," ¶¶80, 82, 83. This theory is riddled with problems.

First, Plaintiff relies on information attributed to three poorly positioned former employees of Avista/Cambrex who do not support Plaintiff's allegation. *See Yates*, 744

---

[4] As to this Statement 1, Defendants said nothing about the manufacturing of PEDMARK™ substance or finished drug product. Defendants, therefore, had no duty to disclose anything concerning real or imagined limitations with its substance manufacturer. *See Matrixx*, 563 U.S. at 44; *Basic*, 485 U.S. at 239 n.17; *In re Rigel Pharma., Inc. Secs. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012) (rejecting notion that "once a company chooses to disclose any [] information [regarding the subject], it must disclose all material information regarding [the subject]").

F.3d at 885; *Avaya*, 564 F.3d at 263 (CW allegations lacking sufficient indicia of reliability are steeply discounted); *In re Trex, Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 573 (W.D. Va. 2006) (similar). <u>None of these individuals are alleged to have worked for Fennec or on PEDMARK™ at the drug substance manufacturer</u>. ¶82.

The "former Scientist" at the Durham facility only started working at Cambrex in June 2019, long after the Avista/Cambrex merger, and therefore has no knowledge of Avista's manufacturing capabilities before then. ¶82. The integration of two companies' operations often involves the consolidation and rationalization of manufacturing facilities. Just because Cambrex was using the Durham facility as an analytical site in June 2019 does not mean pre-merger Avista was not also using it for commercial manufacturing. The "former Research Associate" and "former Senior Director of Corporate Planning" worked in Colorado, not Durham. ¶82. Nonetheless, the "former Research Associate" states that Avista <u>did</u> manufacture drugs in the Durham facility. ¶82. Critically, by referring to Avista's inability to manufacture "finished drug product" and stating that it "could make a drug in powder form and then ship it to another manufacturer to transform the powder into injectable doses," ¶82, these former employees clearly are not claiming that Avista could not manufacture sufficient quantities of the PEDMARK™ substance for transmittal to PEDMARK™'s <u>finished product</u> manufacturer.

<u>Second</u>, the allegedly omitted "fact," that Avista was unable to manufacture sufficient quantities of PEDMARK™'s drug <u>substance</u> for commercialization, is not only contradicted by the former employees but also by the documents incorporated by reference

in the Complaint.  The Complaint incorporates an article, ¶83 n.30, stating that Fennec was a "small batch producer."  Ex. 14 (3/13/19 PropThink) at 1.  If drug substance needs were "small" relative to those of other drugs, there is no reason to believe that Avista could not handle the required output.  The Complaint also incorporates a link to a Cambrex website, ¶82 n.28, stating that the Durham facility does "API manufacturing" and is a "100,900 square [foot]" facility with "100+ people," a "walk-in vault for controlled substance manufacture," and a "dedicated suite for DEA controlled substance production."  Ex. 15 (Durham Webpage) at 1.  Plaintiff does not explain why this was insufficient for Fennec's needs, and this Court need not accept Plaintiff's self-contradictory allegations.  *See In re Novan, Inc.*, No. 1:17CV999, 2018 WL 6732990, at \*12 (M.D.N.C. Nov. 30, 2018) (finding plaintiffs' inferences "not only unsupported but actually contradicted by the documents on which [they] rely.").

### 2. No Actionable Omission About Drug Product Manufacturer in 2019 and 2020

Plaintiff claims that Defendants should have disclosed to investors from December 2018 through August 2020 that its drug product manufacturer allegedly had "serious prior issues," ¶102, had received Form 483s in the past, ¶¶105, 107, and would "likely not pass" its Summer 2020 inspection by the FDA, ¶89.  Again, Plaintiff is wrong.

First, the claim is not pled with the requisite particularity.  Plaintiff admits it is essentially "guessing" who Fennec's "most likely" finished product manufacturer is, Pharmaceutics International or Bayer, alleges that the fateful inspection might have happened July 6-10 or July 20-27, and alleges that the potential deficiencies might have

21

related to one set of concerns, or another, ¶¶102-107. The Complaint does not allege the date of the Form 483, let alone its contents, whether and when the finished product manufacturer and/or Fennec took the allowed 15 days to analyze and respond to the Form 483's observations, ¶59, or how soon thereafter the FDA issued the CRL.

