**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

|  |  |
|---|---|
| JIM CHAPMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br>      v.<br><br>FENNEC PHARMACEUTICALS INC., ROSTISLAV RAYKOV, ROBERT ANDRADE, CHRIS A. RALLIS, MARCO BRUGHERA, ADRIAN J. HAIGH, KHALID ISLAM, and JODI COOK,<br><br>                    Defendants. | Case No. 1:20-cv-00812-LCB-JLW<br><br>CLASS ACTION<br><br>Oral Argument Requested |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

I.   INTRODUCTION .................................................................................................1

II.  STATEMENT OF FACTS .....................................................................................3

III. RELEVANT LEGAL STANDARDS ....................................................................8

IV. ARGUMENT ........................................................................................................9

    A.   Plaintiff Adequately Alleges Falsity..........................................................9

        1. Defendants made actionable misrepresentations. ......................................10

        2. Defendants' challenges to materiality fail. ...............................................13

        3. Defendants' factual disputes do not negate Plaintiff's falsity allegations....14

        4. The safe harbor does not shield Defendants from liability...........................17

    B.   Plaintiff Adequately Alleges Scienter.......................................................21

        1. Plaintiff sufficiently alleges Defendants' state of mind. ..............................25

        2. CWs bolster scienter....................................................................................26

        3. Plaintiff alleges far more than negligence. .................................................27

        4. Plaintiff does not allege fraud by hindsight.................................................28

        5. Though not required, Plaintiff alleges motive. .............................................29

        6. Fennec is liable under the corporate scienter doctrine.................................29

V.  CONCLUSION.....................................................................................................30

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) .......................................................................................28

*Alberici v. Recro Pharma, Inc.*,
  2021 WL 798299 (E.D. Pa. Mar. 1, 2021) ............................................................18

*Bateman Litwin N.V. v. Swain*,
  2008 WL 11378796 (E.D. Va. June 5, 2008) ..........................................................9

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
  2020 WL 6270482 (E.D. Va. Oct. 26, 2020)..........................................................29

*Carlucci v. Han*,
  907 F. Supp. 2d 709 (E.D. Va. 2012).......................................................................9

*City of Ann Arbor Emples. Ret. Sys. v. Sonoco Prods. Co.*,
  827 F. Supp. 2d 559 (D.S.C. 2011).........................................................................10

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020) ....................................................................27

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016) ..................................................................passim

*Epstein v. World Acceptance*,
  2015 WL 2365701 (D.S.C. May 18, 2015) .............................................................19

*Freedman v. St. Jude Med., Inc.*,
  4 F. Supp. 3d 1101 (D. Minn. 2014).........................................................12, 16, 28

*Hirtenstein v. Cempra, Inc.*,
  348 F. Supp. 3d 530 (M.D.N.C. 2018) ...................................................................28

*In re Able Labs. Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008) .............................................................23

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ....................................................................26

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
  738 F. Supp. 2d 614 (D. Md. 2010).........................................................................19

*In re Datastream Sys., Inc. Sec. Litig.*,
2000 WL 33176025 (D.S.C. Jan. 27, 2000) ....................................................13

*In re Discovery Labs. Sec. Litig.*,
2006 WL 3227767 (E.D. Pa. March 15, 2007)................................................28

*In re Dura Pharm., Inc. Sec. Litig.*,
548 F. Supp. 2d 1126 (S.D. Cal. 2008) ........................................................20

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ...............................................17, 21, 23

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015).........................................................................19

*In re Salix Pharm., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ...............................................18

*In re SCANA Corp. Sec. Litig.*,
2019 WL 1427443 (D.S.C. Mar. 29, 2019).........................................18, 20, 23

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011).............................................................9

*In re Under Armour Sec. Litig.*,
342 F. Supp. 3d 658 (D. Md. 2018).............................................................26

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
2016 WL 3981236 (D.S.C. July 25, 2016) ...............................11, 14, 21, 24

*Kiken v. Lumber Liquidators Holdings, Inc.*,
155 F. Supp. 3d 593 (E.D. Va. 2015) .......................................................9, 15

*Klein v. Altria Group, Inc.*,
2021 WL 955992 (E.D. Va. Mar. 12, 2021).............................................12, 16

*Knurr v. Orbital ATK Inc.*,
294 F. Supp. 3d 498 (E.D. Va. 2018). ..........................................................30

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ..............................................................................9, 11, 21

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014)...............................................16, 25, 28

*Odeh v. Immunomedics, Inc.*,
2020 WL 4381924 (D.N.J. 2020) ...........................................................16, 28

*Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.,*
2020 WL 3268531 (S.D.N.Y. June 17, 2020) ......................................................16, 28

*Ollila v. Babcock & Wilson Enters.,*
2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ...........................................................passim

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
135 S. Ct. 1318 (2015).........................................................................................14

*Patriot Expl., LLC v. SandRidge Energy, Inc.,*
951 F. Supp. 2d 331 (D. Conn. 2013) ..................................................................17

*Phillips v. LCI Int'l, Inc.,*
190 F.3d 609 (4th Cir. 1999).................................................................................10

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.,*
2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ..........................................................13

*Pub. Pension Fund Group v. KV Pharm. Co.,*
679 F.3d 972 (8th Cir. 2012) ...........................................................................16, 28

*Roofer's Pension Fund v. Papa,*
2018 WL 3601229 (D.N.J. July 27, 2018)............................................................18

*Singer v. Reali,*
883 F.3d 425 (4th Cir. 2018) ....................................................................11, 13, 15

*Siracusano v. Matrixx Initiatives, Inc.,*
585 F.3d 1167 (9th Cir. 2009) aff'd, 563 U.S. 27 (2011) ....................................14

*Teachers' Ret. Sys. of La. v. Hunter,*
477 F.3d 162 (4th Cir. 2007). .................................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007) ....................................................................15, 21, 22, 29

*Todd v. STAAR Surgical Co.,*
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ....................................................16, 28

*Turka v. S.C. Pub. Serv. Auth.,*
2020 WL 901965 (D.S.C. Feb. 25, 2020)........................................................14, 18, 25

*Vaitkuviene v. Syneos Health, Inc.,*
2020 WL 5742714 (E.D.N.C. Aug. 7, 2020).........................................................3, 17

*Yates v. Mun. Mortg. & Equity, LLC,*
744 F.3d 874 (4th Cir. 2014) ................................................................................16

*Zak v. Chelsea Therapeutics Intern., Ltd.*,
  780 F.3d 597 (4th Cir. 2015) ....................................................................................passim

**Other Authorities**

15 U.S.C. §78u–4(b)(1) ...................................................................................................9

15 U.S.C. §78u-5I(1)(A)(i)............................................................................................19

# I. INTRODUCTION

Defendants[1] have been pursuing the laudable goal of obtaining FDA approval for and commercializing PEDMARK, a drug designed to prevent hearing loss induced by chemotherapy in children. But they have done so in the wrong way. Instead of providing timely and accurate disclosures to investors, Defendants concealed and obfuscated material facts about Fennec's progress with PEDMARK.

