# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JIM CHAPMAN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:20CV812 |
| FENNEC PHARMACEUTICALS INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

## ORDER AND RECOMMENDATION
## OF UNITED STATES MAGISRATE JUDGE

This matter is before the Court upon two motions: (1) Defendants' motion to dismiss (Docket Entry 40) Plaintiff's Consolidated Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim under the heighted pleading standard of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and (2) Defendants' request for judicial notice and consideration of documents incorporated by reference (Docket Entry 43). This is a putative federal securities class action on behalf of all persons who purchased or otherwise acquired Fennec Pharmaceuticals Inc. ("Fennec") securities between December 20, 2018, and August 10, 2020 (the "Class Period"). (Amended Complaint ("Compl.") ¶ 1, Docket Entry 30.) Lead Plaintiff Daniel Malakoti ("Lead Plaintiff") is a purchaser of stock in Fennec during the Class Period. (*Id.* ¶ 1.) In his Complaint, Lead Plaintiff alleges securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission

("SEC") Rule 10b-5 promulgated under Section 10(b). (*Id.*) Defendants in this action are Fennec and its corporate insiders: Rostislav Raykov ("Raykov"), Robert Andrade ("Andrade"), Chris A. Rallis, Marco Brughera, Adrian J. Haigh, Khalid Islam, and Jodi Cook (collectively "Defendants"). (*Id.*) Lead Plaintiff seeks compensatory damages, interest, fees, and costs. (*Id.* ¶¶ 78-79.)

Defendants have filed a motion to dismiss Lead Plaintiff's Amended Complaint for failure to state a claim under the PSLRA's heightened pleading standard. (Docket Entry 40.) Lead Plaintiff has filed a response in opposition. (Docket Entry 45.) Defendants filed a reply brief. (Docket Entry 46.) Defendants have also filed a motion requesting consideration of certain documents referenced in the Complaint and judicial notice of other documents. (Docket Entry 43.) For the reasons set forth below, as to Defendants' motion requesting judicial notice, the undersigned will (1) consider Exhibits 4, 5 and 7 through 15 in making a recommendation on the motion to dismiss; (2) take judicial notice of Exhibit 6; and (3) deny Defendants' motion for judicial notice as to Exhibits 1, 2, and 3. Furthermore, the Court recommends that Defendants' motion to dismiss be granted.

I.      **FACTUAL BACKGROUND**

        a.  *Fennec and PEDMARK*

Fennec is a Canadian company with its principal place of business in Research Triangle Park, North Carolina. (Compl. ¶ 17.) Fennec is a biopharmaceutical company "solely focused" on developing the new drug PEDMARK, a formulation of Sodium Thiosulfate used to prevent hearing loss in children undergoing certain types of chemotherapy treatment. (*Id.* ¶ 3.) In 2002, Fennec entered into an exclusive licensing agreement with Oregon Health &

2

Science University regarding the use of Sodium Thiosulfate in oncology. (*Id.* ¶ 63.) Oregon Health & Science University completed the first two phases of four phases[1] of PEDMARK clinical trials (*Id.*), while Fennec completed the third phase of clinical trials (*Id.* ¶¶ 65-66). In 2017, Fennec announced that the clinical trials showed that Sodium Thiosulfate was effective at reducing certain types of hearing loss in childhood cancer patients undergoing chemotherapy treatment and did not protect tumors in those patients. (*Id.* ¶ 68.) Based on the results of the trials, Fennec announced that it would begin seeking approval of PEDMARK from the Food and Drug Administration ("FDA"). (*Id.* ¶ 70.)

### b. New Drug Application Process

Because PEDMARK is a new pharmaceutical drug, the FDA requires Fennec to seek approval for PEDMARK through the FDA's New Drug Application ("NDA") process before Fennec can sell, market, and distribute PEDMARK for commercial use in the United States. (*Id.* ¶ 32.) The NDA process allows the FDA to evaluate whether a drug is safe for use, whether the drug labeling contains all necessary information, and "whether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity." (*Id.* ¶ 32, quoting U.S. Food & Drug Admin., New Drug Application (NDA) (June 10, 2019), https://www.fda.gov/drugs/types-applications/new-drug-application-nda.) As part of the NDA process, drug sponsors like Fennec must implement Chemistry, Manufacturing and Controls requirements to ensure the version of the drug produced for consumer use has the same safety, efficacy, and quality and

---

[1] Clinical trials have four stages, but drugs are only required to go through the first three stages to be released to market, with the fourth stage involving additional information about the drug after the drug is released to the market. (*See* Compl. ¶ 34.)

3

as the drug used in clinical trials. (*Id.* ¶ 36.) Chemistry, Manufacturing and Controls requirements apply to both the drug itself and the manufacturing facility producing the drug. (*Id.*) If a drug sponsor wishes to change its drug manufacturer, Chemistry, Manufacturing and Controls requires the sponsor to demonstrate to the FDA that the changes will not adversely impact the safety, efficacy, and quality of the drug. (*Id.* ¶ 37.) Depending on the circumstances surrounding the change in manufacturer, it may cause no delay in the NDA cycle or may cause up to a year of delay. (*Id.* ¶¶ 37-41.)

As part of the NDA process, the FDA determines "whether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity." (*Id.* ¶ 53 (citing 505(b)(1)(D), 21 C.F.R. § 314.50(d)(1)(i)).) To do this, the FDA tours the manufacturing facility, performing a Pre-Approval Inspection of an NDA applicant's drug manufacturer. (*Id.* ¶¶ 55, 57.) When conducting a Pre-Approval Inspection, the FDA examines whether the drug manufacturer complies with the FDA's Current Good Manufacturing Practice regulations ("cGMP") and other FDA regulations. (*Id.* ¶ 54.) At the end of the Pre-Approval Inspection, the FDA investigators hold an exit interview where they notify the drug sponsor and facility management of any violations of FDA standards. (*Id.* ¶ 57.) The FDA inspectors also memorialize these violations in a Form 483 issued to the manufacturing facility. (*Id.*) A Form 483 is not considered a final decision, and facility management has fifteen days to respond to the Form 483. (*Id.* ¶ 59.) If the FDA decides not to approve of a drug sponsor's NDA, it issues the drug sponsor a Complete Response Letter that details the reasons why the FDA did

4

not approve the NDA and recommends corrective actions when possible. (*Id.* ¶ 60.) The drug sponsor then has opportunities to resubmit the NDA. (*Id.*)