Second, Plaintiff assumes that any prior Form 483s issued to Fennec's finished product manufacturer were "red flags" that Defendants knew or should have known before the PEDMARK™-related Form 483 and the FDA's subsequent CRL, and should have understood to spell doom for the PEDMARK™-related PAI. ¶¶114, 117, 119, 121, 123. Since 45% of FDA domestic facility inspections result in the issuance of a Form 483 and there were more than 2,788 in 2020, *see supra* at 4, it strains credulity that a receipt of Form 483s in the past constituted a "red flag" requiring disclosure. *See In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2006 WL 3227767, at *9 (E.D. Pa. Nov. 1, 2006) (failure to uncover third-party manufacturer's previous Form 483s not actionable as securities fraud).

Third, Plaintiff does not allege that Fennec was obligated to disclose the existence of the Form 483 earlier than it did. "[T]here is no per se rule that a company immediately disclose receipt of any correspondence with the FDA," *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 243 n.9 (1st Cir. 2015), including Form 483s, *see In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014) (company need not immediately disclose Form 483 because it "d[id] not represent the FDA's final word"); Ex. 2 (FDA Form 483 FAQs) at 1-2; Ex. 3 (FDA Investigations Operations Manual) at 5-107.

Finally, the circumstances here indicate it was impossible for Defendants to have known the results of the PEDMARK™-related inspection until July 2020 at the earliest, when Plaintiff alleges the inspection of Fennec's finished product manufacturer was completed and an exit interview likely conducted. ¶99. Assuming a Form 483 was issued the last day of the earlier inspection, *i.e.*, July 10, Fennec and its manufacturer had until July 25 to respond to the FDA, and then await its decision. As Plaintiff alleges, Fennec received the CRL on August 10 and disclosed it on August 11, no more than about two weeks from their likely response to the FDA's non-final observations. "Managers … are entitled to investigate for a reasonable time until they have a full story to reveal." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007); *see also In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008) (similar).

## III. PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

The U.S. Supreme Court has made clear that the "strong inference" of scienter required by the PSLRA is only pled if Plaintiff alleges a "cogent" and "compelling" inference, *Tellabs*, 551 U.S. at 314, where "the malicious inference is at least as compelling as any opposing innocent inference," *Yates*, 744 F.3d at 885 (citation omitted). Plaintiff comes nowhere close to satisfying this heightened standard.

### A. No Particularized Allegations as to State of Mind of Defendants

The federal securities laws require that Plaintiff plead "particular allegations" that "strongly imply Defendants' contemporaneous knowledge that the statement was false when made." *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 691 (D. Md. 2018).

Here, Plaintiff fails to plead any particularized facts as to the state of mind of any Individual Defendant at the time the challenged statements were made. "[T]here are simply no concrete allegations suggesting that defendants knew, let alone when they knew, that the [FDA] would request additional information about [its] manufacturer, or that defendants actually disbelieved their own estimates as to [the drug's] commercialization date." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 761 (S.D.N.Y. 2018); *see also Discovery Labs.*, 2007 WL 789432, at *6 (similar).

None of the three former Avista/Cambrex are alleged to have worked with or been employed by Fennec or its finished product manufacturer. None are alleged to have ever interacted or communicated with the Individual Defendants, making it impossible from them to allege anything about their state of mind at any time, let alone when the challenged statements were made. *See In re Conventry Healthcare, Inc. Sec. Litig.*, No. 08:09-CV-2337-AW, 2011 WL 1230998, at *6 (D. Md. Mar. 30, 2011) ("defies logic" that individuals with no direct contact with defendants "knew what [they] knew or recklessly disregarded"). Without a single conversation, email, letter, memorandum or other document contradicting any statement made by Defendants, Plaintiff faces the "difficult task" of pleading a "cogent inference of scienter through indirect and circumstantial allegations." *Cozzarelli*, 549 F.3d at 626; *see also Maguire Fin. LP v. Powersecure Int'l, Inc.*, 876 F.3d 541, 549 (4th Cir. 2017) (lack of allegations connecting defendant to knowledge of falsity a "serious deficiency").