In December 2018, Defendants announced an anticipated launch of PEDMARK in the second half of 2019. But they concealed that the current substance manufacturer of PEDMARK lacked the capacity to manufacture PEDMARK for commercial use. Unknown to investors, it was inevitable that Fennec needed to change manufacturing sites and spend time amassing FDA-required stability data. Consequently, Defendants' stated timeline for FDA approval was untenable.

Then, in March 2019, Defendants disclosed a manufacturing delay resulting from a facility change—as if it was new and unexpected—pushing PEDMARK's anticipated launch date to the second half of 2020. This disclosure stunned investors, driving Fennec's stock price down 14%.

Defendants continued touting the successful manufacture of PEDMARK and highlighting Fennec's purported progress towards FDA approval and commercialization,

---

[1] Unless otherwise noted, all emphasis is added, and internal citations are omitted. Capitalized terms used, but not defined, have the meanings ascribed in the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 30) ("Complaint").

while concealing the name and poor track record of PEDMARK's product manufacturer. Unbeknownst to investors, this manufacturer had received at least 17 notices from the FDA about substantial manufacturing deficiencies (*i.e.*, Form 483s). Even when this manufacturer received yet another Form 483 outlining multiple ongoing deficiencies as of July 10, 2020, Defendants concealed this fact, instead informing investors that "[o]ur organization and commercial team have been actively preparing for launch readiness, and, as we await the FDA's decision, we believe that we are well positioned to commercialize PEDMARK, if approved, during the third quarter of 2020" (¶139).

Then, on August 10, 2020, the FDA declined to approve PEDMARK, citing manufacturing deficiencies and requiring Fennec to resubmit its New Drug Application ("NDA") for any chance of future approval. On this news, Fennec's stock dropped 44%.

Defendants' misrepresentations and omissions have not helped anyone—not Fennec's investors funding its efforts and certainly not the children awaiting PEDMARK's approval. Fennec is still trading well below its Class Period high and has not yet resubmitted the NDA for PEDMARK.

Lead Plaintiff Daniel Malakoti ("Plaintiff") and a putative class of investors now seek relief for Defendants' misconduct. In response, Defendants claim they had no duty to disclose, are immunized from liability, and did not act knowingly or recklessly. As explained below, each argument ignores applicable legal standards and Plaintiff's well-pled allegations. Accordingly, Defendants' Motion to Dismiss Consolidated Amended Complaint (ECF No. 40-41) ("Motion" or "Mot") should be denied in full.

## II. STATEMENT OF FACTS[2]

In October 2017, Fennec, a biopharmaceutical company focused primarily on developing PEDMARK since 2002, announced positive efficacy data and its plan to submit an NDA for FDA approval. ¶¶62-63, 68. In March 2018, the FDA granted PEDMARK Breakthrough Therapy and Fast Track designations, meaning Fennec would work closely with the FDA, submit its NDA on a rolling basis, and obtain priority review. ¶69.

To obtain FDA approval, Fennec had to demonstrate that its manufacturers possess the necessary facilities, equipment, and ability to manufacture PEDMARK safely and effectively for widespread distribution, and otherwise comply with the FDA's current Good Manufacturing Practice (cGMP) regulations. ¶¶36-44, 46, 48, 53-59, 90-94. To that end, Fennec had to provide the FDA sufficient information to determine "[w]hether the methods used in manufacturing [PEDMARK] and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity." ¶53. That analysis requires "long-term manufacturing stability data (up to 6 months)." ¶83.

In addition, as part of its review, the FDA conducts a pre-approval inspection ("PAI") of Fennec's manufacturers to, *inter alia*:

(i) determine if they have a quality system designed to achieve sufficient control over the facility and commercial manufacturing operations; and

---

[2] Defendants fail to establish a sufficient basis—under the incorporation by reference or judicial notice doctrines—for the Court to consider any specific facts in 100+ pages of extraneous exhibits (ECF No. 44). *See Vaitkuviene v. Syneos Health, Inc.*, 2020 WL 5742714, at *6 (E.D.N.C. Aug. 7, 2020) (collecting cases); *see also Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (holding that district court erred by considering extraneous documents and failing to "consider[] the information in the light most favorable to the plaintiffs").

(ii) verify that the formulation, manufacturing or processing methods, and analytical (or examination) methods, are consistent with descriptions in Fennec's NDA.

¶56. At a PAI's conclusion, any reportable inspection observations—including missing or unreliable data or other non-conformance with cGMP—are recorded in a Form 483 issued to the facility. ¶¶57-59.

On December 20, 2018, Fennec announced that, following a pre-submission meeting with the FDA, the Company had begun its rolling NDA submission for PEDMARK. ¶¶4, 70, 78, 111. Defendants also represented that Fennec targeted FDA approval for the second half of 2019. *Id*. By providing that target, Defendants conveyed to investors that the facts—as known to Defendants at the time—supported Fennec's ability to, within one year, demonstrate required stability data, pass a PAI, and otherwise establish that its manufacturers were equipped to produce PEDMARK on a commercial scale pursuant to cGMP. ¶¶36-44, 47-48, 53-56. Because Defendants declined to identify Fennec's manufacturers, investors lacked details about the manufacturers' capacity for commercialization or cGMP compliance, other than Defendants' representation that everything was in order for FDA approval within one year. ¶¶7, 79-84. In response to Defendants' representation, Fennec's stock price increased by nearly 20%. ¶111.

**But, as later revealed, Defendants' representation was materially misleading. They had omitted material manufacturing information that patently undermined Fennec's ability to submit an NDA and obtain FDA approval within one year**.

First, to manufacture PEDMARK's drug substance (*i.e.*, APIs), Fennec had retained

Avista.[3] ¶79. However, as of December 20, 2018, Avista lacked a facility capable of large-scale commercial manufacturing. ¶¶82-84. Fennec, in turn, could not provide the FDA-required long-term manufacturing stability data. *Id.* Worse yet, Avista was being acquired by Cambrex, announced in November 2018 and completed in January 2019. ¶84. Fennec, therefore, faced unavoidable delays vis-à-vis onboarding Cambrex and amassing data from a manufacturing site with sufficient commercial capabilities. *Id*. Despite knowing those facts, Defendants conveyed to investors on December 20, 2018, that Fennec was positioned to obtain approval for PEDMARK within 2019—an impossible timeline given Fennec's lack of long-term stability data. ¶¶36-44, 83.