During the Class Period, Fennec was seeking but had not obtained NDA approval from the FDA for PEDMARK. (*Id.* ¶ 2.) Despite success in proving the efficacy of PEDMARK, Fennec struggled to secure FDA approval for PEDMARK's manufacturing sites. (*See generally* Compl.) Fennec relied on third-party drug manufacturers to produce PEDMARK in two stages. (*Id.* ¶ 2.) First, one manufacturer would produce the PEDMARK drug substance—the raw materials that are used to create the final drug product. (*Id.* ¶ 2 n.1., ¶ 80.) Next, another manufacturer would produce the PEDMARK drug product—the finished version of the PEDMARK product, ready for consumer use. (*Id.* ¶ 2 n.1., ¶¶ 102-10.) Although Fennec did not disclose its manufacturers to investors (*Id.* ¶ 79), Lead Plaintiff asserts Fennec planned to use manufacturer Avista Pharma Solutions, Inc. ("Avista") to produce the PEDMARK drug substance and another third-party manufacturer (identified in the Complaint by Lead Plaintiff as being either Pharmaceutics International, Inc. or Bayer AG) to produce the PEDMARK drug product. (*Id.* ¶¶ 80, 102-10.)

First, by December 2018, Fennec selected Avista to be PEDMARK's drug substance manufacturer. (*Id.* ¶ 5.) However, Lead Plaintiff alleges that Avista did not have the capability to manufacture PEDMARK for commercial use. (*Id.* ¶ 80.) Lead Plaintiff further alleges that although Fennec knew or should have known in December 2018 that Avista was not capable of manufacturing PEDMARK, Fennec told investors that it was targeting U.S. approval of PEDMARK in 2019. (*Id.* ¶¶ 80-81.) In asserting that Avista was not capable of producing PEDMARK and that Defendants should have known this, Lead Plaintiff relies on statements

5

from three confidential witnesses employed at Avista. (*See id.* ¶ 82.) In March 2019, Fennec announced to investors that it would need to change its commercial manufacturing facility, blaming the facility change on the fact that PEDMARK's substance manufacturer was being acquired by another company. (*Id.* ¶ 85.) This change in substance manufacturing facility would delay Fennec's NDA submission by at least six months and would delay the commercial launch of PEDMARK by at least a year. (*Id.*) Fennec then experienced a drop in stock value, but Defendants Raykov and Andrade received raises from Fennec. (*Id.* ¶ 88.)

Next, Fennec selected a third-party manufacturer to be PEDMARK's drug product manufacturer. (*Id.* ¶ 102.) While Fennec did not disclose the name of PEDMARK's product manufacturer, Lead Plaintiff asserts the product manufacturer was either Pharmaceutics International, Inc. or Bayer AG. (*Id.* ¶¶ 102-110.) Despite previously having issues with PEDMARK's substance manufacturer, Lead Plaintiff alleges that Defendants did not conduct due diligence into PEDMARK's product manufacturer. (*Id.* ¶¶ 98-99). Specifically, Defendants did not conduct a quality audit or a mock inspection of the product manufacturer's facility and did not ensure that PEDMARK's product manufacturer met cGMP standards. (*Id.*) Lead Plaintiff asserts that both manufacturers that could have been Fennec's product manufacturer had received Form 483s in 2020. (*Id.* ¶ 103.) Had Defendants conducted a quality audit or a mock inspection of the product manufacturer, Defendants would have discovered issues with the product manufacturer. (*Id.* ¶ 101.)

The product manufacturer's deviations from FDA standards caused the FDA to issue PEDMARK's product manufacturer a Form 483. (*Id.* ¶ 101.) Fennec did not notify investors of the Form 483. (*Id.* ¶ 101.) Then, on August 11, 2020, Fennec announced to investors that

6

it had received a Complete Response Letter from the FDA on August 10, 2020, denying Fennec's NDA. (*Id.* ¶ 100.) On August 11, 2020, Fennec hosted a call to discuss the Complete Response Letter. (*Id.*)

### c. Statements and Press Releases

Fennec released statements and press releases throughout the Class Period that contain statements that Lead Plaintiff contends are false and misleading. (*Id.* ¶¶ 111-140.) Lead Plaintiff states that Defendants made false and misleading statements in press releases, the annual report for FY2018, and the annual report for FY2019. (*Id.*) Lead Plaintiff's allegations against Defendants relate to five categories of Defendants' alleged misstatements. (*See id.*)

First, Lead Plaintiff claims that Defendants made false or misleading statements about Fennec's drug substance manufacturing capabilities. (*Id.* ¶¶ 113, 120, 122.) Second, Lead Plaintiff claims that Defendants made false and material misstatements when Defendants stated they were "targeting U.S. approval of PEDMARK in the second half of 2019" (*Id.* ¶¶ 111-12), or statements that stated or implied that they expected a commercial launch of PEDMARK in the second half of 2020 (*Id.* ¶¶ 124, 126, 128, 137, 139.) Third, Lead Plaintiff claims that Defendants made false and material misstatements when Defendants made an optimistic statement about the NDA process, despite allegedly knowing or recklessly disregarding that the FDA would likely deny PEDMARK's NDA. (*Id.* ¶ 135.) Fourth, Lead Plaintiff claims that Defendants made false and material misstatements when Defendants referred to risks as "potential risks" even though the risks had already materialized and were no longer just "potential" risks. (*Id.* ¶¶ 115-16, 130-31.) Finally, Lead Plaintiff claims that

Defendants' certifications under Section 302 of the Sarbanes-Oxley Act of 2002 include false and material misstatements.  (*Id.* ¶¶ 118, 133.)

Lead Plaintiff alleges that these comments are all materially false and misleading in violation of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated under Section 10(b).  (*Id.* ¶¶ 111-140.)

## II.     MOTION REQUESTING JUDICIAL NOTICE

Defendants motioned the Court requesting the Court consider "documents that contain the challenged statements" in Lead Plaintiff's Complaint (Exhibits[2] 4 through 13) and "documents that are hyperlinked in the Complaint" (Exhibits 14 and 15) to be incorporated by reference into Lead Plaintiff's Complaint.  (Docket Entry 44 at 6-9.)[3]  Defendants also motioned the Court requesting judicial notice of other documents that are not referenced in the Complaint, but that Defendants assert are judicially noticeable (Exhibits 1, 2, 3 and 6[4]).  (Docket Entry 44 at 9-11.)  Lead Plaintiff does not oppose this motion.[5]

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), this Court must "accept all factual allegations in the complaint as true." *Yates v. Mun. Mortg. &*

---

[2] All Exhibits are referred to based on the names of the documents as provided by Defendants in the attachments to their Declaration in Support of Defendants' Motion to Dismiss.  (Docket Entries 42-1 through 42-15.)  Thus, Exhibit 1 is Docket Entry 42-1, etc.