24

**B.      Allegations of Negligence Do Not Support a Strong Inference of Scienter**

Plaintiff suggests that Fennec did not conduct "adequate due diligence" into its commercial launch, ¶129, failed to perform a "deep-dive quality audit" of its third-party product manufacturer, ¶¶93, 97, ignored "red flags," ¶114, and generally failed to "ensure that Fennec's product manufacturer met cGMP standards prior to the PAI." ¶99.  But even if one credits this unsupported speculation, what Plaintiff alleges at best is negligence, not fraud.  *See Merck & Co. v. Reynolds*, 559 U.S. 633, 649 (2010) (heightened standards not satisfied where inference is defendant acted "innocently or negligently"); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479-80 (1977) (Section 10(b) does not reach "internal corporate mismanagement").   Indeed, in *In re Discovery Labs. Sec. Litig*., 2006 WL 3227767, at *9, a case with striking resemblance to this one, the court found allegations that defendants "had a duty to engage in due diligence," which would have allegedly uncovered prior Form 483s issued to the company's third-party drug manufacturer, insufficient to plead fraud.  *Id*.; *see also Acito v. IMCERA Grp., Inc*., 47 F.3d 47, 53 (2d Cir. 1995) (prior inspection issues did not equate to "foregone conclusion" of future inspection failure); *Hirtenstein v. Cempra, Inc*., 348 F. Supp. 3d 530, 562 (M.D.N.C. 2018) (more plausible inference was defendants acted "innocently or negligently"), *aff'd*, 816 F. App'x 747 (4th Cir. 2020).

**C.      Fraud by Hindsight Does Not Support a Strong Inference of Scienter**

Plaintiff claims that because the FDA issued a Form 483 to its outside finished product manufacturer and a CRL to Fennec, Fennec executives must have known about the

underlying problems earlier than they claimed and should have disclosed them earlier than they did. Such fraud by hindsight allegations do not support a strong inference of scienter. *See Hillson Partners Ltd. P'ship v. Adage, Inc*, 42 F.3d 204, 209 (4th Cir. 1994) (rejecting fraud by hindsight allegations); *First Union*, 128 F. Supp. 2d at 896 (same).

### D.    Lack of Motive Undermines An Inference of Scienter

Motive is relevant to the scienter inquiry, as is the "lack thereof." *Tellabs*, 551 U.S. at 325; *see also Ottmann,* 353 F.3d at 352 (similar). Here, the Complaint is devoid of a single allegation suggesting the Individual Defendants made suspicious stock sales or otherwise stood to benefit from this alleged "fraud." The Complaint devotes one paragraph to the notion that Raykov and Andrade committed fraud to secure an additional $40,000 to $50,000 in annual salary, ¶88, but the Fourth Circuit has dismissed such arguments: "[T]he motivations to ... increase one's own compensation … add little to an inference of fraud." *Cozzarelli*, 549 F.3d at 628. Nor does Plaintiff allege corporate motive. The Complaint alleges Fennec "[c]onveniently" secured a $12.5 million debt facility before announcing the manufacturing site change, ¶87, but this generic motive does not support scienter, *see Cozzarelli*, 549 F.3d at 628, and Plaintiff ignores that the debt facility was funded only "upon NDA approval," ¶87, meaning that Fennec could not unlock the benefit without first getting PEDMARK™ approved.

### E.    The Non-Culpable Inference Is More Compelling

When evaluating scienter, this Court must assess "all" allegations "holistically," including non-culpable ones, *Tellabs*, 551 U.S. at 326, and all through the lens of "context

26

and common sense," *Yates*, 744 F.3d at 885 (citation omitted).  Plaintiff alleges that Fennec should have done better due diligence into its finished product manufacturer and claims in hindsight that if it had, it would have discovered that the manufacturer was destined to "fail" an FDA inspection in July/August 2020.  But Plaintiff fails to show when the adverse FDA inspection with the drug product manufacturer occurred, when the FDA issued its Form 483 inspection observations, or how such observations would have been known by Defendants beforehand.

The more compelling inference is that Defendants did not know and could not predict that Fennec's third-party drug product manufacturer would fail the inspection until it did in July/August 2020, and that Defendants' projections about targeted approval and commercial launch time frames were both honest and accurate when made.  Indeed, the more compelling inference is that Defendants accurately disclosed the risks associated with PEDMARK™ through the class period, including those associated with its NDA and commercial manufacture, and promptly informed investors when its approval and launch targets were delayed and when it received a Form 483 and CRL from the FDA.

## IV.  PLAINTIFF FAILS TO STATE A CLAIM AGAINST ANY DIRECTOR

It bears special mention that the allegations against the Directors, ¶¶20-30, 115-16, 130-31, border on the frivolous.  Primary liability for violations of Section 10(b) extends only to the "makers" of the statements, *i.e.*, the persons with "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  If a defendant did not

27

utter or sign the statement, the defendant is not its "maker." *See id.*; *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 425 (7th Cir. 2015) (following *Janus*; insiders could not be "makers" merely because they "approved, or furnished information" for statement).