Defendants concealed those material facts until March 13, 2019, when they stunned investors by announcing a substantial delay to PEDMARK's NDA and approval process:

> [T]he drug substance manufacturer for PEDMARK™ was recently acquired requiring a site transition for the commercial manufacturing site.
> *     *     *
> As such, full submission is targeted for late 2019 to early 2020. If approved, Fennec expects a first commercial launch for PEDMARK™ in the second half of 2020.

¶¶6, 85-86, 113. In response to this news, Fennec's stock price fell over 14%. ¶¶144-145.

Furthermore, the disclosure itself was misleading. Defendants portrayed the site transition as unknown and unexpected. Since before December 20, 2018, however, Defendants had known that Cambrex was acquiring Avista and that Avista lacked the capability to commercially manufacture PEDMARK's substance. ¶¶82-84.

---

[3] To date, Defendants have still not identified Fennec's manufacturers. However, Plaintiff's investigation has confirmed Avista as PEDMARK's substance manufacturer. *See* Complaint, n. 27.

Nonetheless, Defendants reassured investors that Fennec had addressed the manufacturing issues which had delayed NDA submission and FDA approval of PEDMARK. In that March 2019 announcement, Defendants represented that "the new facility of the acquiring company has large scale commercial capabilities and a proven and extensive track record of successful FDA inspections and product launches." ¶¶6, 85, 113.

Defendants subsequently continued publicizing Fennec's progress towards FDA approval, only communicating positive news about PEDMARK's manufacturing and commercialization. *See, e.g.*, ¶120 ("pleased with the production transition . . . to the new commercial drug substance manufacturing site"); ¶122 ("pleased to have successfully manufactured PEDMARK"); ¶124 ("building the necessary team and infrastructure to support a rapid commercial launch"); ¶126 ("well underway with commercialization readiness activities"; ¶137 ("continue to make progress on our commercial readiness plan"; ¶139 ("well positioned to commercialize PEDMARK"). By reiterating Fennec's commercialization progress on the new timeline—while remaining silent about manufacturing deficiencies—Defendants conveyed that manufacturing was no longer an issue or risk to FDA approval. *See* ¶¶89, 96, 122, 124, 126, 137, 139.

In reality, Defendants knew, but did not disclose to investors, that Fennec's product manufacturer had a history of significant known deficiencies, rendering FDA approval unlikely and the timeline untenable. ¶¶103-106. From 2009-2018, PEDMARK's product

manufacturer, Pharmaceuticals International, Inc. ("PII"), received at least 17 Form 483s.[4]

¶104. After a July 6-10, 2020 inspection—precisely when PII and Fennec were supposedly demonstrating cGMP compliance for PEDMARK—PII received yet another Form 483 which identified, *inter alia*, a failure to properly test components, unsuitable building construction, improper maintenance of equipment and utensils, the absence of procedures to prevent microbiological contamination of drug products, and inadequate controls over micro-organisms. *Id.*

As Defendants repeatedly touted Fennec's progress towards FDA approval prior to PII's July 2020 Form 483, they knew or recklessly disregarded the serious manufacturing flaws plaguing PII and risking PEDMARK's approval. ¶¶104-106, 122, 124, 126, 137. After that Form 483, Defendants knew that the NDA for PEDMARK faced imminent FDA scrutiny and approval was in serious jeopardy. ¶¶90-94, 137. Yet, on August 5, 2020, Defendants continued to conceal PII's name and to reiterate Fennec's purported progress towards approval without disclosing any problems to investors. ¶¶7-8, 139.

Defendants finally revealed those troubles on August 11, 2020, when disclosing receipt of a CRL from the FDA on August 10, 2020, denying approval of PEDMARK. ¶¶9, 100. While still concealing the manufacturer's identity and relevant dates, Defendants stated that, "after recent completion of a pre-approval inspection of the manufacturing facility of our drug product manufacturer, the FDA identified deficiencies resulting in a

---

[4] As of the filing date of the Complaint, Plaintiff's ongoing investigation had revealed two possible manufacturers which were pled in the alternative: PII and Bayer AG. Based on evidence uncovered since then, Plaintiff now alleges only PII.

Form 483, which is a list of conditions or practices that are required to be resolved prior to the approval of PEDMARK™." *Id.*

Given Defendants' history—*i.e.*, extending the timeframe due to an earlier manufacturing issue and then consistently portraying a smooth process—investors were shocked by Fennec's unexpected revelation about additional manufacturing problems. *See* ¶146 (PropThink: "This is the second time that manufacturing issues have pushed back potential approval."); ¶150 (Seeking Alpha: "The issues identified by the FDA . . . were related to the manufacturing facility for the drug, which is concerning. . . .What's more, there's been little to no transparency from management on resolving this issue to date."). Consequently, Fennec's stock price plummeted over 44%. ¶148. As of the Complaint filed on February 1, 2021, Fennec still had not resubmitted an NDA for PEDMARK. ¶152.

Throughout the Class Period, Defendants misrepresented and omitted material information they had a duty to disclose to investors. ¶¶111-140. Based on that conduct, Plaintiff alleges Defendants violated §§10(b) and 20(a) of the Exchange Act.

### III.  RELEVANT LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ollila v. Babcock & Wilson Enters.*, 2018 WL 792069, at *1 (W.D.N.C. Feb. 8, 2018). "In considering the motion, a court accepts all of a plaintiff's well-pled allegations as true and liberally construes all reasonable inferences in the plaintiff's favor." *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 662 (D.S.C. 2016).

To establish §10(b) liability, "plaintiff must allege: (1) a material misrepresentation

8

(or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance...; (5) economic loss; and (6) loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss." *Id*. The Court must also consider Rule 9(b) and the PSLRA's heightened pleading standards. *See Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 170-72 (4th Cir. 2007). "But the heightened pleadings standards do not, of course, amount to any obligation on securities fraud plaintiffs of 'ultimately prov[ing] their allegations,' as that 'is an altogether different question.'" *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 886 (D. Minn. 2011) (alteration in original) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 50 (2011)).

## IV.    ARGUMENT

### A.    Plaintiff Adequately Alleges Falsity.

"The PLSRA requires a plaintiff to specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 600-01 (E.D. Va. 2015) (quoting 15 U.S.C. §78u–4(b)(1)). In other words, "the complaint must contain the who, what, when, where, and how of the allegedly false statement." *Bateman Litwin N.V. v. Swain*, 2008 WL 11378796, at *3 (E.D. Va. June 5, 2008).

But Plaintiff need not "prove absolute, incontrovertible falsity at the motion to dismiss stage." *Carlucci v. Han*, 907 F. Supp. 2d 709, 727 (E.D. Va. 2012). Plaintiff must "simply allege '**sufficient facts** to support a reasonable belief in the allegation that the defendant's statement was misleading.'" *Epstein*, 203 F. Supp. 3d at 666.