[3] Unless otherwise noted, all citations in this order and recommendation refer to the page numbers at the bottom right-hand corner of the documents as they appear in the Court's CM/ECF system.

[4] As discussed herein, Defendants classify Exhibit 6 as both a document referenced in the Complaint and as an "additional document" not referenced in the Complaint.  (Docket Entry 44 at 7-8, 10.)

[5] Lead Plaintiff does include a footnote in his response to Defendants' Motion to Dismiss where Lead Plaintiff questions the validity of Defendants' judicial notice claim due to the volume of documents that Defendants seek to have the Court incorporate through judicial notice.  (Docket Entry 45 at 9 n.2.)  However, Lead Plaintiff did not file a response in opposition to Defendants' motion requesting judicial notice.

*Equity, LLC*, 744 F.3d 874, 881 (4th Cir. 2014) (quoting *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 176 (4th Cir. 2009)). In doing so, this Court "must consider the complaint in its entirety, as well as other sources ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which the Court may take judicial notice." *Tellabs Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S 308, 322 (2007).

First, Defendants assert that the Court should consider the documents that Lead Plaintiff references in the Complaint, namely the documents containing the challenged statements and documents hyperlinked in the Complaint, as incorporated by reference. (Docket Entry 44 at 6-9.) "Consideration of a document attached to a motion to dismiss ordinarily is permitted only when the document is 'integral to and explicitly relied on in the complaint,' and when 'the plaintiffs do not challenge the document's authenticity.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015) (quoting *Phillips v. LCI Int'l Inc.,* 190 F.3d 609, 618 (4th Cir.1999)); *see also Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F.Supp.2d 525 at 536-37 (M.D.N.C. 2013) ("[I]n a securities fraud case, the court may consider public documents quoted by, relied upon, incorporated by reference or otherwise integral to the complaint.") (internal quotation and citation omitted).

Here, the Court does consider the documents containing the challenged statements, Exhibits 4 and 5 and Exhibits 7 through 13, and the documents hyperlinked in the Complaint, Exhibits 14 and 15, at the motion to dismiss stage. These documents are integral to Lead Plaintiff's Complaint. Lead Plaintiff's allegations necessarily rely on the press releases and SEC filings containing the challenged statements because they contain the foundation for Lead

9

Plaintiff's Complaint. Lead Plaintiff also relies on the documents hyperlinked in the Complaint: a news article regarding PEDMARK's manufacturing facility change (*see* Docket Entry 42-14) and the website of PEDMARK's alleged substance manufacturer (*see* Docket Entry 42-15). Lead Plaintiff's claims of fraud are premised on issues with PEDMARK's manufacturing capability and Defendants' lack of investigation into or concealment of manufacturing issues. (*See generally* Compl.) Further, Lead Plaintiff has not challenged the authenticity of these exhibits. Thus, this Court does consider the documents in determining whether the Court should grant Defendants' motion to dismiss.

Defendants also ask the Court to consider Exhibit 6, excerpts of the Form 10-K for FY 2017, as being integrated by reference into the Complaint. (Docket Entry 44 at 7-8.) The Complaint does not directly reference the FY 2017 Form 10-K although it does reference the December 20, 2018, press release that directs investors to the FY 2017 Form 10-K. (*See* Compl. ¶¶ 4, 5, 70, 78, 81, 111-112; Docket Entry 42-10 at 4.) For this reason, the Court does not consider the FY 2017 Form 10-K as incorporated by reference through the Complaint.

However, the Court does take judicial notice of the FY 2017 Form 10-K excerpts in Exhibit 6 (Docket Entry 42-6). In addition to considering external documents referenced in a complaint, the Court may also consider documents subject to judicial notice by the court. *Tellabs*, 551 U.S. at 322. "Under Federal Rule of Evidence 201, courts at any stage of a proceeding may judicially notice a fact that is not subject to reasonable dispute, provided that the fact is generally known within the court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Zak*, 780 F.3d at 607 (internal citation and quotation omitted). "In securities fraud actions,

Case 1:20-cv-00812-LCB-JLW    Document 48    Filed 12/16/21    Page 10 of 33

courts will also examine the other information that was publicly available to reasonable investors at the time the defendant made statements plaintiffs alleged were fraudulent, including documents or articles cited in the complaint, S.E.C. filings, press releases, stock price tables, and other material on which plaintiff's allegations necessarily rely." *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 626 n.7 (D. Md. 2012), *aff'd sub nom. Yates*, 744 F.3d 874 (4th Cir. 2014) (quoting *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 571 (D. Md. 2005)); *see also Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, No. 119CV1031, 2021 WL 1439680, at *18 (E.D. Va. Mar. 24, 2021) (considering defendant-company's Form 10-Ks at motion to dismiss stage even though they were not referenced in plaintiff-investors' complaint because the Form 10-Ks were public records filed with the SEC).

When a court considers documents that are subject to judicial notice, the court must view the documents in the light most favorable to the plaintiff. *Zak*, 780 F.3d at 606-07. Further, the Court does not judicially notice these documents as to the veracity of the statements made in the documents but solely as to the fact that the statements were made as they appear in the document. *In re Mun. Mortg. & Equity*, 876 F. Supp. 2d at 626.

The 2017 Form 10-K as excerpted in Exhibit 6 is an important part of the information made publicly available to Lead Plaintiff and other Fennec investors when Defendants made one of the statements Lead Plaintiff contends is misleading. Further, the 2017 Form 10-K was explicitly referenced in the December 20, 2018 press release that forms the basis for part of Lead Plaintiff's 10(b) claim. Thus, Exhibit 6 is subject to judicial notice and the Court considers it with Defendants' motion to dismiss.

11

Defendants also assert that the Court should take judicial notice of other documents not referenced in the Complaint that are subject to judicial notice due to their source. (Docket Entry 44 at 9.) The Court does not consider these other documents (Exhibits 1, 2, and 3) because Lead Plaintiff does not reference them in the Complaint and because consideration of these documents is not necessary for the instant decision. *See Sanchez v. Truse Trucking, Inc.*, 74 F. Supp. 3d 716, 729 (M.D.N.C. 2014).

For these reasons, Defendant's request (Docket Entry 43) is granted to the extent the undersigned will consider Exhibits 4 and 5 and Exhibits 7 through 15 herein, the Court takes judicial notice as to Exhibit 6, and it is denied to the extent that the Court will not take judicial notice of Exhibits 1, 2 and 3.