Here, Plaintiff does not allege that the Directors authored, reviewed, approved or participated in drafting the press releases that contain 16 of the 20 misstatements alleged in the Complaint. The Directors, therefore, are not alleged to be the "makers" of these statements and cannot be liable for them. While the Directors signed the two 10-Ks that contain the other four alleged misstatements (through appointment of Raykov as their agent), ¶¶115-16, 130-31 (Statements 4, 5, 13, 14), they are nothing more than non-misleading risk factors. *See supra* Section II(A)(4). Even if they were misleading, Plaintiff alleges nothing about what the Directors knew at any point during the class period, precluding a strong inference of their scienter.

## V. PLAINTIFF'S SECTION 20(A) CLAIM SHOULD BE DISMISSED

Plaintiff contends that the Individual Defendants are liable under Section 20(a) of the Exchange Act, ¶¶28, 175-179. Since Plaintiff does not adequately allege an underlying primary violation and a control person claim is "derivative" of an underlying violation, the Section 20(a) should be dismissed. *Cozzarelli*, 549 F.3d at 628; *see* 15 U.S.C. § 78t(a).

### CONCLUSION

The Complaint fails to state a claim under the heightened pleading requirements of the PSLRA and Rule 9(b) and should be dismissed with prejudice.

Respectfully submitted this 3rd day of March 2021.

**WYRICK ROBBINS YATES & PONTON LLP**

By:  /s/ Lee M. Whitman
 Lee M. Whitman (N.C. Bar No. 20193)
 Samuel A. Slater (N.C. Bar No. 43212)
 lwhitman@wyrick.com
 sslater@wyrick.com
 4101 Lake Boone Trail, Suite 300
 Raleigh, North Carolina 27607
 Telephone:  (919) 781-4000
 Facsimile:   (919) 781-4865

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

By:  /s/ Gregory L. Watts
 Gregory L. Watts (WA Bar No. 43995)
 John C. Roberts Jr. (WA Bar No. 44945)
 Tyre L. Tindall (WA Bar No. 56357)
 gwatts@wsgr.com
 jroberts@wsgr.com
 ttindall@wsgr.com
 701 Fifth Avenue, Suite 5100
 Seattle, Washington 98104
 Telephone: (206) 883-2500
 Facsimile:  (206) 883-2699

 *Attorneys for Defendants Fennec*
 *Pharmaceuticals Inc., Rostislav Raykov,*
 *Robert Andrade, Chris A. Rallis, Marco*
 *Brughera, Adrian J. Haigh, Khalid Islam,*
 *and Jodi Cook*

29

# APPENDIX

## CHART OF ALLEGEDLY FALSE AND MISLEADING STATEMENTS FROM CONSOLIDATED AMENDED COMPLAINT

| No. | Para. | Source | Date | Alleged False Statement | Reason for Dismissal[5] |
|---|---|---|---|---|---|
| 1. | ¶111 | Press Release | 12/20/18 | *"The Company is targeting U.S. approval of PEDMARK™ in the second half of 2019."* | SH, NF, NAO, NS |
| 2. | ¶113 | Press Release | 3/13/19 | "The *new facility ... has large scale commercial capabilities and a proven and extensive track record of successful FDA inspections and product launches."* | NF, NAO, NS |
| 3. | ¶113 | Press Release | 3/13/19 | *"Fennec expects a first commercial launch for PEDMARK in the second half of 2020."* | SH, NF, NAO, NS |
| 4. | ¶115 | 2018 10-K | 3/15/19 | *"If we fail to comply with any of the FDA's continuing regulations, we could be subject to reputational harm and sanctions, including … delays, warning letters and fines ..."* | RSK, NF, NAO, NS |
| 5. | ¶116 | 2018 10-K | 3/15/19 | *"the FDA or comparable foreign regulatory authorities may find inadequate the manufacturing processes or facilities of third-party manufacturers with which we contract for clinical and commercial supplies."* | RSK, NF, NAO, NS |
| 6. | ¶118 | 2018 10-K | 3/15/19 | "this Annual Report does not *… omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading ..."* | NF, NAO, NS |

[5] SH means protected by safe harbor; NF means not false; PUFF means puffery; NAO means no actionable omission; RSK means non-actionable risk factor; and NS means no scienter.