The Complaint meets this standard, and Defendants' arguments to the contrary fail.

9

### 1. Defendants made actionable misrepresentations.

A statement is misleading when "a reasonable investor, exercising due care, would gather a false impression from [the] statement." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999). "[A] statement may be technically true, but in light of the circumstances under which it was made, the statement may be misleading." *City of Ann Arbor Emples. Ret. Sys. v. Sonoco Prods. Co.*, 827 F. Supp. 2d 559, 583 (D.S.C. 2011).

Defendants repeatedly conveyed false impressions regarding PEDMARK's status. At the beginning of the Class Period, Defendants falsely conveyed they had laid the foundation for FDA approval "in the second half of 2019" (¶111). In reality, FDA approval required a demonstration of commercial manufacturing capabilities, which Fennec lacked. ¶¶79-84. As a result, FDA approval on Defendants' stated timeline was extremely unlikely, if not impossible, and Defendants' representations to the contrary were materially misleading. *See* ¶112. Defendants subsequently blamed the first delay on the purportedly unexpected acquisition of Fennec's undisclosed substance manufacturer, Avista—concealing that the manufacturer was unable to produce PEDMARK on a large commercial scale. ¶¶6, 82-86, 113.

Defendants subsequently misrepresented that Fennec had overcome manufacturing shortfalls, secured facilities with appropriate commercial manufacturing capabilities, and established the foundation for FDA approval in 2020. ¶¶113, 122, 124, 126, 128, 137, 139. These representations contradicted facts known to Defendants. Every year from 2009 to 2018, the FDA had issued a Form 483 to PII, Fennec's product manufacturer, listing multiple deficiencies. ¶105. And in July 2020, the FDA issued yet another Form 483 to

10

PII, describing a host of problematic conditions and practices apparent during a routine inspection. ¶¶100, 104-105. Accordingly, while touting their creation of a commercialization infrastructure warranting FDA approval, Defendants possessed contradictory facts. Nothing more is required to establish falsity. *See, e.g.*, *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *5 (D.S.C. July 25, 2016) (finding falsity where "[t]he statements Individual Defendants made regarding 3D systems towards the end of the Class Period seem to paint a different picture" than earlier statements); *Ollila*, 2018 WL 792069, at *4 (finding falsity where "then-existing material facts . . . contradicted [defendants'] statements," including, for example, "that a 'strong backlog' was providing momentum and growth going forward" when "defendants were aware of significant, undisclosed problems and delays").

Moreover, Defendants omitted information they had a duty to disclose.

[D]isclosure of material information is required 'when necessary to make statements made, in the light of the circumstances under which they were made, not misleading.' Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.

*Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018). "In other words, 'companies can control what they have to disclose under [§10(b) and SEC Rule 10b-5] by controlling what they say to the market.'" *Id.* (quoting *Matrixx*, 563 U.S. at 44); *see also Zak*, 780 F.3d at 609 ("[W]hile [a company] and its corporate officers may have lacked an independent, affirmative duty to disclose [an] adverse FDA staff recommendation and the shortcomings of [the company]'s evidence of efficacy, []defendants' failure to do so must be viewed . . . in the context of the statements that they affirmatively elected to make.").

When repeatedly speaking about "manufacturing" and "commercialization" vis-à-vis Fennec's timeline for FDA approval of PEDMARK (*see* ¶¶111, 113, 122, 124, 126, 128, 137, 139), Defendants had a duty to disclose facts so as not to render those statements misleading. Defendants spoke about targeting FDA approval in the "second half of 2019" and, therefore, had a duty to disclose Fennec had not yet retained a substance manufacturer capable of commercially manufacturing PEDMARK—a prerequisite to FDA approval. ¶¶36-46, 80-82. And when Defendants subsequently touted Fennec's manufacturing infrastructure in place for FDA approval and commercial launch in the second half of 2020, they had a duty to disclose Fennec's product manufacturer had numerous ongoing deficiencies, as confirmed by consistent Form 483s. After PII received another Form 483 in July 2020, Defendants concealed the deficiencies listed therein and, instead, publicized their "continue[d] work with the FDA as a part of their review process" and "belie[f] that we are well positioned to commercialize PEDMARK, if approved, during the third quarter of 2020" (¶139). Defendants had a duty to disclose facts demonstrating that Fennec was not well-positioned to obtain FDA approval and commercialize PEDMARK, given its manufacturer's failure to meet FDA standards. ¶¶90-94, 104-105.

Those allegations demonstrate that Defendants concealed material information about what they chose to speak. *See Klein v. Altria Group, Inc.*, 2021 WL 955992, at *11 (E.D. Va. Mar. 12, 2021) ("[F]ailure to disclose negative information about the products at issue can create a misleading impression to investors about the success of the company."); *Freedman v. St. Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1114 (D. Minn. 2014) ("[W]here []Defendants chose to speak on the company's interactions with the FDA, they had a duty

not to make inaccurate, incomplete or misleading disclosures.").

### 2. Defendants' challenges to materiality fail.

Relying on out-of-context snippets, Defendants contend that their statements are puffery or too vague to be actionable. Mot. at 15-16, A-1-A-3. Not so.

Defendants' "puffery" argument is a challenge to the materiality of their misstatements and omissions. *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *2 (N.D. Ill. Feb. 12, 2018) ("Statements that are vague aspirations or unspecific puffery are not considered material."). "[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Singer*, 883 F.3d at 440. "[A] complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id*. Assessing "materiality is a mixed question of law and fact that generally should be presented to a jury." *In re Datastream Sys., Inc. Sec. Litig.*, 2000 WL 33176025, at *2 (D.S.C. Jan. 27, 2000).

Because materiality involves fact questions, resolving it at this stage is premature. Nonetheless, if the Court chooses to assess materiality, Plaintiff's allegations are sufficient. PEDMARK is Fennec's primary product, and FDA approval of its NDA is critical to its success. ¶¶3, 62, 98. Therefore, a reasonable investor would consider the status of PEDMARK's manufacturing—alone and as part of the NDA process—important, as

13

disclosing Defendants' ongoing manufacturing problems would have significantly altered the total mix of available information. *See, e.g.*, ¶150.