## III.   MOTION TO DISMISS

### a.  Standard of Review

A motion to dismiss tests the sufficiency of the complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (1999). A complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" must be dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Id.*; *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.") (citations and quotations omitted). The "court accepts all well-pled facts as true and construes these facts in the light most favorable

to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, and bare assertions devoid of factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted). In other words, the standard requires a plaintiff to articulate facts, that, when accepted as true, demonstrate the plaintiff has stated a claim that makes it plausible he is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 557). Plaintiffs alleging fraud must meet the pleading standards of Federal Rule of Civil Procedure 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake."

Further, plaintiffs bringing a claim of securities fraud under Section 10(b) must also meet the PSLRA's heighted pleading standards. *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 173 (4th Cir. 2007). Congress enacted the PSLRA to "to prevent Securities Exchange Act claims from being 'employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law.'" *In re Novan, Inc.*, No. 1:17CV999, 2018 WL 6732990, at *4 (M.D.N.C. Nov. 30, 2018) (quoting *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018)). The PSLRA requires plaintiffs bringing Section 10(b) claims to

> include "*each statement* alleged to have been misleading, *the reason* or reasons why the statement is misleading, and if an allegation regarding the statement . . . is made on information and belief, the complaint shall state *with particularity all facts* on which that belief is formed." 15 U.S.C. § 78u-4(b)(2). And in alleging scienter, the plaintiff must, "with respect to each act or omission alleged to violate this chapter, state with particularity *facts giving rise to a strong inference* that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(3)(A).

13

*Teachers' Ret. Sys. of LA*, 477 F.3d at 172 (emphasis in original). A complaint that does not meet the PSLRA's heightened pleading standard must be dismissed. *Singer*, 883 F.3d at 439.

### b. Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act and SEC Rule 10b-5 prohibit fraud "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To make out a claim of fraud under Section 10(b), a plaintiff must sufficiently plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (internal citation omitted).

Here, Defendants have moved to dismiss Lead Plaintiff's claims based on five grounds: (1) the PSLRA's safe harbor provision for forward looking statements, (2) Plaintiff's failure to plead false or misleading statements or actionable omissions with particularity, (3) Plaintiff's failure to plead a strong inference of scienter, (4) Plaintiff's failure to state a claim against any director and (5) Plaintiff's failure to state a claim under Section 20(a) where there is no predicate Section 10(b) claim. (*See* Docket Entry 41 at 10.)

### i. The PSLRA's Safe Harbor Provision

Defendants claim that the following statements, all from Fennec press releases, are protected under the PLSRA's Safe Harbor Provision because they are "clearly forward-looking," accompanied by meaningful cautionary language, and were not made with actual knowledge of falsity (Docket Entry 41 at 16-20):

- Statement 1: "The Company is targeting U.S. approval of PEDMARK in the second half of 2019." (Compl. ¶ 111; Docket Entry 42-10 at 2.)

14

- Statement 3: "Fennec expects a first commercial launch for PEDMARK in the second half of 2020." (Compl. ¶ 113; Docket Entry 42-7 at 2.)

- Statement 9: "[W]e plan to launch PEDMARK in the second half of 2020." (Compl. ¶ 122; Docket Entry 42-11 at 2.)

- Statement 17: "[W]e continue to make progress on our commercial readiness plan in preparation for the potential launch of PEDMARK, if approved, in the second half of 2020." (Compl. ¶ 137; Docket Entry 42-12 at 2.)

- Statement 20: "[W]e are well positioned to commercialize PEDMARK, if approved, during the third quarter of 2020." (Compl. ¶ 139; Docket Entry 42-13 at 2.)

Plaintiff contends that the Safe Harbor does not apply here because Defendants omitted present facts, misrepresented current or historical facts, any meaningful cautionary language presented by Defendants was not tailored to the specific risks faced by Fennec, and because Defendants had actual knowledge of the falsity of their statements. (Docket Entry 45 at 23-27.)[6]

Under the PSLRA Safe Harbor Provision, defendants are protected from liability for forward-looking statements when (1) the statement is accompanied by "meaningful cautionary statements," or (2) the defendant "had actual knowledge that [the statement] was false when it was made." *Johnson v. Pozen, Inc.*, 2009 WL 426235, at *14. Forward-looking statements include "'a statement containing a projection of revenues, income . . . , earnings . . . or other

---

[6] As a preliminary matter, Plaintiff also alleges that the Safe Harbor does not protect Defendants because the Court cannot determine the adequacy of cautionary language at the motion to dismiss stage. (Docket Entry 45 at 23.) This Court disagrees and has dismissed similar complaints based in part on the applicability of the Safe Harbor provision. *See Johnson v. Posen Inc.*, No. 1:07CV599, 2009 WL 426235 (M.D.N.C. Feb. 19, 2009), *report and recommendation adopted*, No. 1:07CV599, 2009 WL 10680297 (M.D.N.C. Sept. 29, 2009), *In re Lab'y Corp. of Am. Holdings Sec. Litig.*, No. 1:03CV591, 2006 WL 1367428, at *10 (M.D.N.C. May 18, 2006), *Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2015 WL 1457980 (M.D.N.C. Mar. 30, 2015).

15

financial items,' as well as 'a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer.'" *Id.* (quoting 15 U.S.C. § 78u–5(i)(1)). This Court has previously held that statements anticipating a particular launch date are forward-looking. *See Johnson*, 2009 WL 426235, at *22.

Meaningful cautionary statements are those that convey "substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business." *Phillips v. Triad Guar. Inc.*, 2015 WL 1457980, at *9 (internal quotation and citation omitted). Even predating the PSLRA, the Fourth Circuit has held that "projections of future performance not worded as guarantees are generally not actionable." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) (internal quotation and citation omitted).

Here, part or all of each of the statements identified by Defendants are protected by the Safe Harbor Provision. These statements were made in press releases and stated either that Fennec targeted approval of PEDMARK in the second half of 2019 or that Fennec expected to launch PEDMARK in the second half of 2020. (Docket Entry 41 at 37-39.)

First, the identified statements are forward looking, in part, because Fennec identified these statements as forward-looking in the press releases. (Docket Entries 42-10 at 3-4; 42-7 at 4-5; 42-11 at 4; 42-12 at 5-6; 42-13 at 5.) Additionally, each of the statements refers to the anticipated launch of PEDMARK, language this Court has already determined is forward-looking. *See Johnson*, 2009 WL 426235, at *22. Plaintiff argues that the statements identified by Defendants are not forward looking but are instead omitted present facts and representations of current or historical fact. (Docket Entry 45 at 23-24.) To the extent that

16

Lead Plaintiff argues that these statements are not forward-looking because they are based on concealment of then existing fact, his argument fails. This Court has previously held that "whether a statement is forward-looking is determined by examining the statement, not the fact allegedly omitted." *Johnson*, 2009 WL 426235, at *22 (dismissing plaintiffs' argument that company's statement could not be forward-looking because it omitted present facts).