A-1

| | | | | | |
|---|---|---|---|---|---|
| 7. | ¶120 | Press Release | 5/9/19 | "[w]e were very pleased with **the production transition of PEDMARK™ API to the new commercial drug substance manufacturing site during the first quarter.**" | NF, NAO, PUFF, NS |
| 8. | ¶122 | Press Release | 8/9/19 | "[d]uring the quarter, *we* are pleased to have *successfully manufactured PEDMARK and are working closely with the FDA on our rolling NDA submission.*" | NF, NAO, NS |
| 9. | ¶122 | Press Release | 8/9/19 | "*we plan to launch PEDMARK in the second half of 2020.*" | SH, NF, NAO, NS |
| 10. | ¶124 | Press Release | 11/12/19 | "*we are focused on building the necessary* team and *infrastructure to support a rapid commercial launch of PEDMARK.*" | NF, NAO, PUFF, NS |
| 11. | ¶126 | Press Release | 2/11/20 | "*[w]e are well underway with commercialization readiness activities to support the potential launch of PEDMARK and our transition to becoming a commercial-stage organization.*" | NF, NAO, PUFF, NS |
| 12. | ¶128 | Press Release | 2/14/20 | "*[d]uring the year, we also made solid progress in preparing for the potential launch of PEDMARK including* the hiring of a chief commercial officer and *the preparation and execution of our commercial readiness plan.*" | NF, NAO, PUFF, NS |
| 13. | ¶130 | 2019 10-K | 2/14/20 | "*If we fail to comply with any of the FDA's continuing regulations, we could be subject to reputational harm and sanctions, including … delays, warning letters and fines ...*" | RSK, NF, NAO, NS |

A-2

| 14. | ¶131 | 2019 10-K | 2/14/20 | *"the FDA or comparable foreign regulatory authorities may find inadequate the manufacturing processes or facilities of third-party manufacturers with which we contract for clinical and commercial supplies."* | RSK, NF, NAO, NS |
|---|---|---|---|---|---|
| 15. | ¶133 | 2019 10-K | 2/14/20 | "this Annual Report does not … *omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading ...*" | NF, NAO, NS |
| 16. | ¶135 | Press Release | 4/13/20 | "[t]he *FDA filing acceptance of our NDA and granting of Priority Review represents a significant milestone in the development of PEDMARK …*" | NF, NAO, NS, PUFF |
| 17. | ¶137 | Press Release | 5/14/20 | *"we continue to make progress on our commercial readiness plan in preparation for the potential launch of PEDMARK, if approved, in the second half of 2020."* | SH, NF, NAO, PUFF, NS |
| 18. | ¶139 | Press Release | 8/5/20 | *"[w]e continue to work with the FDA as a part of their review process in advance of the pending PEDMARK™ PDUFA date of August 10."* | NF, NAO, NS, PUFF |
| 19. | ¶139 | Press Release | 8/5/20 | *"[o]ur organization and commercial team have been  actively preparing for launch readiness"* | NF, NAO, PUFF, NS |
| 20. | ¶139 | Press Release | 8/5/20 | *"we are well positioned to commercialize PEDMARK, if approved, during the third quarter of 2020."* | SH, NF, NAO, NS |

A-3

**CERTIFICATE OF COMPLIANCE**

Defendants, by and through undersigned counsel, certify that this Memorandum of Law complies with the word-count limit in LR 7.3(d)(1), as modified by the Court's February 23, 2021 Order enlarging the limit to 8,000 words. The word count of the Memorandum, including the Appendix, is 7,993 words.

This the 3rd day of March 2021.

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

/s/ Gregory L. Watts
Gregory L. Watts (WA Bar No. 43995)
gwatts@wsgr.com
701 Fifth Avenue, Suite 5100
Seattle, Washington 98104
Telephone: (206) 883-2500
Facsimile: (206) 883-2699

*Attorney for Defendants Fennec*
*Pharmaceuticals Inc., Rostislav Raykov,*
*Robert Andrade, Chris A. Rallis, Marco*
*Brughera, Adrian J. Haigh, Khalid Islam,*
*and Jodi Cook*

# CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on this day a copy of the foregoing document was filed with the Court's CM/ECF system which served the same on all counsel of record.

This the 3rd day of March 2021.

**WYRICK ROBBINS YATES & PONTON LLP**

By: /s/ Lee M. Whitman
Lee M. Whitman (N.C. Bar No. 20193)
lwhitman@wyrick.com
4101 Lake Boone Trail, Suite 300
Raleigh, North Carolina 27607
Telephone: (919) 781-4000
Facsimile: (919) 781-4865