Because those issues were material to investors, moreover, Defendants' partial disclosures on March 13, 2019 and August 11, 2020 sent Fennec's stock plummeting 14% and 44%, respectively. ¶¶144-150. *See KBC*, 2016 WL 3981236 at *6 ("[T]he negative market reaction to the disclosures made by [Defendant] . . . supports the conclusion that these misrepresentations were material."). Thus, Plaintiff's allegations sufficiently establish materiality.[5]

### 3. Defendants' factual disputes do not negate Plaintiff's falsity allegations.

Defendants quibble about whether they omitted information from investors. Mot. at 19-23. Specifically, Defendants dispute the factual allegation that Fennec's substance manufacturer (Avista) could not commercially manufacture PEDMARK. Mot. at 19-21 ("[T]here is no reason to believe that Avista could not handle the required output"). Defendants further dispute the circumstances under which Fennec's product manufacturer

---

[5] To the extent Defendants claim any alleged misstatements were opinions, Defendants are still liable. Opinions are actionable where, as here, defendants omit "particular (and material) facts going to the basis for the opinion" or "material facts about the[ir] inquiry into or knowledge concerning a statement of opinion" rendering such statements misleading in context. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329, 1332 (2015); *see also Epstein*, 203 F. Supp. 3d at 667-68. Additionally, Defendants' argument that risk factors cannot be misleading (Mot. at 17-18) is wrong. *See Turka v. S.C. Pub. Serv. Auth.*, 2020 WL 901965, at *7 (D.S.C. Feb. 25, 2020) (finding falsity where defendants stated "generic risk factors" but project "was already actually at risk"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1171, 1181 (9th Cir. 2009) aff'd, 563 U.S. 27, 37 (2011) (finding "risk factors" misleading).

(PII) received a Form 483 and, relatedly, the relevance of a Form 483 in securities fraud cases. *Id*. at 21-23. These factual disputes cannot warrant dismissal.

**First**, the Court cannot resolve factual disputes at the pleading stage. On a "motion to dismiss a § 10(b) action, courts **must** . . . **accept all factual allegations in the complaint as true**." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007); *Singer*, 883 F.3d at 437 ("[W]e accept all factual allegations in the Complaint as true, . . . consider the Complaint in its entirety [and] draw all reasonable inferences in favor of [Plaintiff]."). Accordingly, "[P]laintiff is only required to 'allege facts and circumstances that, drawing reasonable inferences in their favor, would render their claims [of falsity] plausible' and [is] not required to prove the falsity of the alleged misrepresentations." *Lumber*, 155 F. Supp. 3d at 601.

Here, Plaintiff alleges that Avista was Fennec's undisclosed substance manufacturer and, as of December 20, 2018, was incapable of manufacturing PEDMARK's substance at the FDA-required commercial level. ¶¶5, 79-84. Plaintiff further alleges that PII was Fennec's undisclosed product manufacturer who suffered from a long history of receiving Form 483s and again received a Form 483 on July 10, 2020, listing an array of deficiencies that led to a CRL rather than FDA approval of PEDMARK. ¶¶9, 100, 104. Those facts, taken as true and with all reasonable inferences in Plaintiff's favor, render the falsity claims plausible.

**Second**, it is indisputable that, on August 11, 2020, Defendants **first disclosed** to investors that the FDA "had previously complet[ed] . . . a pre-approval inspection of the manufacturing facility of our drug product manufacturer" and "identified deficiencies

15

resulting in a Form 483." ¶¶9, 100; ECF No. 42-9. That disclosure, coupled with the resultant 44% stock drop, confirms investors previously lacked those vital facts.

Furthermore, courts nationwide have repeatedly acknowledged that misrepresentations or omissions vis-à-vis a Form 483 can give rise to falsity. *See Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.,* 2020 WL 3268531, at \*15 (S.D.N.Y. June 17, 2020) ("[F]ailing to disclose a recent Form 483 that lists numerous cGMP violations could render misleading a company's statements that it is presently substantially in compliance with cGMP")*; Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at \*7 (D.N.J. 2020) (finding falsity where "a reasonable shareholder could consider the omitted information about . . . the Form 483 to be important when making an investment decision"); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 961 (N.D. Cal. 2014) (finding falsity where complaint "alleges Defendants made broad statements regarding the FDA's purported approval of Impax's manufacturing" but "the 2012 Form 483 highlighted issues with the manufacturing"); *see also Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at \*10 (C.D. Cal. Apr. 12, 2016); *Freedman*, 4 F. Supp. 3d at 1114; *Pub. Pension Fund Group v. KV Pharm. Co.*, 679 F.3d 972, 983–84 (8th Cir. 2012).

**Third,** Defendants' challenges to information from Confidential Witnesses ("CWs") are inapposite. Defendants' cases considered CWs in the context of scienter, not falsity. *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 886 (4th Cir. 2014) ("We present the allegations of each of the [CWs] before assessing the strength of the scienter inferences they support."); *see also Klein*, 2021 WL 955992 at \*17 (assessing whether court "should discount allegations from [CWs], because anonymity can frustrate the court's

ability to compare the inferences" of scienter). Nonetheless, as discussed below, Plaintiff has provided adequate information regarding the CWs. *See* §B.2, *infra*.

Thus, Defendants' factual challenges fail. *See, e.g., Epstein*, 203 F. Supp. 3d at 669 ("Although Defendants deny Plaintiff's allegations and assert their own arguments to refute Plaintiff's position, the Court need not address these arguments when reviewing the pleadings on a motion to dismiss[.]").

### 4. The safe harbor does not shield Defendants from liability.

Tacitly conceding that the safe harbor does not apply to most of the alleged misstatements, Defendants argue that the safe harbor immunizes them for five statements. Mot. at 9-13; ¶¶111, 113, 122, 137, 139. But the safe harbor applies only if Defendants meet the burden to establish several substantive and procedural requirements. *See, e.g., Patriot Expl., LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 358 (D. Conn. 2013)

("[D]efendants . . . carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor."). For five primary reasons, Defendants have not met their burden to trigger the safe harbor.

**First**, applying "the safe-harbor provision often involves factual determinations inappropriate for resolution at the Rule 12(b)(6) stage." *Vaitkuviene*, 2020 WL 5742714 at *16 ("[T]he court cannot, at this stage of the litigation, determine whether the safe harbor applies"); *Ollila*, 2018 WL 792069, at *5 ("[A]dequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss."); *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 790 (E.D. Va. 2015) (same).

**Second**, even if the Court chooses to assess the issue at this stage, the safe harbor

does not apply to omissions of present facts. *See, e.g.*, *Alberici v. Recro Pharma, Inc.*, 2021 WL 798299, at *9 (E.D. Pa. Mar. 1, 2021) ("[F]orward-looking statement protection does not apply to statements challenged on the basis that they omitted present facts[.]"); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *7 (D.N.J. July 27, 2018) "([T]o the extent plaintiffs [] challenge defendants' alleged omission of present facts . . . PSLRA's safe harbor does not apply."); *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016) ("[S]afe harbor also does not protect material omissions.").

As stated above, Defendants omitted material facts. *See* §IV.A.2., *supra*. Consequently, the safe harbor cannot insulate Defendants.