Additionally, Lead Plaintiff argues that the statements are not forward-looking because they contain representations of current or historical fact. The Court notes that districts are divided on this issue. Other courts in this Circuit have held that "[i]f a statement is a mix of both forward-looking and present or past facts, it is taken out of the safe harbor with respect to the parts of the statement that are not forward-looking." *Ollila v. Babcock & Wilson Enters., Inc.*, No. 3:17-CV-109, 2018 WL 792069, at *5 (W.D.N.C. Feb. 8, 2018) (citing *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 788 (E.D. Va. 2015)). Some circuits have determined that statements implying some present facts or circumstances as the basis for forward-looking statements qualify as forward-looking statements. *See Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 678 (6th Cir. 2003); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) (determining statement that a company was "well positioned" was forward-looking). To the extent that the language in Statement 17 stating "we continue to make progress" and Statement 20 stating "we are well-positioned" represent current fact, this Court does not need to determine whether the Safe Harbor applies to this language because, as provided herein, Lead Plaintiff has not sufficiently pleaded that these statements are false or misleading.[7]

---

[7] Statements 17 and 20 are further discussed on pages 21-23 herein.

17

Second, the Statements 1, 3, and 9 and the portions of Statements 17 and 20 referring to the anticipated approval of PEDMARK were accompanied by meaningful cautionary language. Lead Plaintiff alleges that Fennec's cautionary language is not sufficient because it is mere boilerplate and not properly tailored to the specific risks faced by Fennec. (Docket Entry 45 at 25.) While boilerplate warnings are not sufficient cautionary language under the Safe Harbor Provision, *Plymouth*, 966 F. Supp. 2d at 550, this Court has previously held that even "standard" cautionary language satisfies the Safe Harbor requirements when it puts potential investors on notice of "significant risks similar to that actually realized." *In re Lab'y Corp.*, 2006 WL 1367428, at *4 (determining language warning against "competitive actions in the marketplace and adverse actions of governmental and other third-party payors" and directing investors to the Company's Form 10-K was a cautionary statement under the Safe Harbor). Here, Fennec made cautionary statements sufficient to invoke the protections of the Safe Harbor Provision. In the press releases containing Statements 1, 3, 9, 17, and 20 Fennec also disclosed the following warning:

> Forward-looking statements are subject to certain risks and uncertainties inherent in the Company's business that could cause actual results to vary, including such risks that regulatory and guideline developments may change, scientific data may not be sufficient to meet regulatory standards or receipt of required regulatory clearances or approvals . . . and other risks detailed from time to time in the Company's filings with the Securities and Exchange Commission including its Annual Report on Form 10-K . . . .

(Docket Entry 42-10 at 3-4; 42-7 at 4-5; 42-11 at 4; 42-12 at 5-6; 42-13 at 5.) This statement put potential investors on notice that Fennec "may not meet regulatory standards" and may not receive required regulatory approvals—the very risks that Fennec and investors actually

18

realized. Like the sufficiently cautionary statement in *In re Lab'y Corp*, this statement also directed investors to Fennec's Form 10-K for additional information regarding those risks. Thus, Statements 1, 3, and 9 and the portions of Statements 17 and 20 referring to the anticipated approval of PEDMARK were accompanied by meaningful cautionary language.

For these reasons, Statements 1, 3, and 9 and the parts of Statements 17 and 20 referring to PEDMARK's approval are protected by the PSLRA's Safe Harbor Provision and are not actionable.[8]

### ii. *PSLRA Heightened Pleading Standard*

Defendants claim that Lead Plaintiff has failed to plead with the required particularity that any of the allegedly misleading statements were actually misleading or included actionable omissions. (Docket Entry 41 at 20-29.)

"To establish an actionable false or misleading statement or omission, the challenged statement or omission must be *factual* i.e., one that is demonstrable as being true or false; it must be *false*, or the omission must render public statements misleading; and any statement or omission of fact must be *material*." *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 553 (M.D.N.C. 2018), *aff'd sub nom. Janies v. Cempra, Inc.*, 816 F. App'x 747 (4th Cir. 2020) (internal quotation and citation omitted). This Circuit has held that

> a fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.

---

[8] Because the Court has found that Fennec's forward-looking statements contained cautionary language sufficient to invoke the Safe Harbor Provision, it need not consider whether Lead Plaintiff sufficiently pleaded knowledge of actual falsity. *See Plymouth*, 966 F. Supp. 2d at 552 n.18.

19

*Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (citations omitted). There is no affirmative duty to disclose material information under Section 10(b) unless disclosure is "necessary to make . . . statements made, in the light of the circumstances they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (citations omitted); *see also Hirtenstein*, 348 F. Supp. 3d at 557 (determining pharmaceutical company's non-disclosure of adverse events observed during Phase 2 of a clinical trial was not actionable where the company's statement focused on clinical data as a whole, without directly mentioning Phase 2 of the trial).

Further, "statements that consist of nothing more than indefinite statements of corporate optimism, also known as 'puffery,' are immaterial as a matter of law." *Plymouth Cnty. Ret. Ass'n*, 966 F. Supp. 2d at 544 (quoting *In re Lab'y Corp.*, 2006 WL 1367428 at *9) Puffery includes "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id.* (quoting *In re Cable & Wireless, PLC, Sec. Litig.*, 332 F.Supp.2d 896, 900 (E.D. Va. 2004)); *see also Longman*, 197 F.3d at 685 (determining the statement that "we will continue to pay close attention to service levels and cleanliness in our stores and believe we will achieve high marks from customers in these areas" was facially immaterial puffery); *In re Computer Scis. Corp. Sec. Litig.*, 890 F.Supp.2d 650, 668 (E.D. Va. 2012) (determining statements that company had "steadily made progress" and was "pleased with [its] progress" were immaterial puffery).

Lead Plaintiff's claims fall into five categories and will be discussed herein by category.