**Third**, "the safe harbor does not protect representations of current or historical fact." *Ollila*, 2018 WL 792069, at *4-5. Accordingly, "[s]tatements that might arguably have some forward-looking aspects are unprotected by the PSLRA safe harbor provision to the extent that they are premised on representations of present fact." *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *7-8 (D.S.C. Mar. 29, 2019).

In addition to omitting material information, the five statements at issue misrepresented current or historical facts. Defendants stated that, as of specific dates, Fennec had manufacturers with "a proven and extensive track record of successful FDA inspections and product launches," had "successfully manufactured PEDMARK," had "made progress on [its] commercial readiness plan," and was "well positioned to commercialize PEDMARK." ¶¶113, 122, 137, 139. As of those dates, those representations were untrue, irrespective of any forward-looking statements mixed in. Thus, the safe harbor does not apply. *See Turka*, 2020 WL 901965 at *7 (not applying safe harbor where

"complaint alleges that the actual results of the . . . [p]roject did differ significantly from what the generic . . . [s]tatements represented").

**Fourth**, the safe harbor applies only if a "forward-looking statement . . . is accompanied by *meaningful cautionary statements* identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5I(1)(A)(i). "[D]ocuments must contain detailed and meaningful cautionary language *tailored to the specific risks* the company faces." *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 625 (D. Md. 2010). "Mere boilerplate – This is a forward-looking statement caveat emptor – does not meet the statutory standard because by its nature it is general and ubiquitous, not tailored to the specific circumstances of a business operation, and not of useful quality." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102-03 (D.C. Cir. 2015) (collecting cases). "[G]eneralized warnings that forward-looking statements are not guarantees of future performance . . . and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them" are insufficient. *Id.* Similarly, "cautionary language is meaningless if it warns only of risks which have already materialized." *Ollila*, 2018 WL 792069, at *5; *see also Epstein v. World Acceptance*, 2015 WL 2365701, at *6 (D.S.C. May 18, 2015) (safe harbor inapplicable if risk disclosures "purport to warn investors of risks concerning practices of which Defendants were already aware").

Defendants' cautionary language was consistently boilerplate, without substantive

updates, throughout the Class Period.[6] Defendants can only identify hollow, generic statements: Fennec might not "meet regulatory standards" or obtain "required regulatory clearances or approvals"; "[r]egulatory approval . . . is time-consuming, expensive and uncertain"; "manufacturing facilities must be approved by the FDA before they can be used"; and failure "to meet required manufacturing standards [] could result in delays[.]" Mot. at 11-12. No statement cautioned that Fennec's initial substance manufacturer had never commercially manufactured a drug like PEDMARK or that its product manufacturer had multiple deficiencies prompting annual Form 483 letters—including as recently as July 2020. Indeed, Defendants refused to identify Fennec's manufacturers, leaving investors unable to identify the materialized risks about which Defendants knew.[7] Thus, Defendants' cautionary language was not sufficiently "tailored to the specific risks" surrounding PEDMARK. *See SCANA*, 2019 WL 1427443 at *9 ("Plaintiffs plausibly allege cautionary language relied on by SCANA fails to convey any substantive warning to investors regarding the specific deficiencies facing the Project[.]").

---

[6] Defendants argue that "cautionary language need not be appended to the statement itself so long as the statement incorporates it by reference, typically by pointing to a recent SEC filing." Mot. at 11-12. However, "[w]here a press release 'refers to other factors presented in SEC filings that may threaten [a product's] ultimate success', the safe harbor provision does not apply because the corporation 'does not specify what these risk factors are, instead leaving investors to obtain these other documents and compare their contents' with the press release." *In re Dura Pharm., Inc. Sec. Litig.*, 548 F. Supp. 2d 1126, 1143-44 (S.D. Cal. 2008). Defendants' press releases did not point to specific risk factors tailored to the newly announced information. Instead, the press releases contained ambiguous and unchanging references to "other risks detailed from time to time in the Company's [SEC] filings." *See* Defs. Exs. 7–13.

[7] Plaintiff was only able to identify Fennec's manufacturers by utilizing Defendants' partial disclosures that one manufacturer had been acquired and the other had received a recent Form 483.

**Finally**, Defendants had actual knowledge of the shortcomings of Fennec's manufacturers and, therefore, cannot invoke safe harbor protection. *See Genworth*, 103 F. Supp. 3d at 790 ("If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading."); *see also* §IV.B., *infra*.

**B.      Plaintiff Adequately Alleges Scienter.**

The Complaint also pleads a strong inference of scienter. A "plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud" or "deliberate recklessness." *Matrixx*, 563 U.S. at 48. Recklessness is an act "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Zak*, 780 F.3d at 613; *Singer*, 883 F.3d at 443 (same).

Courts must accept as true, and "holistically" evaluate Plaintiffs' allegations to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322-23, 326 (emphasis in original). It is improper and unnecessary for the Court to consider allegations individually. *See, e.g., KBC*, 2016 WL 3981236 at *8 (all facts should be viewed holistically "instead of each piece being scrutinized in isolation").

The inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," *Matrixx*, 563 U.S. at 29, but "need not

be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. "[I]n evaluating these inferences, we . . . accord those allegations 'the inferential weight warranted by context and common sense.'" *Zak*, 780 F.3d at 606. Scienter is established at the pleading stage where "plaintiffs have sufficiently alleged that [defendants] had access to information on such issues" that were the subjects of the misrepresentations or omissions. *Ollila,* 2018 WL 792069, at *3.

The inference that Defendants acted recklessly (if not knowingly) is at least as strong as the inference that they innocently touted manufacturing and commercialization success while concealing manufacturing and commercialization problems. Defendants had one goal during the Class Period: obtain FDA approval of PEDMARK. ¶3. Defendants had extensive experience with the processes for FDA approval and new drug commercialization. ¶¶18-24. Therefore, they knew that FDA approval and the concomitant commercial launch depended on demonstrating Fennec's ability to commercially manufacture PEDMARK. *See* ¶¶83-84, 89-94. Consistent with those goals, Defendants identified, hired, communicated and organized with Fennec's manufacturers. ¶¶113, 120, 122, 124, 126, 139.

Assuming those facts are true—as the Court must—there is a cogent and compelling inference that Defendants knew or should have known that:

- as of December 20, 2018, Fennec's chosen substance manufacturer, Avista, could not commercially manufacture PEDMARK's drug substance;

- Fennec's chosen product manufacturer, PII, had numerous ongoing manufacturing deficiencies, including those documented by the FDA as recently as July 2020.

¶¶79-84, 104-105. Nonetheless, Defendants chose to tout Fennec's manufacturing and commercialization, while concealing those material complications. *See* ¶¶111-140; *see also* §§II, IV.A.1-2., *supra*.