### 1. *Statements regarding Commercial Readiness*

Defendants argue that Lead Plaintiff's claims as to Fennec's statements regarding commercial readiness should be dismissed because Plaintiff has not sufficiently pleaded that the statements are false and misleading. (Docket Entry 41 at 22-23.) In the Complaint, Lead Plaintiff alleges that Defendants made false and misleading statements regarding PEDMARK's commercial readiness in the form of press releases expressing the steps Fennec was taking and the progress Fennec was making on the plan to launch PEDMARK in either 2019 or 2020. (Compl. at ¶¶ 122-29, 137-40.) The statements Defendants categorize as statements regarding commercial readiness are:

- Statement 10: "[W]e are focused on building the necessary team and infrastructure to support a rapid commercial launch of PEDMARK." (Compl. ¶ 124.)

- Statement 11: "We are well underway with commercialization readiness activities to support the potential launch of PEDMARK and our transition to becoming a commercial-stage organization." (*Id.* ¶ 126.)

- Statement 12: "During the year, we also made solid progress in preparing for the potential launch of PEDMARK including the hiring of a chief commercial officer and the preparation and execution of our commercial readiness plan." (*Id.* ¶ 128.)

- Statement 17: "[W]e continue to make progress on our commercial readiness plan in preparation for the potential launch of PEDMARK, if approved, in the second half of 2020." (*Id.* ¶ 137; Docket Entry 42-12 at 2.)

- Statement 18: "We continue to work with the FDA as a part of their review process in advance of the pending PEDMARK PDUFA date of August 10." (Compl. ¶ 139; 42-13 at 2.)

- Statement 19: "Our organization and commercial team have been actively preparing for launch readiness . . . ." (Compl. ¶ 139; Docket Entry 42-13 at 2.)

- Statement 20: "[W]e are well positioned to commercialize PEDMARK, if approved, during the third quarter of 2020." (Compl. ¶ 139; Docket Entry 42-13 at 2.)

21

(Docket Entry 41 at 37-39.)

Lead Plaintiff alleges that commercial readiness statements anticipating a launch in 2019 were misleading because PEDMARK's substance manufacturer had never been capable of large-scale commercial drug manufacturing, which Defendants knew or should have known would exclude the manufacturer from receiving FDA approval, would require Fennec to find a new substance manufacturing site, and would delay FDA approval beyond 2019. (Compl. ¶ 5.) Additionally, Lead Plaintiff alleges that commercial readiness statements anticipating a launch in 2020 were misleading because Defendants did not adequately monitor PEDMARK's product manufacturer-despite prior issues with the substance manufacturer, and Defendants did not conduct adequate due diligence into the product manufacturer, and thus had no reasonable basis to expect a commercial launch of PEDMARK in 2020. (*Id.*) Lead Plaintiff further alleges that PEDMARK's product manufacturer had deficiencies that Defendants either knew about and chose not to disclose or recklessly failed to investigate, making statements about Fennec's plans for PEDMARK's success misleading. (*Id.* ¶¶ 102-110.) Defendants contend that the commercial readiness statements were not false but were accurate statements of historical fact, detailing Defendants' progress and plans at the time the statements were made. (Docket Entry 41 at 22-23.) Defendants further claim these statements are too vague to be actionable. (*Id.* at 23.) Lead Plaintiff responds by claiming that Defendants' commercial readiness statements, even if true, are still misleading because they conveyed a false impression of PEDMARK's status. (Docket Entry 45 at 16-17.)

Here, Lead Plaintiff has not sufficiently alleged that Fennec's statements regarding PEDMARK's commercial readiness were false and misleading. However, like in *Hirtenstein*,

22

Fennec's statements about PEDMARK's commercial launch did not contain enough substantive information to trigger Fennec's obligation to disclose the bad facts that could have prevented or delayed PEDMARK's launch. *See Hirtenstein*, 348 F. Supp. 3d at 557. Further, many of the statements about commercial readiness are vague and optimistic statements constituting immaterial puffery, including statements about Fennec's "progress." (*See Compl.* ¶¶ 128, 137.) Thus, Fennec's statements about PEDMARK's commercial readiness are not false and misleading.

### 2. Statements regarding PEDMARK Substance Manufacturing

Defendants argue that Lead Plaintiff's claims as to Fennec's statements regarding PEDMARK substance manufacturing should be dismissed because Plaintiff has not sufficiently pleaded that the statements are false and misleading. (Docket Entry 41 at 20-21.) Lead Plaintiff alleges that Defendants made the following false and misleading statements regarding PEDMARK's substance manufacturing progress:

- Statement 2: "The new facility ... has large scale commercial capabilities and a proven and extensive track record of successful FDA inspections and product launches." (Compl. ¶ 113.)

- Statement 7: "We were very pleased with the production transition of PEDMARK API to the new commercial drug substance manufacturing site during the first quarter." (*Id.* ¶ 120.)

- Statement 8: "During the quarter, we are pleased to have successfully manufactured PEDMARK and are working closely with the FDA on our rolling NDA submission." (*Id.* ¶ 122.)

(*Id.* ¶¶ 113-14, 120-23.) Lead Plaintiff alleges these statements are false and misleading because

(i) Defendants did not conduct adequate due diligence into Fennec's product manufacturer to ensure that it complied with cGMP or ignored red flags indicating that the product manufacturing site would not pass a preapproval inspection

23

> because it was not in compliance with cGMP, unlike the substance manufacturer; and, (ii) as a result, the FDA would, and did, observe deficiencies at the product manufacturing site warranting a Form 483 and the denial of Fennec's NDA for PEDMARK. In short, Fennec did not have a reasonable basis to tell investors that it expected a commercial launch of PEDMARK in the second half of 2020.

(*Id.* ¶ 121.) Defendants claim that their statements about the substance manufacturing progress were not false at the time they were made. (Docket Entry 41 at 21.) Defendants further claim that there is no way Defendants could have known that issues with the product manufacturer would arise when the statements were made in March, May, and August of 2019, over a year before the product manufacturer failed to comply with cGMP. (*Id.*) Lead Plaintiff responds by claiming the statements were false in context (Docket Entry 45 at 22) and that the Court should not engage the factual dispute of falsity at this stage (*Id.* at 21).

Here, Lead Plaintiff has not sufficiently alleged that Fennec's statements regarding PEDMARK's substance manufacturer are false or misleading. Lead Plaintiff's allegations rely on the argument that Fennec's statements regarding Fennec's *substance* manufacturer misled investors and gave investors a false impression as to Fennec's *product* manufacturer. Even if Fennec had known about issues with Fennec's product manufacturer, Fennec's positive statements about its substance manufacturer do not require Fennec to disclose bad facts about Fennec's product manufacturer. *See Hirtenstein*, 348 F. Supp. 3d at 557 (determining pharmaceutical company's positive remarks about the safety of a drug did not obligate the company to disclose adverse events from a specific phase of the clinical trials.) Thus, Fennec's statements about PEDMARK's substance manufacturer are not false and misleading.