Viewed holistically, those facts give rise to a strong inference of scienter. Defendants had access to, but failed to disclose, information that counteracted their public statements about PEDMARK. *See Zak,* 780 F.3d at 610 ("Chelsea's omission of the information regarding the adverse FDA staff recommendation, when viewed in the context of the known problems of the efficacy studies and Chelsea's earlier remarks regarding those studies, supports the inference that Chelsea intentionally or recklessly misled investors."); *Ollila*, 2018 WL 792069, at *2 (inferring scienter where "plaintiffs have sufficiently alleged that [defendants] had access to information on such issues" that were "the subjects of the misrepresentations or omissions"); *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *17 (D.N.J. Mar. 24, 2008) ("[T]hat [defendant] knew of the FDA warning letter, and failed to take any action to address the continuing compliance problems, combined with the compliance problems disclosed by the recalls, allows this Court to infer [defendant]'s recklessness."); *SCANA*, 2019 WL 1427443 at *11 (inferring scienter based on "allegations of contemporaneous presentations, reports, analyses, and correspondence that individually and collectively informed Defendants that their public statements concerning the status of the Project were materially false and misleading when made").

Furthermore, FDA approval of PEDMARK, including manufacturing and commercialization, was core to Fennec's business and Defendants' focus. *See Genworth*,

23

103 F. Supp. 3d at 784 (misrepresentations about one of the Company's "core sets of businesses" are "certainly relevant to the Court's holistic analysis" of scienter and that the Individual Defendants held senior executive positions "augments the other allegations of intimate involvement"); *KBC*, 2016 WL 3981236at *9 ("In addition to the inferences drawn from Individual Defendants' positions, the allegedly misrepresented issues all related to core operations, which by nature can contribute to a strong inference of scienter"). Taken as true and viewed holistically, those facts give rise to a strong inference that Defendants acted at least recklessly in concealing Fennec's manufacturing issues.

Despite those well-pleaded allegations, Defendants aver that "[t]he more compelling inference is that Defendants did not know and could not predict that Fennec's third-party drug product manufacturer would fail the inspection until it did in July/August 2020, and that Defendants' projections about targeted approval and commercial launch time frames were both honest and accurate when made." Mot. at 27. This argument effectively concedes that Defendants knew of the inspection and resulting Form 483 on July 10, 2020—which they concealed from investors until August 11, 2020. ¶104.

Moreover, Defendants' reference to their ability to "predict" is a mischaracterization of the Complaint and a red herring. The Complaint's crux is that Defendants concealed past and present manufacturing problems, while speaking about manufacturing and commercialization progress and success.

Additionally, the inference of innocence proposed by Defendants is uncompelling. Because PEDMARK's commercialization was Defendants' primary focus, they could not innocently remain unaware of glaring manufacturing problems inhibiting

commercialization. *See, e.g.*, *Impax*, 36 F. Supp. 3d at 970 ("[I]t is absurd to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions—the heart of a company whose main business is manufacturing pharmaceuticals for public consumption. The idea that the defendants here would be unaware of these manufacturing and quality control problems is even more unlikely given the repeated Form 483s and the Warning Letter from the FDA.").

Finally, seeking to contravene the requisite holistic analysis, Defendants compartmentalize each indication of scienter and then argue, one by one, that scienter requires more than that particular indication. That tactic is misplaced. The Court should consider the facts addressed above collectively, not in isolation. Nonetheless, Plaintiff addresses Defendants' discrete arguments.

### 1. Plaintiff sufficiently alleges Defendants' state of mind.

Defendants contend that Plaintiff's allegations do not sufficiently show the state of mind of any Individual Defendant and lack facts to "strongly imply Defendants' contemporaneous knowledge that the statement was false when made." Mot. at 23-24. This contention fails.

First, Defendants are wrong to the extent they suggest that knowledge is required. Recklessness suffices. *Turka*, 2020 WL 901965 at *7 ("[I]t remains sufficient for plaintiffs [to] plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.").

Next, as alleged, Defendants focused their entire efforts on obtaining FDA approval and commercializing PEDMARK, including the vital manufacturing process. ¶¶3, 6-7, 62-74, 85, 98, 113, 122, 124, 126, 128, 139. Those allegations establish Defendants' contemporaneous knowledge about their misstatements and omissions.

Finally, Defendants' cases are distinguishable. In *In re Under Armour Sec. Litig.*, plaintiffs alleged "[a]n undisclosed fundamental shift in Under Armour's business" with "declining" "customer demand" and "provide[d] no corroborating factual allegations to support the allegation that Exchange Act Defendants were in possession of conflicting facts" with their public statements. 342 F. Supp. 3d 658, 690-691 (D. Md. 2018). And in *In re Aratana Therapeutics Inc. Sec. Litig.*, defendants "notified investors" about potential delays from "a transfer of manufacturing" and "the company's statements satisfactorily armed investors with all the information necessary to evaluate the risks associated with the anticipated timeline." 315 F. Supp. 3d 737, 760 (S.D.N.Y. 2018).

Here, in contrast, Plaintiff alleges that Defendants possessed but concealed facts conflicting with or otherwise undermining their public statements. Namely, Avista could not commercially manufacture PEDMARK, and PII had ongoing serious manufacturing deficiencies at the time the FDA was scrutinizing Fennec's ability to manufacture PEDMARK pursuant to cGMP regulations. ¶¶79-84, 104-105. Those alleged facts show, at a minimum, Defendants' recklessness.

### 2. CWs bolster scienter.

Defendants suggest that the Court should discount information from CWs. Mot. at 19-21, 24. This argument is unpersuasive.

"Reliance on confidential sources in alleging these facts is permissible so long as the plaintiff describe[s] the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Epstein*, 203 F. Supp. 3d at 666.

Satisfying that standard, the Complaint describes how each source was positioned to possess the information alleged. A scientist and research associate/manufacturing chemist—both formerly employed at Avista—described Avista's activities, including manufacturing PEDMARK, at the sites where they worked. *See* ¶82. Additionally, a former Senior Director of Corporate Planning at Avista described manufacturing requirements for NDAs—a subject well within the purview of that person's responsibilities. *See id.* Because it is probable that those CWs have knowledge about Avista's manufacturing capabilities and activities at those sites, as well as the manufacturing requirements for NDAs, they bolster the Complaint's allegations. *See, e.g.*, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) (applying "liberal" standard for crediting CW's information as "heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources, even where those sources offer indirect knowledge").

### 3. Plaintiff alleges far more than negligence.

Based on cherry-picked references regarding "due diligence," "quality audit," and "red flags," Defendants suggest that Plaintiff has pled negligence, not recklessness or knowledge. Mot. at 25. This argument fails.