### 3. Statements regarding Potential Risks

Defendants argue that Lead Plaintiff's claims as to Fennec's statements regarding potential risks should be dismissed because Plaintiff has not sufficiently pleaded that the following statements are false and misleading:

- Statement 4: "If we fail to comply with any of the FDA's continuing regulations, we could be subject to reputational harm and sanctions, including … delays, warning letters and fines . . ." (Compl. ¶ 115; Docket Entry 42-5 at 12.)

- Statement 5: "The FDA or comparable foreign regulatory authorities may find inadequate the manufacturing processes or facilities of third-party manufacturers with which we contract for clinical and commercial supplies." (Compl. ¶ 116; Docket Entry 42-5 at 16.)

- Statement 13: "If we fail to comply with any of the FDA's continuing regulations, we could be subject to reputational harm and sanctions, including … delays, warning letters and fines . . ." (Compl. ¶ 130; Docket Entry 42-5 at 12.)

- Statement 14: "[T]he FDA or comparable foreign regulatory authorities may find inadequate the manufacturing processes or facilities of third-party manufacturers with which we contract for clinical and commercial supplies." (Compl. ¶ 131; Docket Entry 42-5 at 15.)

(Docket Entry 41 at 37-39.)

Lead Plaintiff alleges these statements were false and misleading because they portrayed the risks as potential future risks when the risks mentioned had already materialized. (Compl. ¶ 115-17, 130-132.) Defendants claim that calling these items risk factors did not guarantee that the risks had not already materialized at the time of the statements. (Docket Entry 41 at 24.) Further, Defendants allege that Lead Plaintiff has not adequately pleaded falsity because the delay and FDA denial that Defendants noted as risks did not occur until after the Defendants released the statements about potential risks. (*Id.* at 25.) Lead Plaintiff again

responds by claiming the statements were false in context (Docket Entry 45 at 22) and that the Court should not engage the factual dispute of falsity at this stage (*Id.* at 21).

Lead Plaintiff does not allege that the specific risks noted in the 2018 and 2019 10-Ks—delay and FDA denial—had already occurred at the time the statements were made, but that the risks would occur sometime after the statements were made. (*See* Compl. ¶ 134 ("the product manufacturing site *would likely not pass* a pre-approval inspection site . . . the FDA *would, and did*, observe deficiencies at the product manufacturing site") (emphasis added).) Thus, Lead Plaintiff has not sufficiently pleaded that the risk factors were false or misleading at the time they were made, and this Court need not consider whether "risk factor" is prospective. Lead Plaintiff's claim fails as to Fennec's statements regarding potential risks.

### 4. *Statement regarding FDA Acceptance*

Lead Plaintiff alleges that Defendants made a false and misleading statement about PEDMARK's FDA acceptance when Fennec's press release stated, "[t]he FDA filing acceptance of our NDA and granting of Priority Review represents a significant milestone in the development of PEDMARK …." (Compl. ¶ 135.) Lead Plaintiff argues this statement was false and misleading because Defendants knew or should have known that there was a high risk that the FDA would ultimately deny the PEDMARK NDA. (*Id.*) Defendants argue this statement is not false and that the term "significant milestone" is too vague to be actionable. (Docket Entry 41 at 23.)

This Court has held that statements of opinion are "not actionable where they consist of little more than vague optimistic statements . . . ." *Hirtenstein*, 348 F.Supp.3d at 557. Further, noting that something is a "significant milestone" is a vague optimistic statement and is

26

generally not actionable. *Shah v. GenVec, Inc.*, No. CIV.A. DKC 12-0341, 2013 WL 5348133, at *7 (D. Md. Sept. 20, 2013). Here, Lead Plaintiff has not alleged any unique facts that would make Fennec's "significant milestone" statement anything more than a vague optimistic statement that is not actionable. Thus, this claim fails.

### 5. Sarbanes-Oxley Act Certifications

Finally, Lead Plaintiff alleges that Defendants' Sarbanes-Oxley Act certifications were false and misleading because statements in the 2018 10-K and 2019 10-K were false and misleading. (Compl. ¶¶ 118-19, 133-34.) Defendants claim that, because no other statements are actionable, the Sarbanes-Oxley Act certifications are not false or misleading. (Docket Entry 41 at 25-26.)

In the 2018 and 2019 10-Ks, Defendants Raykov and Andrade made Sarbanes-Oxley Act certifications, stating:

> Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report.

(Compl. ¶¶ 118, 133.) Because no other statements in the 2018 and 2019 10-Ks are actionable, Defendants Raykov and Andrade's certifications are not false or misleading. Thus, this claim fails.

### iii. Scienter Requirement

Defendants claim that Lead Plaintiff's Complaint should be dismissed because Lead Plaintiff fails to plead a strong inference of scienter. (Docket Entry 41 at 30-34.) Lead Plaintiff alleges he adequately pleaded scienter because Defendants possessed but concealed bad facts

27

about Fennec, Lead Plaintiff's confidential witnesses bolster scienter allegations, and Lead Plaintiff supports scienter allegations with motive. (Docket Entry 45 at 33-36.)

To survive a motion to dismiss a Section 10(b) claim, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs Inc.*, 551 U.S. at 321. Here, the required state of mind is scienter. *See id.* Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 319. "Raising a strong inference of scienter is no small burden." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 624 (4th Cir. 2008) (citing *Tellabs*, 551 U.S. at 323). "For an inference of scienter to be considered "strong," it must be "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Johnson*, 2009 WL 426235, at *13 (quoting *Tellabs*, 551 U.S. at 324). Negligence is not sufficient to prove scienter, instead a plaintiff must show intentional misconduct or recklessness that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Matrix Cap. Mgmt. Fund*, 576 F.3d at 181. Conclusory allegations that Defendants "knew or were reckless in not knowing" "do not raise a strong inference of conscious misbehavior or recklessness" and are "so broad and conclusory as to be meaningless." *Krim v. Coastal Physician Grp., Inc.*, 81 F. Supp. 2d 621, 632 (M.D.N.C. 1998), *aff'd*, 201 F.3d 436 (4th Cir. 1999) (internal quotation and citation omitted).

Here, Lead Plaintiff's Complaint alleges scienter based on Defendants' alleged knowledge of serious issues with PEDMARK's substance and product manufacturers.