Plaintiff alleges that Defendants touted Fennec's commercialization and manufacturing progress, when, in reality, they retained and worked closely with a substance manufacturer without commercial capacity and a product manufacturer with ongoing deficiencies identified by the FDA. *See* §II, *supra*.[8] Courts have repeatedly found similar allegations regarding drug manufacturing sufficient for pleading scienter. *See Teligent*, 2020 WL 3268531 at *15; *Impax*, 36 F. Supp. 3d at 961; *Immunomedics*, 2020 WL 4381924 at *8; *STAAR*, 2016 WL 6699284 at *10; *KV Pharm*, 679 F.3d at 983–84; *Freedman*, 4 F. Supp. 3d at 1114.[9]

### 4. Plaintiff does not allege fraud by hindsight.

Defendants incorrectly claim that the Complaint pleads fraud by hindsight. Mot. at 25-26. "[I]t is not fraud by hindsight if allegations forecast evidence that defendants' statements were false or misleading at the time they were made." *Ollil*a, 2018 WL 792069, at *4 (collecting cases). "Further, courts 'must be cautious' in applying fraud by hindsight to dismiss a case, as its effect at this stage 'is to cut off the case as a matter of law, without further factual development.'" *Id.*

As described above, Defendants knew but concealed current facts regarding

---

[8] In this case, unlike *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 562 (M.D.N.C. 2018), where "Plaintiffs fail[ed] to plausibly allege that Defendants knew that certain facts would prevent the regulatory approval or marketing of solithromycin and concealed those facts from the investing public," the Complaint alleges material facts known to Defendants but hidden from investors. *See* §II, *supra*; *see also Zak,* 780 F.3d at 609–10.

[9] Unlike in *In re Discovery Labs. Sec. Liti*g., 2006 WL 3227767, at *9 (E.D. Pa. March 15, 2007), and *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995), where the courts found the alleged misstatements immaterial and, in turn, held that recklessness could not be established for immaterial statements, Plaintiff here has established materiality and sufficiently alleged scienter. *See* §IV.A.3., *supra*.

Avista's and PII's ability to manufacture PEDMARK commercially and meet FDA requirements. Those facts indicate material misstatements and omissions about current and past facts, not fraud by hindsight.

### 5. Though not required, Plaintiff alleges motive.

Defendants argue that the Complaint lacks motive allegations. Mot. at 26. Defendants are wrong. Plaintiff alleges that, while misleading investors, (1) Defendants were motivated to sell the Company (¶98); (2) prior to their first misstatement, Defendants were motivated to secure financing for Fennec (¶87); and (3) Defendants Raykov and Andrade were motivated to increase their compensation (¶88). Even if those allegations do not establish motive, motive is not required to plead scienter. *See Ollila*, 2018 WL 792069, at *3 (Though "plaintiff has yet to provide a strong explanation of what motivated defendants' alleged obfuscation of what was supposedly occurring in the field in favor of a more favorable report to shareholders than the facts would support, 'the absence of a motive allegation is not fatal.'" (quoting *Tellabs*, 551 U.S. at 324)).

### 6. Fennec is liable under the corporate scienter doctrine.

"[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.'" *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc*., 2020 WL 6270482, at *8 (E.D. Va. Oct. 26, 2020). Indeed, the relevant "state of mind . . . for purposes of establishing corporate scienter" includes that of "[a]ny individual agent who authorized, requested, commanded, furnished information for, prepared[,] . . . reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance." *Knurr v. Orbital ATK Inc*., 294 F. Supp. 3d 498,

513 (E.D. Va. 2018). Accordingly, a corporation can have scienter even where high-level officers named as defendants did not have the culpable state of mind. *See id. at 515* (finding corporate scienter "despite the dismissal of the § 10(b) claims against the individual corporate officers who signed the 10–Ks").

Here, Fennec focused on the solitary goal of FDA approval and commercialization of PEDMARK. Fennec's agents working on PEDMARK's manufacturing knew of the undisclosed problems, and that knowledge is imputed to Fennec.

\* \* \*

In sum, viewed holistically, Plaintiff's allegations give rise to a strong inference of scienter. Defendants' piecemeal arguments ignoring the well-pled allegations do not warrant dismissal.[10]

## V. **CONCLUSION**

For the reasons above, Plaintiff respectfully requests that the Court deny the Motion. If the Court grants the Motion, Plaintiff respectfully requests leave to amend.[11]

DATED: April 2, 2021                    Respectfully Submitted,

---

[10] The Individual Defendants' half-hearted arguments for dismissal also fail. *See* Mot. 27-28. The Directors signed the misleading 10-Ks purporting to warn of known risks when those risks had already materialized. *See* ¶¶115-116, 130-131. Furthermore, Defendants admit their press releases incorporated those misleading 10-Ks. *See* Mot. at 11-12. As to Plaintiff's §20(a) claims, Defendants only argue the lack of a predicate primary violation (*see* Mot. at 28), but as stated herein, Plaintiff has adequately alleged a §10(b) claim.

[11] On March 30, 2021, Defendants filed Fennec's FY2020 10-K. *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001211583/000110465921043756/tm 21107d1_10k.htm. In apparent recognition that risks had materialized, Defendants included a new section "Manufacturing and Clinical Supplies" under "Business," detailing information previously limited to "Risk Factors."

**ROCHE FREEDMAN LLP**

*/s/ Constantine P. Economides*

Constantine P. Economides
Velvel (Devin) Freedman
Ivy T. Ngo
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Emails: ceconomides@rcfllp.com
vel@rcfllp.com
ingo@rcfllp.com

Eric Rosen
Kyle Roche (*pro hac vice* forthcoming)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Emails: erosen@rcfllp.com
kyle@rcfllp.com

*Counsel for Lead Plaintiff Daniel Malakoti and Lead Counsel for the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Jay Chaudhuri
150 Fayetteville Street, Suite 980
Raleigh, NC 27601
Telephone: (919) 890-0560
Email: jchaudhuri@cohenmilstein.com

*Counsel for Lead Plaintiff Daniel Malakoti and Liaison Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Daniel Malakoti*

31

# CERTIFICATE OF COMPLIANCE

Plaintiff, by and through undersigned counsel, certifies that this Opposition complies with the word-count limit in LR 7.3(d)(1), as modified by the Court's February 23, 2021 Order enlarging the limit to 8,000 words. The word count of the Opposition is 7,997 words.

This the 2nd day of April 2021.

*/s/ Constantine P. Economides*
Constantine P. Economides

# <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on this day a copy of the foregoing document was filed with the Court's CM/ECF system which served the same on all counsel of record.

This the 2nd day of April 2021.

/s/ *Constantine P. Economides*
Constantine P. Economides