28

(Compl. ¶¶ 99-101.) Plaintiff infers this knowledge from the fact that the FDA issued Fennec a Complete Response Letter on August 10, 2020, noting deficiencies with PEDMARK's product manufacturer. (*See id.* ¶ 101.) Lead Plaintiff claims that Defendants either had actual knowledge of these deficiencies prior to the FDA inspection or "recklessly failed to discover these deficiencies prior to the FDA inspection." (*Id.* ¶¶ 99-101.) To support his claim of recklessness, Lead Plaintiff alleges that Defendants would have uncovered the deficiencies "had Fennec conducted the necessary due diligence, a quality audit, and/or mock inspection of the facility." (*Id.* ¶ 101.)

In *In re Novan, Inc.*, a case from this Court, plaintiff-investors' Section 10(b) scienter allegations relied on the contention that pharmaceutical company-defendants should have monitored their drug's clinical trials more closely and alleged motive based on the defendants' efforts to raise capital during the company's initial public offering. 2018 WL 6732990, at *14. The Court held that this was not sufficient to plead scienter because "the facts as a whole more plausibly suggest that Defendants were acting innocently or negligently rather than deliberately misreporting material information or recklessly disregarding the truth." *Id.*; *but see Hirtenstein*, 348 F. Supp. 3d at 554 (quoting *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom. State Universities Ret. Sys. of Illinois v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009)) ("If the management knows that certain facts will necessarily prevent the regulatory approval or the marketing of the drug and conceals these facts from the investing public, then there is scienter. There is also scienter if the management is reckless in dealing with such adverse facts.").

29

Just like the plaintiff in *In re Novan*, Lead Plaintiff contends that Defendants had scienter based on Defendants' failure to more closely monitor PEDMARK's product manufacturer. Plaintiff asserts that because PEDMARK's product manufacturer eventually received a Complete Response Letter, Defendants should have been aware of the issues that would lead to the Complete Response Letter before the Complete Response Letter was issued. However, as in *In re Novan*, the facts as a whole more plausibly suggest that Defendants' failure to more closely monitor the product manufacturer was innocent or negligent. (*See* Compl. ¶ 89 (stating "Defendants either failed to conduct adequate due diligence into Fennec's third-party product manufacturer or, even worse, ignored the fact that its chosen manufacturer would *likely* not pass a pre-approval inspection") (emphasis added).) Thus, Lead Plaintiff's contention that Defendants had scienter based on a failure to more closely monitor elements that were later assessed by the FDA in their approval process fails.

Lead Plaintiff attempts to bolster his scienter argument with information from confidential witnesses employed at PEDMARK's substance manufacturer. (*Id.* ¶ 82.) First, the statements of the confidential witnesses only relate to one of Fennec's statements—that Fennec anticipated the release of PEDMARK in 2019. Second, Lead Plaintiff does not allege that any of the confidential witnesses communicated with Defendants about their concerns with PEDMARK's substance manufacturer and does not even allege that the confidential witnesses had any connection to Defendants. (*See id.*) Thus, the confidential witnesses' statements do not create a strong presumption that Defendants had scienter. *See In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 475 (M.D.N.C. 2004) (determining confidential witnesses do not support a strong inference of scienter where witnesses' statements require the court to

infer defendants' knowledge of facts alleged). Thus, to the extent that Lead Plaintiff used confidential witnesses to support the fact that Defendants knew or should have known that PEDMARK's substance manufacturer was not capable of large-scale commercial manufacturing, this argument fails.

Lead Plaintiff also claims that Defendants recklessly withheld this information, misleading investors, with the motive of raising capital (*see id.* ¶ 87), selling Fennec (*see id.* ¶ 98), and, for Defendants Raykov and Andrade, increasing their compensation (*see id.* ¶ 88). (*Id.* ¶ 101.) However, "the motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud." *Cozzarelli*, 549 F.3d at 627 (internal citation omitted); *see also Hirtenstein*, 348 F. Supp. 3d at 560-61 ("Every for-profit company is motivated by financial gain in our free enterprise system. Without more, Plaintiffs' allegations of motive and opportunity based on the company's need to raise capital are insufficient to establish a strong inference of scienter."). Here, Defendants' motives of raising capital and increasing compensation as alleged by Lead Plaintiff do not support a strong presumption of scienter as required by the PSLRA. The facts present here more plausibly suggest that Defendants were motivated by financial gain, not fraud. Thus, this argument fails.

For these reasons, Lead Plaintiff has not adequately pleaded a strong presumption of scienter and his claims under section 10(b) must be dismissed for failure to state a claim.

### iv. *Claims Against Defendants*

Defendants claim that Lead Plaintiff failed to state a claim against any director. (Docket Entry 41 at 34-35.) Because Lead Plaintiff has failed to sufficiently plead that Fennec's statements were materially misleading and failed to establish scienter, Lead Plaintiff has

necessarily failed to state a claim against any director under Section 10(b). *See In re Inspire Pharms., Inc. Sec. Litig.*, 515 F. Supp. 2d 631, 638-639 (M.D.N.C. 2007), *aff'd sub nom. Cozzarelli*, 549 F.3d 618 (quoting 15 U.S.C. § 78t(a)).

### c. Section 20(a) of the Exchange Act

Defendants also claim that Lead Plaintiff has failed to state a claim under section 20(a) of the Exchange Act. In his Complaint, Lead Plaintiff asserts that all Defendants, "by reason of their positions within Fennec" were controlling persons under section 20(a) and "had the power and influence to cause [Fennec] to engage in the unlawful conduct complained of herein." (Compl. ¶ 28.) Section 20(a) imposes liability on "every person who, directly or indirectly, controls any person liable under any provision of this this chapter," including Section 10(b). *In re Inspire Pharms., Inc. Sec. Litig.*, 515 F. Supp. 2d at 641 (quoting 15 U.S.C. § 78t(a)). Here, because Lead Plaintiff has failed to state a claim under section 10(b), Lead Plaintiff's 20(a) claims must also fail. *See Hirtenstein*, 248 F. Supp. 3d at 570.

32

## IV. CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that Defendants' motion requesting judicial notice (Docket Entry 43) be **GRANTED** to the extent that the Court considers Exhibits 4-5 and 7-15 in making a recommendation on the motion to dismiss and to the extent that the Court take judicial notice of Exhibit 6 and **DENIED** as to Exhibits 1-3.

**IT IS RECOMMENDED** that Defendants' motion to dismiss (Docket Entry 40) be **GRANTED** as to Lead Plaintiff's claims of securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5.

Joe L. Webster
United States Magistrate Judge

December 16, 2021
Durham, North Carolina

33