# EXHIBIT A

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF NORTH CAROLINA

JIM CHAPMAN, Individually and On Behalf of All Others Similarly Situated,

        Plaintiff,

    v.

FENNEC PHARMACEUTICALS INC., ROSTISLAV RAYKOV, ROBERT ANDRADE, CHRIS A. RALLIS, MARCO BRUGHERA, ADRIAN J. HAIGH, KHALID ISLAM, and JODI COOK,

        Defendants.

Case No. 1:20-cv-00812-UA-JLW

<u>CLASS ACTION</u>

<u>DEMAND FOR JURY TRIAL</u>

**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ............................................................................. 1

II.  JURISDICTION AND VENUE ...................................................................... 10

III.  PARTIES ........................................................................................................ 11

IV.  SUBSTANTIVE ALLEGATIONS ................................................................. 18

    A.  The FDA's New Drug Application, Generally ..................................... 18

        1.  Clinical Trials ............................................................................ 19

        2.  CMC Requirements and Manufacturing Changes ..................... 20

        3.  Pre-Submission Meeting with the FDA ..................................... 23

        4.  NDA Submission and Special Designation ............................... 24

        5.  NDA Review – Pre-Approval Inspection .................................. 27

    B.  Fennec and the Development of PEDMARK ....................................... 32

    C.  Defendants' Fraudulent Scheme to Hide Drug Substance and
        Production Manufacturing Deficiencies ............................................. 40

        1.  Unbeknownst to investors, Fennec's drug substance manufacturer
            was not capable of manufacturing PEDMARK for commercial use,
            which caused a lengthy delay. .................................................... 40

        2.  Unbeknownst to investors, there was a high risk that Fennec's drug
            product manufacturer would not pass FDA inspections, which would
            further delay FDA approval of PEDMARK. ............................ 46

            a.  Manufacturing according to cGMP standards is a critical
                component
                of gaining FDA approval. ................................................ 47

            b.  Fennec failed to ensure that its manufacturer would be able to
                successfully produce PEDMARK under cGMP standards... 50

V.  FALSE AND MISLEADING STATEMENTS DURING
    THE CLASS PERIOD ................................................................................. 67

VI.  LOSS CAUSATION ....................................................................................... 105

VII.  PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET .................. 112

VIII.  INAPPLICABILITY OF SAFE HARBOR .................................................... 114

IX.  CLASS ALLEGATIONS ............................................................................... 114

X.  CLAIMS FOR RELIEF ................................................................................. 117

    COUNT I ................................................................................................... 117

    COUNT II .................................................................................................. 120

XI.    PRAYER FOR RELIEF ........................................................................122

XII.    JURY TRIAL DEMANDED ................................................................122

I.    NATURE OF THE ACTION ..................................................................1

II.    JURISDICTION AND VENUE ............................................................10

III.    PARTIES ..............................................................................................11

IV.    SUBSTANTIVE ALLEGATIONS ......................................................18

    A.    The FDA's New Drug Application, Generally ...........................18

        1.    Clinical Trials ..................................................................19

        2.    CMC Requirements and Manufacturing Changes............20

        3.    Pre-Submission Meeting with the FDA ...........................23

        4.    NDA Submission and Special Designation ......................24

        5.    NDA Review – Pre-Approval Inspection ........................27

    B.    Fennec and the Development of PEDMARK ...........................32

    C.    Defendants' Fraudulent Scheme to Hide Manufacturing Deficiencies ........40

        1.    Unbeknownst to investors, Fennec's substance manufacturer was not capable of manufacturing PEDMARK for commercial use and thus did not have the FDA-required stability data.....................40

        2.    Unbeknownst to investors, Fennec's product manufacturer was not cGMP-compliant as required by the FDA................................46

            a.    Manufacturing according to cGMP standards is a critical component of gaining FDA approval. ..................................47

            b.    Fennec failed to ensure that its product manufacturer would be able to successfully produce PEDMARK under cGMP standards. ...........................................................................50

            d.    Instead of investing in R&D, Defendants were lining their own pockets. ..........................................................67

V.    MATERIALLY MISLEADING STATEMENTS DURING THE CLASS PERIOD…….. ...............................................................................72

VI.    ADDITIONAL ALLEGATIONS OF SCIENTER ..............................92

    A.    PEDMARK Was Fennec's Only Potential Revenue Source......92

    B.    Defendants Knew Compliance with cGMP was Critical ...........93

    C.    Defendants Touted Their Close Relationship with the FDA and PII. ..........97

    D.    That Fennec Had Sufficient Cash to Develop and Commercialize PEDMARK was Key to Investors and Analysts .........................98

E. The Individual Defendants Had Access To and Responsibility for the Due Diligence of Fennec's Manufacturers and Thus Were Aware of, or Reckless to, Their Shortcomings.................................................................100

1. The Individual Defendants Were Knowledgeable About Fennec's Substance Manufacturer: Avista ....................................................101

2. The Individual Defendants Were Knowledgeable About Fennec's Product Manufacturer: PII ............................................................103

VII. LOSS CAUSATION ................................................................................105

VIII. PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET ...................112

IX. INAPPLICABILITY OF SAFE HARBOR ...................................................114

X. CLASS ALLEGATIONS...........................................................................114

XI. CLAIMS FOR RELIEF ...........................................................................117

COUNT I...............................................................................................117

COUNT II .............................................................................................120

XII. PRAYER FOR RELIEF...........................................................................122

XIII. JURY TRIAL DEMANDED ....................................................................122

Lead Plaintiff Daniel Malakoti ("Lead Plaintiff" or "Mr. Malakoti"), by and through his attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to his own acts and on information and belief as to all other matters. Lead Plaintiff bases this information and belief on, among other things, the investigation conducted by his counsel, which includes a review and analysis of: United States Securities and Exchange Commission ("SEC") filings by Fennec Pharmaceuticals Inc. ("Fennec" or the "Company"); press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning Fennec; independent factual sources, including individuals formerly employed by the Company and related third-party companies; and other publicly available information. Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to Defendants or are exclusively within their custody or control. Lead Plaintiff's investigation indicates substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.       NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of a class ("Class") consisting of all persons and entities that purchased or otherwise acquired Fennec securities between December 20, 2018 and ~~August 10, 2020~~November 28, 2021, inclusive (the "Class Period"), against Fennec, and corporate insiders Rostislav Raykov ("Raykov"), Robert Andrade ("Andrade"), Chris A. Rallis ("Rallis"), Marco Brughera ("Brughera"), Adrian J. Haigh ("Haigh"), Khalid Islam ("Islam"), and Jodi Cook ("Cook") (collectively, "Individual Defendants") (together with Fennec, "Defendants"), pursuing remedies under

1

§§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder. These claims are asserted against Defendants who, during the Class Period, participated in the drafting, preparation, and/or approval of the various public reports and other communications and filings with the SEC and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially ~~false and~~ misleading nature, employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct that operated as a fraud or deceit upon Mr. Malakoti and other members of the Class.

2.      In particular, Defendants misled investors concerning Fennec's ability to achieve approval from the United States Food and Drug Administration ("FDA") for its New Drug Application ("NDA") for PEDMARK™ ("PEDMARK" or the "Drug") by knowingly failing to disclose material deficiencies related to its two third-party drug manufacturers, which resulted in: (1) a March 2019 delay of the NDA submission and commercial launch because of a necessary drug substance manufacturing site change; and (2) the August 2020 denial of the NDA by the FDA and another delay in the commercial launch due to manufacturing deficiencies at the drug product manufacturing facility.~~[1]~~; and (3) the November 2021 denial of the NDA by the FDA and yet another delay in the commercial launch due to manufacturing deficiencies at the *same* drug product manufacturing facility.

---

[1] ~~A drug substance consists of the raw drug materials that are required to be mixed with other components to make a drug; drug production, on the other hand, refers to the finished product of a drug that is available in the market and is ready for use.~~

2

3. Specifically, Fennec is a biopharmaceutical company solely focused on the development of PEDMARK, a unique formulation of Sodium Thiosulfate ("STS") for the prevention of ototoxicity (ear poisoning) induced by cisplatin chemotherapy in pediatric patients with localized, non-metastatic, solid tumors.

4. On the first day of the Class Period, December 20, 2018, Fennec issued a press release announcing that it had initiated a rolling NDA to the FDA for PEDMARK and was "targeting ***U.S. approval of PEDMARK*** *in the second half of 2019*."[2] Fennec did not manufacture PEDMARK itself, and ~~it did not disclose~~would have to ~~investors which~~contract with one or more third-party ~~manufacturer it was using~~manufacturers to ~~manufacture its drug~~do so.

5. ~~Subsequent~~Manufacturers of pharmaceuticals are subject to rigorous regulations and standards. As such, Fennec needed to be hyper-sensitive to quality control and manufacturing issues with any third-party manufacturer with whom it chose to contract to make its drug. Manufacturing issues will cause delays in FDA approval, which will, in turn, negatively impact a company's expected sales and, if investors are caught unaware, the company's stock price.

6. Fennec has never disclosed to investors the number or identities of the third-party manufacturer(s) it was using. Through investigation, it has ~~revealed~~been determined that, Fennec contracted with two different manufacturers at the time of its December 2018 ~~press release, Fennec was using~~Press Release. One that had multiple serious, repeated and

---

[2] Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

uncorrected, deficiencies identified in prior inspections by the FDA and British and European regulatory agencies and three drug recalls just since its 2018 FDA inspection. The other was unable to commercially manufacture PEDMARK and was being acquired months before the Class Period, thus necessitating a manufacturing site change that delayed FDA approval. Fennec had contracted with Avista Pharma Solutions, Inc. ("Avista") to manufacturebe the drug substance for PEDMARK. Nonemanufacturer and Pharmaceutics International, Inc. ("PII") to be the drug product manufacturer for PEDMARK.

7.      At the time of its December 2018 press release, none of Avista's facilities hashave ever been capable of large-scale commercial drug manufacturing. However, pursuantThus, to establish sufficient data for submission and ultimate NDA approval, PEDMARK would need to be manufactured at a different site. Additionally, and undisclosed to investors, the previous month it had been announced that Avista was in the process of being acquired.

5.8.    Pursuant to FDA requirements, in order to receive approval, an NDA must provide detailed information about the manufacturer's standard and practices, including long-term manufacturing stability data (up to six months), from the facility manufacturing PEDMARK for commercial use. Thus, Fennec knew or should have knownrecklessly disregarded that it would have to manufacture PEDMARK for commercial use at yet *another* site. As such, Fennec did not have the necessary stability data at the time it initiated its rolling submission of the PEDMARK NDA nor did Fennec know when it would be able to obtain such data because Avista was in the process of being acquired by Cambrex Corporation ("Cambrex"), who publicly announced the deal in November 2018. In short,

4

while Fennec told investors that it was targeting the "second half of 2019" for approval of PEDMARK, it did not have, nor could it have had, a reasonable basis for this publicly announced target due to its use of Avista as its drug substance manufacturer.

6.9.   On March 13, 2019, before the markets opened, Fennec revealed to investors in a press release that "the drug substance manufacturer for PEDMARK™ [Avista] was recently acquired requiring a site transition for the commercial manufacturing site." This would delay the full submission of the PEDMARK NDA to the FDA by at least six months and the commercial launch by at least a year. Even though Fennec was now "expect[ing] a first *commercial launch for PEDMARK™ in the second half of 2020*," it assured investors that "[t]he *new facility* of the acquiring company *has large scale commercial capabilities and a proven and extensive track record of successful FDA inspections and product launches*." On this news of the lengthy delay, which would obviously impact the Company's projected sales, the Company's stock price fell over 14% to close at $5.83 on March 14, 2019, after two days of heavy trading.

7.10.   Fennec did not tell investors then (and still has not) what company was manufacturing PEDMARK. Nonetheless, rather than letting investors conduct their own due diligence by releasing the name of this new manufacturer or any other manufacturer, from March 13, 2019 through to the end of the Class Period, Defendants secreted that information and continued to mislead investors about the strength of their ability to manufacture PEDMARK. Fennec told investors that there would be no other manufacturing-related delays as Fennec transitioned "to becoming a commercial-stage organization" by, *inter alia*, confirming that its mysterious manufacturers had

5

"*successfully* manufactured PEDMARK." And Fennec assured investors that they were "*well underway* with commercialization readiness activities" and had "*made solid progress* in … the preparation and execution of [the Company's] commercial readiness plan" for the commercial launch of PEDMARK. Such activities and preparations included "working closely with the FDA" to obtain regulatory approval and ensuring the successful manufacturing of PEDMARK for commercial use so that it gets "to patients in need as quickly as possible" upon approval. As such, that Fennec disclosed increased Research & Development expenses ("R&D") leading up to the NDA submissions made sense.

8.11. These statements made by Fennec were falsemisleading. In short, *manufacturing* deficiencies prevented FDA approval of PEDMARK and caused yet another commercial launch delay. The Company's third-party drug product manufacturing facility did not, in fact, comply with current Good Manufacturing Practices ("cGMP") and those deficiencies resulted in the issuance of a Form 483 from the FDA, which is sent to facility management at the conclusion of an inspection when an FDA investigator has observed conditions that may constitute violations of the Food, Drug & Cosmetic Act (the "FDCA"). In short, manufacturing deficiencies prevented FDA approval of PEDMARK and caused yet another commercial launch delay. Instead of investing in R&D as they were telling investors, Defendants were lining their own pockets. Compounding the issue was the fact that investors had no visibility into who Fennec had contracted with to manufacture PEDMARK and whether the manufacturer(s) had prior FDA inspection issues. The *only* information available to investors during the Class Period was Defendants' misleading positive statements about the Company's manufacturing success and, preparedness for

6

commercialization, and investment in R&D. As a result, Fennec's stock continued to trade at artificially inflated levels throughout the Class Period.

12. From the beginning of the Class Period, PII was a manufacturer with a history of multiple serious deficiencies identified in prior FDA inspections, of inadequate corrective measures after deficiencies were identified, and involving three drug recalls just since its 2018 FDA inspection. Defendants either failed to conduct adequate due diligence into Fennec's third-party product manufacturer or, even worse, ignored the fact that its chosen manufacturer would not be able to receive FDA approval for manufacturing.

9.13. While Fennec stock was trading at an all-time high in anticipation of FDA approval, the Company issued a press release before the markets opened on August 11, 2020, announcing that iton the previous day, the Company had received a Complete Response Letter ("CRL")[3] from the FDA the day before.rejecting the NDA for reasons relating to its unnamed product manufacturing facility (PII).[4] Instead of FDA approval, the press release stated that "after recent completion of a pre-approval inspection of the manufacturing facility of our drug product manufacturer, the FDA identified deficiencies

---

[3] The FDA sends a pharmaceutical company a CRL if the agency determines that it will not approve the company's NDA in its present form.

[4] A Complete Response Letter (CRL) is sent by the FDA to a pharmaceutical company if the agency determines that it will not approve the company's NDA in its present form. *Fennec Pharmaceuticals Receives Complete Response Letter From the FDA For Its New Drug Application For Pedmark™ To Prevent Ototoxicity Associated With Cisplatin In Pediatric Patients With Localized, Non-Metastatic, Solid Tumors,* FENNEC PHARMACEUTICALS, INC. (Aug. 11, 2020), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-receives-complete-response-letter-fda-its.

resulting in a Form 483, which is a list of conditions or practices that are required to be resolved prior to the approval of PEDMARK™." Plainly stated, Fennec's manufacturer had failed inspection, and approval of PEDMARK would be delayed. On this news, the Company's stock price plummeted over *44%* to close at $5.67 on August 13, 2020, after three days of heavy trading.

10. Since then, the Company has continued its obfuscation. While the Company has participated in meetings with the FDA to discuss a path forward for resubmitting the NDA, and has spent $1.4 million in Research and Development ("R&D") (an increase of $573,000 over the same period in 2019, which the Company attributed to increased activities "after the CRL from the FDA related to manufacturing and regulatory"), Fennec has failed to provide any more detail to investors on when to expect resubmission; it has also not announced a new target date for the commercial launch of PEDMARK.

14. At the same time, Defendant Raykov specifically assured investors that "[w]e will work closely with our manufacturer and the FDA to fully address the issues raised in the letter as expeditiously as possible." *Id*. Defendants thus gave investors the impression that they were on top of the issues and getting them resolved quickly. Defendants provided the same narrative for the rest of the Class Period.

15. On May 28, 2021, the Company resubmitted its NDA for PEDMARK, which the FDA accepted on June 22, 2021. At no time did Defendants raise any potential issues with the resubmission. As a result, analysts and investors alike believed that Fennec had resolved the deficiencies at its product manufacturer's (PII's) facility. As noted by Seeking Alpha on June 24, 2021, "[a]ll that was needed was time to clear up the manufacturing site

8

issues[,]"[5] and on July 29, 2021, "Fennec and its contract manufacturer should easily have addressed [the manufacturing-related issues] by now."[6]

16.　But before markets opened on November 29, 2021, Fennec announced that it expected to receive another CRL from the FDA regarding its PEDMARK NDA based on deficiencies identified at the PII manufacturing facility *again* during the redo of the "pre-approval inspection of the manufacturing facility of drug product manufacturer."[7]

17.　Then, on November 30, 2021, Fennec confirmed that it had received a CRL from the FDA, which "was issued as a result of identified manufacturing deficiencies which need to be satisfactorily resolved before the Pedmark NDA can be approved."[8] In addition, Defendant Raykov noted that while Fennec "[w]ill work closely with [its] current manufacturer as well as the FDA to fully address the issues raised in the letter[,] we

---

[5] *Fennec Pharmaceuticals: The PEDMARK NDA Has Been Accepted, We Remain Bullish On The November PDUFA Catalyst*, SEEKING ALPHA (June 24, 2021 06:00 PM ET), https://seekingalpha.com/article/4436487-fennec-pharmaceuticals-the-pedmark-nda-has-been-accepted-we-remain-bullish-on-the-november-pdufa-catalyst.

[6] Andy Jones, *Fennec Could See Upside If Pedmark Gets Approved*, SEEKING ALPHA (July 29, 2021 06:02 PM ET), https://seekingalpha.com/article/4442781-fennec-stock-could-see-upside-if-pedmark-gets-approved.

[7] *Fennec Pharmaceuticals Expects to Receive Complete Response Letter from the FDA for its New Drug Application for PEDMARK™ to Prevent Ototoxicity Associated with Cisplatin in Pediatric Patients with Localized, Non-Metastatic, Solid Tumors*, FENNEC PHARMACEUTICALS, INC. (Nov. 29, 2021), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-expects-receive-complete-response-letter.

[8] *Fennec Pharmaceuticals Receives Complete Response Letter From the FDA for Its New Drug Application for Pedmark™ to Prevent Ototoxicity Associated With Cisplatin in Pediatric Patients With Localized, Non-Metastatic, Solid Tumors*, FENNEC PHARMACEUTICALS, INC. (Nov. 30, 2021), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-receives-complete-response-letter-fda-0.

9

continue to advance our second drug product manufacturing facility." *Id.*

18. As a result of the news on November 29 and 30, 2021, the Company's stock price plummeted over *59%* to close at $3.89 on December 1, after three days of heavy trading.

~~11.~~19. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Fennec securities, Mr. Malakoti and the other members of the Class have suffered significant losses and damages.

## ~~II.~~I.   JURISDICTION AND VENUE

~~12.~~20. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

~~13.~~21. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

~~14.~~22. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially ~~false and/or~~ misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

~~15.~~23. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the

10

facilities of a national securities exchange.

## ~~III.~~I.  PARTIES

~~16.~~24. Lead Plaintiff Daniel Malakoti was appointed to serve as Lead Plaintiff in this Action by Order of this Court dated December 3, 2020 (ECF No. 25). As set forth in his shareholder certification (ECF No. 19-1), which is incorporated by reference herein, Mr. Malakoti purchased Fennec securities at artificially inflated prices during the Class Period and suffered economic losses when true facts about the Company's business operations and future prospects were disclosed and the artificial inflation was removed from the price of Fennec securities.

~~17.~~25. Defendant Fennec, incorporated under the laws of British Columbia, Canada, has its principal executive offices in Research Triangle Park, North Carolina. Fennec's common stock trades on the NASDAQ exchange under the symbol "FENC."

~~18.~~26.  Defendant Raykov was, at all relevant times, a director and Fennec's Chief Executive Officer ("CEO"). Prior to Fennec, he was the co-founder and portfolio manager for Alchem Investment Partners ("Alchem"), an event driven hedge fund, and DCML LLC ("DCML"), a private investment partnership. Prior to founding Alchem and DCML, he was a portfolio manager and securities analyst for John A. Levin & Co., an event driven fund (2002-2005), a securities analyst for the Merger Fund at Tiedemann Investment Group (1999-2002), and an investment banking analyst at Bear Stearns (1998-1999). Mr. Raykov earned a B.S. in Business Administration from the University of North Carolina at Chapel Hill. Due to Mr. Raykov's financial expertise and experience with the Company as it has developed within the drug development industry, Fennec's SEC filings tout that he is able

to provide the Company with unique insight and guidance.

19.27. Defendant Andrade was, at all relevant times, Fennec's Chief Financial Officer ("CFO"). Prior to Fennec, he was the co-founder and General Partner at DCML. Prior to founding DCML, he was a portfolio manager and securities analyst for Millennium Partners L.P. (2006-2007), a securities analyst for the event driven fund at Caxton Associates, LLC (2003-2005), a private equity associate at Trimaran Capital Partners (2000-2003), and an investment banking analyst at Bear Stearns (1997-1999). Mr. Andrade earned an M.A. and B.A. in Economics from the University of Southern California.

20.28. Defendant Islam, at all relevant times, was the Chairman of Fennec's Board of Directors ("Board"), and a member of its Audit Committee. Previously, as CEO and Chairman of Gentium S.p.A. ("Gentium") (2009-2014), he led its transition from a loss-making company to be cash-flow positive and profitable, increasing its value from $25 million to a successful all cash $1 billion merger with Jazz Pharmaceuticals, PLC ("Jazz"). Since the sale of Gentium, he has been involved on both an advisory and Board level in several public and private healthcare related companies. He is Board Chair of Minoryx Therapeutics (Spain) and Gain Therapeutics (Switzerland), and on the boards of Karolinska Development (Sweden), OxThera (Sweden), MolMed S.p.A. (Italy), and Immunomedics Inc. (IMMU). In the past, he has served as Board Chairman of Pcovery Aps (Copenhagen), Adenium Aps (Copenhagen), and C10 Pharma AS (Oslo). He was also President and CEO of Arpida AG, from 1999 to 2008, during which time he transitioned it from an early-stage start-up to a SWX-listed company and raised $300 million in an initial public offering and follow-ons. Prior to Arpida AG, he held various positions in HMR & MMD (now Sanofi-

12

Aventis) (1987-1999), worked in academia at Imperial College (University of London) and Milan University (1977-1987), and is a founder/co-founder of Sirius Healthcare Partners GmbH (Zurich), PrevAbr LLC (D.C.), BioAim LLC (L.A.), and Life Sciences Management GmbH (Zug). He holds several patents, has published over 80 articles in leading journals, is an advisor to the venture group Kurma Biofund in Paris, is a graduate of Chelsea College and received his Ph.D. from Imperial College, University of London. Fennec touts in its SEC filings that Dr. Islam's extensive international pharmaceutical expertise in transitioning companies from development to production strengthened the Board's collective qualifications, skills and experience.

21.29. Defendant Rallis, at all relevant times, was a director of Fennec and a member of its Audit and Compensation Committees. In addition, he has been an executive-in-residence at Pappas Capital, a life science venture capital firm since January 2008, was the President and CEO of ImmunoBiosciences, Inc. ("IBI"), a vaccine technology company, from April 2006 to June 2007, and previously served as a consultant for Duke University and Panacos Pharmaceuticals, Inc. He also previously served as Executive Vice President ("EVP"), Business Development and General Counsel before being promoted to President, Chief Operating Officer ("COO") and Director of Triangle Pharmaceuticals, Inc. ("Triangle") prior to its acquisition by Gilead Sciences in 2003. While at Triangle, he participated in 11 equity financings, generating gross proceeds of approximately $500 million, and was primarily responsible for all business development activities, which included a worldwide alliance with Abbott Laboratories and the in-licensing of ten compounds. Before joining Triangle in 1995, he served in various business development

and legal management roles with Burroughs Wellcome Co., including Vice President ("VP") of Strategic Planning and Business Development, and served on the boards of biopharmaceutical companies, Aeolus Pharmaceuticals and Tenax Therapeutics, Inc. Mr. Rallis received his A.B. degree in Economics from Harvard College and a J.D. from Duke University. As touted in Fennec's SEC filings, as a result of his professional achievements, Mr. Rallis possessed particular healthcare industry knowledge and expertise which strengthened the Board's collective qualifications, skills, and experience.

22.30. Defendant Brughera, at all relevant times, was a director of Fennec and serves as a member of its Compensation Committee. In addition, since January 2011, he has been CEO of Lediant Biosciences S.p.A. and has held several positions for the Sigma-Tau Group, including CEO, Global Head of Sigma Tau Rare Disease, and President of Sigma-Tau Research and Sigma-Tau Pharmaceuticals. He drove the commercial revival of a lead oncology product line leading to its successful sale for around $900M and successfully out-licensed the Defibrotide U.S. rights to Jazz. From 2004 to 2010, he served as VP of Preclinical Development at Nerviano Medical Sciences ("NMS"), a pharmaceutical oncology-focused integrated discovery and development company, and as the Managing Director at Accelera, an independent contract research organization with the NMS Group. Previously, he held senior level positions in research and development with Pharmacia and Pfizer (1999-2004) and various positions at Pharmacia & Upjohn and Farmitalia Carlo Erba SpA, an Italian pharmaceutical company (pre-1999). He currently serves on the Board of Solgenix and Lee's Pharmaceutical, and until early 2014, the Board of Gentium SpA. Dr. Brughera earned his degree in veterinary medicine from the

14

University of Milan and is a European Registered Toxicologist. Fennec touts in its SEC filings that, Defendant Brughera's wide-spread experience and knowledge of pharmaceutical drug development, specifically in international companies, deepens the Board's collective qualifications, skills and experience.

23.31. Defendant Haigh, at all relevant times, was a director of Fennec and a member of its Governance Committee. In addition, he has been a director at Arch Biopartners Inc. since August 2014 and a Senior Vice President ("SVP") and General Manager of EMEA Region and Asia Pacific at PTC Therapeutics, Inc. since September 2014. Previously, he served as SVP, Chief Commercial Operations ("CCO") and COO of Gentium GmbH; Regional VP and CCO at Biogen Idec.; General Manager of Amgen Nordis and Portugal; and EVP of Global Marketing and Corporate Planning at EUSA Pharma, where he led the international oncology franchise. He has also held senior commercial and marketing positions at SmithKline Beecham, Schering Plough, Organon and Novo Nordisk. Mr. Haigh received a B.A. with Honors in Economic History from Huddersfield Polytechnic, West Yorkshire, England and a Diploma in Marketing from the Institute of Marketing. Fennec touts in its SEC filings that, as a result of his professional experiences, Mr. Haigh has extensive international oncology development expertise which strengthens the Board's collective qualifications, skills and experience.

24.32. Defendant Cook was a director of Fennec beginning in September 2019 and serves as a member of its Compensation and Governance Committees. She currently serves as Head of Gene Therapy Strategy at PTC Therapeutics, Inc. ("PTC"), a global biopharmaceutical company focused on developing and commercializing clinically

15

differentiated medicines for patients with rare disorders. As a founding member and COO of Agilis Biotherapeutics, a clinical-stage company focused on gene therapies for patients with rare diseases, she had led its sale to PTC. Previously, she was an Assistant Professor of Audiology and Director of the Hearing Aid Program at Mayo Clinic and has held executive positions at a number of biotech start-ups within the hearing industry. Fennec touts in its SEC filings that Dr. Cook's extensive scientific, clinical and executive business experience deepened the Board's collective qualifications, skills and experience.

25.33. The Individual Defendants, because of their positions with the Company, had access to non-public information about the Company's business operations and prospects, financial condition, markets, and meetings and communications with the FDA and/or third-parties *via* access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and *via* reports and other information provided to them in connection therewith. Because of the Individual Defendants professional achievements, education, and relevant industry expertise, the Individual Defendants were aware of regulatory requirements and had access to industry standards and protocols. Indeed, Defendant Andrade publicly stated in April 2019 that as part of its "lean and mean" structure of three employees, the Company "***leaned heavily on its board of directors, who remain[ed] intimately involved***."[9]

---

[9] Seth Thomas Gulledge, *This $90M public company is "set up" for sale, CFO says*, AMERICAN CITY BUSINESS JOURNALS (Apr. 25, 2019, 2:30 PM EDT), https://www.bizjournals.com/triangle/news/2019/04/25/this-90m-public-company-is-set-up-for-sale-cfo.html.

26.34. As such, the Individual Defendants had access to material adverse non-public information concerning Fennec's ability to achieve approval from the FDA for its PEDMARK NDA and the quality and capabilities of its third-party drug manufacturers, as discussed in detail below. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

27.35. The Individual Defendants are liable as direct participants in the wrongs complained of herein. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Each of the Individual Defendants had access to the adverse undisclosed information about Fennec's ability to achieve approval from the FDA for its PEDMARK NDA and the quality and capabilities of its third-party drug manufacturers as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about Fennec and its business, which were issued or adopted by the Company, materially false and misleading.

28.36. In addition, the Individual Defendants, by reason of their positions with Fennec, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Fennec's business.

29.37. As control persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Fennec's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Fennec's securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions of material facts during the Class Period violated these specific requirements and obligations.

30.38. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Fennec's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public concerning the Company's ability to gain approval from the FDA for its PEDMARK NDA and the quality and capabilities of its third-party drug manufacturers, causing Lead Plaintiff and other members of the Class to purchase Fennec common stock at artificially inflated prices.

## IV.I. SUBSTANTIVE ALLEGATIONS

### A. The FDA's New Drug Application, Generally

31.39. Enacted in 1938, the Food, Drug and Cosmetic Act (("FDCA)") created the FDA, an agency of the United States Department of Health and Human Services, to "protect the public health" by ensuring that "drugs are safe and effective." 21 U.S.C. §

18

393(b)(2)(B). The FDCA provides that "[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to [this section] is effective with respect to such drug." 21 U.S.C. § 355(a).

~~32.~~40. Accordingly, new pharmaceutical drugs, such as PEDMARK, must receive FDA approval prior to sale, marketing, and commercial distribution in the United States. Drug sponsors/applicants, such as Fennec, seek approval from the FDA through the FDA's New Drug Application (NDA) process. The NDA process has been designed to provide information to permit the FDA to determine whether: (i) the drug is safe and effective in its proposed use(s), and the benefits of the drug outweigh the risks; (ii) the drug's proposed labeling (package insert) is appropriate, and what it should contain; and (iii) the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality and purity.[10]

### 1. Clinical Trials

~~33.~~41. The NDA process includes adequate and well-controlled human clinical trials to establish the efficacy of the drug for each indication. 21 C.F.R. § 314.126.

~~34.~~ Clinical trials involve the administration of the drug to human subjects under the supervision of qualified clinical investigators.[11] Clinical trials are conducted under

---

[10] U.S. FOOD & DRUG ADMIN., NEW DRUG APPLICATION (NDA) ("FDA NDA") (June 10, 2019), https://www.fda.gov/drugs/types-applications/new-drug-application-nda.
[11] ~~U.S. FOOD & DRUG ADMIN., WHAT ARE THE DIFFERENT TYPES OF CLINICAL RESEARCH? (Jan. 4, 2018), https://www.fda.gov/patients/clinical-trials-what-patients-need-know/what-are-different-types-clinical-research.~~ U.S. FOOD & DRUG ADMIN., THE DRUG DEVELOPMENT PROCESS (Jan. 4, 2018), https://www.fda.gov/patients/learn-about-drug-and-device-approvals/drug-development-process.

19

protocols detailing the objectives of the study, the parameters used in monitoring safety, and the effectiveness criteria to be evaluated. Each clinical trial protocol must be submitted to the FDA for clearance. Clinical trials are typically conducted in four sequential phases~~:~~

- **~~Phase I~~** ~~involves researchers testing an experimental drug or treatment in a small group of people for the first time. The researchers evaluate the treatment's safety, determine a safe dosage range, and identify side effects.~~

- **~~Phase II~~** ~~involves the experimental drug or treatment being given to a larger group of people to see if it is effective and to further evaluate its safety.~~

- **~~Phase III~~** ~~involves the experimental drug or treatment being given to large groups of people. Researchers confirm its effectiveness, monitor side effects, compare it to commonly used treatments, and collect information that will allow the experimental drug or treatment to be used safely.~~

- **~~Phase IV~~** ~~involves post-marketing studies, conducted after a drug or treatment is approved for use by the FDA, which provide additional information, including the treatment or drug's risks, benefits, and best use.~~

~~35.~~42. . *Id.* Once the required clinical testing is successfully completed, the results of the preclinical and clinical studies are submitted to the FDA as part of an NDA. *Id.*

### 2. *CMC Requirements and Manufacturing Changes*

~~36.~~43. Chemistry, Manufacturing and Controls ("CMC") is an integral part of any pharmaceutical NDA submitted to the FDA. CMC applies to the entire product lifecycle – beginning during Phase I clinical trials, continuing through post-approval and beyond. CMC ensures that pharmaceutical drug products are consistently effective, safe and high quality for consumers. It sustains a connection between the drug that is used in clinical studies and the commercial drug that is marketed and available to consumers. CMC applies to both the drug itself and the facility in which the drug is being manufactured.

~~37.~~44. A sponsor or manufacturer may choose to make changes during the drug

development process, such as a new manufacturing site, ~~formulation, purification column, equipment, or components,~~ however, when changes are made to the manufacturing process, the sponsor and/or manufacturer must demonstrate that the changes will not have an adverse impact on the quality, safety, and efficacy of the drug product.[12]

~~38.~~45. For example, manufacturing changes due to a site-transfer requires additional site-specific stability data ("SSS data"). To determine the amount of SSS data needed, the potential for an adverse impact is assessed on a three-tiered risk-based system, examining the timing of the change, the drug substance makeup and the drug product form. *Id*.

~~39.~~46. First, a manufacturing change due to site-transfer is ranked as having *major* potential to have an adverse effect on the drug substance/product stability occurs when: (i) ***the change is at submission (prior to the NDA filing)***; (ii) the form or particle size of the drug substance is critical to the performance of the drug product; or (iii) the drug product composition consists of modified release solid oral dosage forms, sterile lyophilized powders, liposomal formulations, meter-dosed inhalers, dry-powder inhalers, or transdermal patches. The amount of SSS data needed in these circumstances could take anywhere from 3 to 12 months to produce. *Id*.

~~40.~~47. Second, the FDA ranks manufacturing changes due to site-transfer as having *moderate* potential to have an adverse effect on the drug substance/product stability when: (i) the change occurs at a midpoint in the NDA review cycle; (ii) the drug substance is

---

[12] U.S. FOOD & DRUG ADMIN., CHANGES TO AN APPROVED NDA OR ANDA - GUIDANCE FOR INDUSTRY (April 2004), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/changes-approved-nda-or-anda.

susceptible to manufacturing conditions, technology or site transfer ~~(*e.g.* biotechnology/biological products; environmentally sensitive substances);~~ or (iii) the drug product composition consists of solid oral dosage forms where the drug substance has low solubility, suspensions, semisolids, sterile solutions (including nasal, ophthalmic, topical solutions), sterile powders, or drug products containing drug substances susceptible to manufacturing conditions. The amount of SSS data needed in these circumstances would likely take about 3 months to produce. *Id.*

~~41.~~48. Third, the FDA ranks manufacturing changes due to site-transfer as having *minor* potential to have an adverse effect on the drug substance/product stability when: (i) the change occurs post-approval in the Annual Report; (ii) the drug substance is any other substance not listed; or (iii) the drug product composition consists of solid oral dosage forms where the drug substance has high solubility, non-sterile solutions, powders for oral solution or suspension. Such circumstances do not call for any additional data other than the standard stability commitment. *Id.*

~~42.~~49. In order to assemble the necessary SSS data, the sponsor and/or manufacturer must conduct a comparability or bridge study to show that drug substance and/or drug product affected by the change, when studied side-by-side in a well-controlled study, is consistent with what has been produced throughout the development program, *i.e.* clinical trials. This requires the sponsor to compare post-change product to pre-change product following manufacturing process changes; and assessing the impact of observed difference in the quality attributes caused by the manufacturing process change for a given product as it relates to safety and efficacy of the product. *Id.*

43.50. The demonstration of comparability does not require the quality attributes of the pre-change and post-change drug product to be identical, but to be highly similar, and that the existing knowledge is sufficiently predictive to ensure that any difference in quality attributes have no adverse impact on the safety and efficacy of the drug product. *Id.*

44.51. A determination of comparability can be based on a combination of analytical testing, assays, and in some cases, nonclinical and clinical data. If a sponsor and/or manufacturer can provide assurance of comparability through analytical studies alone, nonclinical or clinical studies with the post-change product is not required. However, where the relationship between specific quality attributes and safety and efficacy has not been established, and differences between quality attributes of the pre- and post-change product are observed, it might be appropriate to include a combination of quality, nonclinical and/or clinical studies in the comparability exercise. *Id.*

### 3. Pre-Submission Meeting with the FDA

45.52. Prior to submitting an NDA filing, the FDA will conduct a pre-submission meeting with the sponsor to discuss possible filing and format issues.[13] Typically, a pre-submission meeting will be held 6 months prior to the planned NDA submission date.

46.53. As part of the pre-submission meeting, the CMC review team will meet with the sponsor to ensure the submission of a well-organized and complete NDA. Examples of CMC issues that could be addressed in the pre-submission meeting include, but are limited

---

[13] U.S. DEPT. OF HEALTH AND HUMAN SERVICES, GUIDANCE FOR INDUSTRY (May 2001), https://www.fda.gov/files/Guidance-for-Industry---IND-Meetings-for-Human-Drugs-and-Biologics---Chemistry—Manufacturing—and-Controls-Information-%28PDF%29.pdf.

to: (i) discussion of the relationship between the manufacturing, formulation, and packaging of the drug product used in the Phase III studies and the final drug product intended for marketing, and assurance that any previously agreed upon comparability or bridging studies have been appropriately completed; (ii) assurance that the submission will contain adequate stability data in accordance with stability protocols agreed upon previously in meetings with the FDA; (iii) confirmation that all facilities (*e.g.*, manufacturing, testing, packaging) will be ready for inspection by the time of the NDA submission; and (iv) identification of any other issues, potential problems, or regulatory issues that should be brought to the attention of the FDA or sponsor. *Id*.

### 4. *NDA Submission and Special Designation*

47. 54. After successful completion of the required clinical testing, the preclinical study and clinical trial results are submitted to the FDA as part of an NDA to support approval to market a drug for one or more indications, along with detailed information regarding the drug or treatment's CMC and proposed labeling, among other things.

48. 55. The FDA must conduct a preliminary review of an NDA within 60 days after submission to determine whether it is sufficiently complete to permit a substantive review. If the FDA accepts the NDA for filing, it begins the substantive review process, reviewing the NDA to determine, among other things, whether the drug is safe and effective for its intended use and whether the facility in which it is manufactured, processes, packaged or held meets standards designed to assure the product's continued safety, quality and purity.

56. In 1992, under the Prescription Drug User Fee Act ("PDUFA"), the FDA agreed to specific goals for improving the drug review time and created a two-tiered system

of review times – Standard Review and Priority Review.[14] ~~Typically~~

49.57. Under the Standard Review, the NDA review process does not begin until a drug sponsor submits a full application to the FDA. However, because expediting the availability of drugs that treat serious diseases is in the public interest, particularly when a drug is the first available treatment or has advantages over existing treatments, the FDA developed four distinct approaches to making such drugs available as quickly as possible: (i) Priority Review; (ii) Fast Track; (iii) Breakthrough Therapy; ~~(iii~~and (iv) Accelerated Approval~~; and (iv) Fast Track~~.[15]

50.58. ~~In 1992, under the Prescription Drug User Fee Act ("PDUFA"), the FDA agreed to specific goals for improving the drug review time and created a two-tiered system of review times – Standard Review and Priority Review.[16]~~ ~~A Priority Review designation means the FDA's goal is to take action on an application within 6 months (versus 10 months for standard review).~~ A Priority Review designation is reserved for applications of drugs that, if approved, would significantly improve the safety or effectiveness of the treatment,

---

[14] U.S. FOOD & DRUG ADMIN., PRIORITY REVIEW (Jan. 4, 2018), https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/priority-review.

[15] U.S. FOOD & DRUG ADMIN., FAST TRACK, BREAKTHROUGH THERAPY, ACCELERATED APPROVAL, PRIORITY REVIEW (Feb. 23, 2018), https://www.fda.gov/patients/learn-about-drug-and-device-approvals/fast-track-breakthrough-therapy-accelerated-approval-priority-review.

[16] ~~U.S. FOOD & DRUG ADMIN., PRIORITY REVIEW (Jan. 4, 2018), https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/priority-review.~~

diagnosis, or prevention of serious conditions when compared to standard applications.[17] A Priority Review designation means the FDA's goal is to take action on an application within 6 months (versus 10 months for Standard Review). The FDA informs a sponsor of a Priority Review designation within 60 days of receiving an NDA.

51.59. Fast Track is specifically designed to facilitate the development, and expedite the review, of drugs treating serious conditions and filling an unmet medical need in order to get them to patients earlier.[18] A drug that receives Fast Track designation is eligible for, among other things: Accelerated Approval and Priority Review if certain criteria are met, and a Rolling Review, meaning that a drug sponsor can submit sections of its NDA for review as they are completed rather than waiting for all sections to be completed. The FDA informs a sponsor of a Priority Review designation within 60 days of receiving an NDA.

52.60. Similarly, Breakthrough Therapy is designed to expedite the development and review of drugs intended to treat a serious condition and whose preliminary clinical evidence indicates that it may demonstrate substantial improvement over available therapy on a clinically significant endpoint.[19] For this designation, a clinically significant endpoint generally is one that measures an effect on irreversible morbidity or mortality, or on symptoms that represent serious consequences of the disease. A drug that receives

---

[17] *Supra* n. 13.

[18] U.S. FOOD & DRUG ADMIN., FAST TRACK (Jan. 4, 2018), https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/fast-track.

[19] U.S. FOOD & DRUG ADMIN., BREAKTHROUGH THERAPY (Jan. 4, 2018), https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/breakthrough-therapy.

Breakthrough Therapy designation is eligible for all Fast Track features in addition to intensive guidance on an efficient drug development program and organizational commitment involving FDA senior managers. *Id.*

### 5. NDA Review – Pre-Approval Inspection

53.61. As part of the NDA process, a drug sponsor must provide the FDA with sufficient information to reach a decision as to "[w]hether the ***methods used in manufacturing*** the drug ***and the controls used to maintain the drug's quality*** are adequate to preserve the drug's identity, strength, quality, and purity." 505(b)(1)(D), 21 C.F.R. § 314.50(d)(1)(i).

54.62. The FDA ensures a drug's quality by monitoring the drug manufacturer(s)' compliance with the FDA's Current Good Manufacturing Practice (cGMP) regulations. The cGMP regulations contain minimum requirements for the methods, facilities, and controls used in manufacturing, processing, and packing of a drug to ensure that it is safe for use and has the ingredients and strength it claims to have.[20]

55.63. As such, the NDA review process includes an examination of the drug manufacturer's compliance with the cGMP regulations and a determination of whether it has the necessary facilities, equipment, and ability to manufacture the drug. *Id.* To assist in that determination, the FDA performs a pre-approval inspection ("PAI").[21] The FDA

---

[20] U.S. FOOD & DRUG ADMIN., CURRENT GOOD MANUFACTURING PRACTICE (CGMP) REGULATIONS (Sept. 21, 2020), https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-regulations.

[21] Denise DiGiulio, *What Toto Expect When Being Inspected*, U.S. FOOD & DRUG ADMIN., (July 15-16, 2015), https://www.fda.gov/media/92857/download.

conducts both domestic and international PAIs for generic and innovator drug applications, and may inspect all facilities associated with a submission, including drug component manufacturing (such as Active Pharmaceutical Ingredients ("APIs"), also known as drug substances), finished drug product manufacturing, and control testing laboratories.[22]

56.64. Since the goal is to confirm that the manufacturer named in an NDA is capable of manufacturing the drug, and that the submitted data is accurate and complete, the FDA's three main objectives for the PAI are to: (i) assess readiness for commercial manufacturing, *i.e.* determine if the manufacturer(s) has a quality system designed to achieve sufficient control over the facility and commercial manufacturing operations; (ii) assess conformance to the application, *i.e.* verify that the formulation, manufacturing or processing methods, and analytical (or examination) methods, are consistent with descriptions in the NDA; and (iii) conduct a data integrity audit, *i.e.* audit the raw data (hardcopy or electronic) to authenticate the submitted data and verify that all relevant data was submitted such that the FDA could rely on the data as complete and accurate.[23]

57.65. When conducting a PAI, trained investigators tour the facility with the facility's staff and the drug sponsor, look for significant deviations from the FDCA and other acts where the FDA has enforcement authority, and take note of factual observations that, in their judgment, constitute violations of FDA standards. Any reportable inspection observations are presented and explained to the facility's management and the drug sponsor

---

[22] U.S. FOOD & DRUG ADMIN., COMPLIANCE GUIDANCE MANUAL (Apr. 12, 2010), https://www.fda.gov/media/71498/download.

[23] U.S. FOOD & DRUG ADMIN., *Compliance Program 7346.832, Chapter 46-New Drug Evaluation* (Sept. 16, 2019), https://www.fda.gov/media/121512/download.

at an exit interview on the last day of the inspection, and then recorded in a Form 483 (explained below) issued to the facility after the exit interview. FDA Investigators and analysts make every reasonable effort to discuss all observations with facility management and the drug sponsor as they are observed or on a daily basis, to minimize surprises, errors and misunderstandings when the Form 483 is issued. *Id.*

58.66. Reportable inspection observations warranting a Form 483 include:

- PAI findings reflectreflecting differences from the filed CMC ("Chemistry and Manufacturing Controls") description for bio-batch, or stability batches, such that the proposed commercial batch record does not assure a reproducible manufacturing operation.

- PAI listslist of differences from filed CMC description of formulations, processing principles, equipment use, or discrepancies in raw material lot reconciliation (*i.e.* inconsistencies in records for receipt, inventory, or use in production).

- Missing or unreliable data in that the data/information submitted was potentially unreliable or misleading or there were unexplained or inappropriate gaps in a chromatographic or analytical sequence.

- A pattern of inappropriately disregarded test results and/or inadequate or lack of justification for not reporting data/information.

- Insufficiency, discrepancy, or failing of an analytical method validation program.

- Lack of suitability of the facility, equipment or manufacturing operations intended for making the commercial API or finished product to the cGMP regulations.

- Other specific non-conformance (*e.g.*, conditions, practices, procedures) with the cGMP regulations. *Id.*

59.67. All observations recorded in a Form 483 are significant and correlate to regulated products or processes being inspected. Notations may be made for recurring or not corrected observations (*i.e.* a "repeat observation"), but not required. Facility

29

management has ~~fifteen~~15 days to provide written responses to the Form 483 observations. *Id*.

~~60.~~68. If the FDA does not approve an NDA, it will send the sponsor a Complete Response Letter (CRL).[24] The CRL describes all the specific deficiencies that the FDA identified in the NDA and when possible, recommends actions that the sponsor could take to place its NDA in condition for approval. A sponsor may resubmit its NDA clearly stating that it considers the resubmission a complete response to the deficiencies outlined in the CRL that needed to be addressed by the sponsor prior to approval of the original NDA.[25] Upon receipt of a resubmission, the FDA will determine whether or not the response is a complete response; if so, an acknowledgement of receipt letter will be issued stating the classification of the resubmission, Class 1 or Class 2, and the performance goal date.[26]

~~61.~~69. Pursuant to PDUFA, the FDA is committed to reviewing and acting on a sponsor's resubmission in six months or less. Any resubmission constitutes the start of a new review cycle beginning on the date the FDA receives the resubmission; the cycle is two months for a Class 1 resubmission and six months for a Class 2 resubmission. This

---

[24] Applications for FDA Approval to Market a New Drug, Complete Response Letter to Applicant, 21 C.F.R. § 314.110 (2020), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?fr=314.110.

[25] CENTER FOR DRUG EVALUATION AND RESEARCH, MANUAL OF POLICY AND PROCEDURES (effective date Feb. 26, 2015), https://www.fda.gov/media/72727/download.

[26] The Class 1 or Class 2 distinction does not pertain to resubmissions of non-efficacy supplements (*i.e.* labeling and manufacturing supplements). *See* n.~~15~~ 17.

30

classification is based on the information submitted by the sponsor in response to the CRL.

A Class 1 resubmission includes the following items (or combination of these items):

- Final printed labeling.

- Draft labeling.

- Safety updates submitted in the same format, including tabulations, as the original submission with new data and changes highlighted (but if the resubmission presents a large amount of new information, including important new adverse experiences, it will be a Class 2 resubmission).

- Stability updates to support provisional or final dating periods.

- Assay validation data.

- Discussions of post-marketing requirement/commitments, including proposals or protocols for such requirements/commitments (*i.e.* Phase IV).

- Final release testing on the last 1-2 lots used to support approval.

- A minor re-analysis of data previously submitted to the application (determined by the FDA as fitting the Class 1 category).

- Other minor clarifying information determined by the FDA as fitting the Class 1 category.

- Other specific items identified by the FDA and communicated through guidance for industry.[27]

70.  A Class 2 resubmission includes any item not specified as a Class 1 item, including any item that would warrant presentation to an advisory committee or a re-inspection. *Id.*

---

[27] CENTER FOR BIOLOGICS EVALUATION AND RESEARCH, SOPP 8405.1: PROCEDURES FOR RESUBMISSION TO AN APPLICATION OR SUPPLEMENT (Nov. 1, 2021), https://www.fda.gov/media/84417/download.

31

### B. Fennec and the Development of PEDMARK

~~62.~~ 71. Fennec is a biopharmaceutical company focused primarily on developing PEDMARK, a unique formulation of Sodium Thiosulfate (STS) for the prevention of ototoxicity, *i.e.* hearing loss, induced by cisplatin chemotherapy in pediatric patients with localized, non-metastatic, solid tumors. Cisplatin and other platinum compounds are key chemotherapeutic components for many pediatric malignancies, but platinum-based therapies can cause ototoxicity, and are particularly harmful to pediatric cancer survivors.

~~63. In November 2002, Fennec acquired an exclusive worldwide license agreement with Oregon Health & Science University ("OHSU") for the intellectual property directed to thiol-based compounds including STS and their use in oncology. In addition to preclinical studies, OHSU investigators completed Phase I and Phase II studies showing that STS reduces the hearing loss associated with platinum-based chemotherapy.~~

~~64.~~ 72. The FDA granted PEDMARK Orphan Drug Designation in 2004.[28] The Orphan Drug Act provides for granting special status to a drug or biological product to treat a rare disease or condition, but that status does not alter the standard regulatory requirements and process for obtaining marketing approval.[29] The drug's effectiveness and

---

[28] ~~*Fennec Announces Issuance of U.S. Patent for PEDMARK™*, FENNEC PHARMACEUTICALS, INC. (Sept. 21, 2020 6:00 AM ET), https://www.globenewswire.com/news-release/2020/09/21/2096346/0/en/Fennec-Announces-Issuance-of-U-S-Patent-for-PEDMARK.html.~~ Fennec Pharmaceuticals, Inc., Quarterly Report (Form 10-Q) (Aug. 13, 2018) ("2Q18 10-Q"), https://www.sec.gov/Archives/edgar/data/0001211583/000114420418043914/tv500190_10q.htm.

[29] U.S. FOOD & DRUG ADMIN., DESIGNATING AN ORPHAN PRODUCT: DRUGS AND BIOLOGICAL PRODUCTS (Apr. 6, 2020), https://www.fda.gov/industry/developing-

32

safety still must be established through adequate and well-controlled studies.[30]

73. ~~Through collaborative partnerships, Fennec provided PEDMARK for two Phase III clinical studies. First, between June 23, 2008 and September 28, 2012, the Clinical~~In February 2013, Fennec acquired an exclusive worldwide license agreement with Oregon Health & Science University ("OHSU") for the intellectual property directed to thiol-based compounds including STS and their use in oncology. In addition to preclinical studies, OHSU investigators completed Phase I and Phase II studies showing that STS reduces the hearing loss associated with platinum-based chemotherapy.[31]

~~65.~~74. STS was studied by cooperative groups in two Phase 3 trials. Between March 2008 and September 2012, the Children's Oncology Group Protocol ("COG") ACCL0431 enrolled 131 participants from 38 institutions. The COG ACCL0431 study included one of five childhood cancers typically treated with intensive cisplatin therapy for localized and disseminated disease, including hepatoblastoma, germ cell tumor, osteosarcoma, neuroblastoma, and medulloblastoma. COG ACCL0431 final results were published in the Lancet Oncology in December 2016. *Id.*

~~66.~~75. Second, the ~~International~~ Childhood Liver Tumor Strategy Group, also known as SIOPEL, launched SIOPEL 6, a multi-center open label randomized Phase III

---

products-rare-diseases-conditions/designating-orphan-product-drugs-and-biological-products.

[30] Anne Pariser, M.D., Office of Translational Scienter Center for Drug Evaluation and Research, *Rare Disease and Clinical Trials*, U.S. FOOD AND DRUG ADMIN. (Nov. 4, 2014), https://www.fda.gov/media/91349/download.

[31] 2Q18 10-Q.

33

trial enrolling hepatoblastoma patients with localized tumors.[32] From October 2007 to December 2014, 52 centers in 11 countries worldwide enrolled 113 evaluable patients. In February 2015, the Independent Data Monitoring Committee ("IDMC"), established to assess any potential concern of adverse effect of STS on the efficacy of the cisplatin chemotherapy and to review safety according to protocol pre-specified patient numbers, recommended the continuation of SIOPEL 6 to allow for a final safety review on 100 patients. The IDMC completed its review in October 2017. The final results of the SIOPEL 6 study were published in the June 21, 2018 issue of the New England Journal of Medicine.[33]

67.76. Under the terms of its agreement with both COG and SIOPEL, Fennec had to provide the drug, drug distribution and pharmacovigilance, or safety monitoring, for the studies. Pursuant to Fennec's agreement with SIOPEL, preparations of sodium thiosulfate, *i.e.* the drug substance, was made by American Regent, Inc., and the packaging and

---

[32] *Fennec Announces Preliminary Results of SIOPEL 6 Study on PEDMARK™ (sodium thiosulfate) to be Presented at the 49TH Congress of the International Society of Pediatric Oncology (SIOP) 2017 Meeting*, FENNEC PHARMACEUTICALS, INC. (Sept. 13, 2017, 12:16 PM ET), https://www.globenewswire.com/news-release/2017/09/13/1120427/0/en/Fennec-Announces-Preliminary-Results-of-SIOPEL-6-Study-on-PEDMARK-sodium-thiosulfate-to-be-Presented-at-the-49TH-Congress-of-the-International-Society-of-Pediatric-Oncology-SIOP-20.html.

[33] University of Birmingham, *Cisplatin With or Without Sodium Thiosulfate in Treating Young Patients With Stage I, II, or III Childhood Liver Cancer (SIOPEL6)*, CLINICALTRIALS.GOV (Apr. 3, 2008, updated May 29, 2018), https://clinicaltrials.gov/ct2/show/NCT00652132; Fennec Pharmaceuticals, Inc., Annual Report (Form 10-K) (Mar. 28, 2018) ("2017 10-K"), https://www.sec.gov/Archives/edgar/data/0001211583/000114420418017571/tv488216_10k.htm.

labeling, *i.e.* the drug product, was completed by Almac Clinical Services Ltd.[34]

77.    In May 2015 Fennec negotiated an amendment to the OHSU Agreement, expanding the prior agreement to include the use of N-acetylcysteine as a standalone therapy and/or in combination with STS for the prevention of ototoxicity induced by chemotherapeutic agents to treat cancers.[35]

68.78. On October 16, 2017, Fennec announced the SIOPEL 6 study had met its primary endpoint, concluding that the randomized Phase III trial showed that adding STS significantly reduced the incidence of cisplatin-induced hearing loss without any evidence of tumor protection, and discussed its plan to pursue FDA approval of PEDMARK based on data from the SIOPEL 6 study and proof of principle data from COG ACCL0431.[36]

69.79. In March 2018, the FDA granted PEDMARK Breakthrough Therapy and Fast Track designations.[37] As discussed above, Fast Track designation allowed Fennec to

---

[34] *SIPOEL 6 — Standard Risk Hepatoblastoma*, INTERNATIONAL SOCIETY OF PEDIATRIC ONCOLOGY (Oct. 31, 2007), https://www.nejm.org/doi/suppl/10.1056/NEJMoa1801109/suppl_file/nejmoa1801109_protocol.pdf.

[35] 2017 10-K.

[36] *Fennec Announces Positive Results From Phase 3 SIOPEL 6 Study on PEDMARK™ (sodium thiosulfate) Presented at the 49th Congress of the International Society of Pediatric Oncology (SIOP) 2017 Meeting*, FENNEC PHARMACEUTICALS, INC. (Oct. 16, 2017, 6:00 AM ET), https://www.globenewswire.com/news-release/2017/10/16/1147926/0/en/Fennec-Announces-Positive-Results-From-Phase-3-SIOPEL-6-Study-on-PEDMARK-sodium-thiosulfate-Presented-at-the-49th-Congress-of-the-International-Society-of-Pediatric-Oncology-SIOP-2.html.

[37] *Fennec Pharmaceuticals Receives Fast Track Designation By FDA for PEDMARK*, FENNEC PHARMACEUTICALS, INC. (Mar. 21, 2018), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-receives-fast-track-designation-fda.

35

work closely with the review team within the FDA's Oncology Division, to submit the NDA on a rolling basis, and to receive Priority Review when the NDA was filed.

80. In August 2018, the Pediatric Committee of the European Medicines Agency (EMA) accepted the Company's pediatric investigation plan for PEDMARK for the condition of the prevention of platinum-induced hearing loss, which is a prerequisite for filing a Marketing Authorization Application for any new medicinal product in Europe. The Company was also advised that PEDMARK is eligible for submission of an application for a Pediatric Use Marketing Authorization ("PUMA"). Therefore, this decision allows Fennec to proceed with the submission of a PUMA in the European Union ("EU") with incentives of automatic access to the centralized procedure and up to 10 years of data and market protection. The PUMA is a dedicated marketing authorization covering the indication and appropriate formulation for medicines developed exclusively for use in the pediatric population and provides data and market protection up to 10 years.[38]

70.81. On December 20, 2018, Fennec announced that, following a pre-submission meeting with the FDA's Oncology Division, it had initiated a Rolling Review of the PEDMARK NDA, claiming a target date for FDA approval in the second half of 2019.[39] Since "FENC held a pre-submission meeting with the FDA oncology division regarding

---

[38] Fennec Pharmaceuticals, Inc., Quarterly Report (Form 10-Q) (Nov. 13, 2018) ("3Q18 10-Q").

[39] *Fennec Pharmaceuticals Initiates Rolling New Drug Application to U.S. Food and Drug Administration for PEDMARK™*, FENNEC PHARMACEUTICALS, INC. (Dec. 20, 2018, 6:00 AM ET), https://www.globenewswire.com/news-release/2018/12/20/1670128/0/en/fennec-pharmaceuticals-initiates-rolling-new-drug-application-to-u-s-food-and-drug-administration-for-pedmark.html.

PEDMARK, and afterwards initiated a rolling NDA," analysts "presume[d] this move comes with the FDA's encouragement."[40] Based on the Company's statements, analysts further understood that "FENC expects to complete the NDA filing in 1H19" and thus "estimate[d] a potential FDA approval decision in late 2H19 given Pedmark has several FDA granted designations, such as Orphan Drug, Breakthrough Therapy and Fast Track."[41]

71. In March 2020, Fennec announced that the United States Patent and Trademark Office ("USPTO") will issue United States Patent 10,596,190 entitled "Method for Reducing Ototoxicity in Pediatric Patients Receiving Platinum-Based Chemotherapy," which captured the use of PEDMARK to reduce the ototoxic effects of cisplatin in pediatric patients, particularly in the age group of five years or younger.[42] Application No. 16/112,195, approved and issued as Patent 10,596,190, was filed on August 24, 2018 in continuation of U.S. Application No. 15/826,243, filed on November 29, 2017.

72. Patent 10,596,190 explains STS is a water-soluble thiol compound with reducing agent properties. When detailing the "Packaging and Labeling" of STS provided by Fennec, used in the SIOPEL 6 study, Patent 10,596,190 states:

> Each vial was placed into a six vial kit box. Each box was labelled with a multi-language kit label. STS drug product was manufactured, labelled, and packaged under GMP conditions and supplied as a 25% (250 mg/ML), preservative free, sterile solution. The drug product formulation contained

---

[40] David Nierengarten, Ph.D., Jeffrey La Rosa, *FENC Initiates Rolling NDA with Broad Label for PEDMARK*, WEDBUSH SECURITIES (Dec. 20, 2018).

[41] Yale Jen, Ph.D., *Pedmark NDA Rolling Submission Started with Planned European Regulatory Filing in 2019*, LAIDLAW & COMPANY (Dec. 20, 2018); 2017 10-K.

[42] *Fennec Announces Issuance Of U.S. Patent For Use Of PEDMARK™*, FENNEC PHARMACEUTICALS, INC. (Mar. 5, 2020), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-announces-issuance-us-patent-use-pedmarktm.

sodium thiosulfate pentahydrate and sodium borate. The vial label indicated the drug product batch number and the initial release until date.

73. Further, Patent 10,596,190 discusses the "Preparation" as follows:

STS was supplied in 50 ml vials containing a 25% (250 mg/ml or 12/5 g/vial) solution. Each ml of the 25% STS was diluted with one ml of sterile water for injection (1:1 dilution) to a concentration of 125 mg/ml for direct administration. (This is approximately equivalent isotonicity to a 2.3% sodium chloride solution). The volume from the appropriate number of vials for the dose was combined in a PVC IV infusion bag.

Reconstituted STS for administration consisted of a clear solution. There were no preservatives in the formulation. After dilution the PVC infusion bag containing the dosing solution was placed upside down (inverted with injection and filling ports at the top) at room temperature and used within eight hours. Any solution remaining in the vial was destroyed according to institutional procedures.

74. In September 2020, Fennec announced the issuance of United States Patent 10,792,363 entitled "Anhydrous Sodium Thiosulfate and Formulations Thereof," which captured the unique anhydrous form of the active ingredient in PEDMARK, and related methods of synthesis.[43] Patent 10,792,363 was issued in connection to Application No. 16/458,261 filed on July 1, 2019, which claimed priority to and incorporated, U.S. Provisional Patent Application Nos. 62/693,502 and 62/693,503, both filed on July 3, 2018. The application also related to and incorporated U.S. Patent Application No. 16/458,267, titled "Formulations of Anhydrous Sodium Thiosulfate" filed on July 1, 2019.[44]

---

[43] *Fennec Announces Issuance of U.S. Patent For PEDMARK™*, FENNEC PHARMACEUTICALS, INC. (Sept. 21, 2020), https://fennecpharma.com/fennec-announces-issuance-of-u-s-patent-for-pedmark/.

[44] While Application No. 16/458,267 is still pending, it was assigned to Fennec and Avista on August 7, 2020. *See* https://patents.google.com/patent/US20200023003A1/en (last visited on Jan. 28, 2020).

38

75. In addition to a sterile solution administered intravenously, as utilized in the SOIPEL 6 study and detailed in Patent 10,596,190, Patent 10,792,363 offers "[t]he STS formulation may be provided as a liquid, a suspension, or as a dry composition" and administered:

Pharmaceutical compositions suitable for administration by injection include sterile aqueous solutions, suspensions, or dispersions and sterile powders or lyophilizates for the extemporaneous preparation of sterile injectable solutions or dispersion.

Suitable methods of drying are, for example, spray drying, and lyophilization (freeze-drying). In one aspect, the STS formulation is prepared as a solution and then dried by lyophilization. In another aspect, the STS formulation is prepared as a dry composition that reconstituted immediately prior to use with sterile water for injection and then administered intravenously by either direct veni-puncture or using an intravenous line.

Suitable compositions for transdermal application include an effective amount of a biologically active agent with a suitable carrier. Carriers suitable for transdermal delivery include absorbable pharmacologically acceptable solvents to assist passage through the skin of the host.

Suitable compositions for topical application, *e.g.*, to the skin, eyes, or joints, include aqueous solutions, suspensions, ointments, creams, gels or sprayable formulations, *e.g.*, for delivery by aerosol or the like. Such topical delivery systems will in particular be appropriate for dermal application. They are thus particularly suited for use in topical, including cosmetic, formulations well known in the art. Such may contain solubilizers, stabilizers, tonicity enhancing agents, buffers, or preservatives.… [A] topical application may also pertain to an inhalation or to an intranasal application. They may be conveniently delivered in the form of a dry powder (either alone, as a mixture, for example a dry blend with lactose, or a mixed component particle, for example with phospholipids) from a dry powder inhaler or an aerosol spray presentation from a pressurized container, pump, spray, atomizer or nebulizer, with or without the use of a suitable propellant.

76. Patent 10,792,363 also discusses the possible methods of containing the STS formulation based on the various compositions mentioned above, stating in relevant part:

For liquid or suspension compositions, the container is preferably a single

39

chamber syringe. For dry compositions, preferably the container is a dual chamber syringe. The dry composition is provided in a first chamber of the dual-chamber syringe and reconstitution solution is provided in a second chamber of the dual chamber syringe.

Prior to administering the dry STS formulation to a subject in need thereof, the dry composition is reconstituted. Reconstitution can take place in the container in which the dry STS formulation is provided, such as in a vial, syringe, dual-chamber syringe, ampoule, or cartridge. Reconstitution is performed by adding a predefined amount of reconstitution solution to the dry composition. Reconstitution solutions are sterile liquids, such as water for injection, phosphate buffered saline, isotonic saline, or other buffers, which may contain further excipients, such as preservatives and/or antimicrobials, such as, for example, benzylalcohol and cresol. Preferably, the reconstitution solution is sterile water for injection. Alternatively, the reconstitution solution is sterile phosphate buffered saline (PBS) or physiological saline.

Another embodiment is a kit comprising one or more vials or pre-filled syringes comprising a solution or suspension of one or more STS formulations. [S]uch a kit comprises a vial or pre-filled syringe comprising STS formulations as described herein in a blister pack or a sealed sleeve. The blister pack or sleeve may be sterile on the inside. In one aspect, vials or pre-filled syringes as described herein may be placed inside such blister packs or sleeves prior to undergoing sterilization, for example terminal sterilization. The kit may also comprise documents comprising prescribing information or instructions for use.

77.     Patent 10,792,363 determines "STS may be administered parenterally or enterally. If administered parenterally, the STS can be administered intravenously (IV), subcutaneously (SC), or intramuscularly (IM). Enteral administration includes oral, sublingual, or rectal."

C.     **Defendants' Fraudulent Scheme to Hide** Drug Substance *and* Production **Manufacturing Deficiencies**

1.     *Unbeknownst to investors, Fennec's* drug *substance manufacturer was not capable of manufacturing PEDMARK for commercial use,*

40

*which caused a lengthy delay* *and thus did not have the FDA-required stability data*.

78.82. As stated above, in December 2018, Fennec publicly announced that it was targeting U.S. approval of PEDMARK in the second half of 2019. However, as described below, Fennec knew, or should have knownrecklessly disregarded, that this release date was unfeasible and unlikely when announced to investors.

79.83. Although Defendants have never disclosed to investors the number or identity of either of PEDMARK's drug substance manufacturer or drug product manufacturer, Plaintiff's investigation confirms that at the time Fennec met with the FDA for its pre-submission meeting in December 2018, that drug substance manufacturer was Avista.[45]

80.84. Avista, however, was not capable of manufacturing PEDMARK for commercial use. This meant that Fennec would have to transition production to another site for commercial manufacturing and therefore, its disclosures to investors should have taken into account the extra time needed to provide additional stability data to the FDA as part of its NDA submission.

81.85. In that regard, at the time that Fennec told investors that it was targeting U.S approval of PEDMARK in the second half of 2019, Avista operated four facilities located in Durham, NC ("Durham Site"); Longmont, CO ("Longmont Site"); Agawam, MA; and

---

[45] *See* Deniel Mero, *Fennec Delays NDA Due to Manufacturing Facility Change*, PROPTHINK (Mar. 13, 2019, 11:48 AM), https://propthink.com/fennec-delays-nda-due-to-manufacturing-facility-change/#, *infra* ¶ 82; and *supra* ¶ 74.

Edinburgh, Scotland, UK.[46]

~~82.~~86. None of these facilities was capable of manufacturing PEDMARK for use by consumers:

- A former Scientist ("FE1") who worked at the Durham Site from June 2019 to July 2020, and who was aware that PEDMARK was a compound that Cambrex was working on after it acquired Avista, confirmed that *the Durham Site was* an analytical site for early phase drug development, *not a commercial manufacturing site* for making finished drug product.

- A former Research Associate ("FE2") in Process Chemistry at the Longmont Site from June 2018 to October 2020, formerly a Manufacturing Chemist from November 2017 to June 2018, stated that *the Durham Site was not capable of making drugs for* Phase III or *commercial scale at any level*. ~~The Research Associate~~FE2 further stated that after Cambrex acquired Avista, a number of drugs being manufactured at Avista facilities were transferred to Cambrex facilities, including to its largest site in Charles City, IA, because those drugs needed to be produced in a facility with a higher or different manufacturing capability and/or the client was not happy with Avista's performance. ~~The Research Associate~~FE2 noted that while *neither of Avista's two manufacturing facilities (in Longmont or Durham) were capable of making injectable doses (a requirement for PEDMARK),* Avista could make a drug in powder form and then ship it to another manufacturer to transform the powder into injectable doses.

- A former Senior Director of Corporate Planning ("FE3") at the *Longmont Site* from July 2016 to March 2018 stated that *if a pharmaceutical company changes where its drug is manufactured after the conclusion of Phase III, it would need to submit a detailed bridging study in the CMC section* of the NDA *about the new facility, its processes for making the drug, quality controls, and proof that everything equates to what the previous facility* was doing.

---

[46] *Cambrex to Acquire Avista Pharma Solutions, Adding Early Stage API and Finished Dosage Form Development & Testing Services to its Global Contract Development & Manufacturing Network*, CAMBREX CORP. (Nov. 20, 2018), https://www.cambrex.com/cambrex-to-acquire-avista-pharma-solutions-adding-early-stage-api-and-finished-dosage-form-development-testing-services-to-its-global-contract-development-manufacturing-network/.

83.87. Due to the fact that none of Avista's facilities – then or now – are capable of large-scale commercial manufacturing, at all relevant times, Fennec knew ~~or should have known~~and recklessly disregarded that it would have to manufacture PEDMARK for commercial use – meaning using the drug substances to make drug products – at another facility. [47] And because "NDA submissions require … long-term manufacturing stability data (up to 6 months)," Fennec also knew or ~~should have known~~recklessly disregarded that it had "to show that [any] new manufacturing facility can produce a stable commercial batch of Pedmark."[48]

84.88. But Fennec did not have the required ~~long- term~~ six months of manufacturing stability data at the time it initiated its rolling NDA of PEDMARK. Nor did it know when it would ~~be able to obtain~~begin obtaining such long-term data because Avista was in the process of being acquired by Cambrex~~.~~ for $252 million. This large acquisition was

---

[47] *See Overview of Durham, NC, USA Facility,* CAMBREX CORP., https://www.cambrex.com/facilities/durham-nc-usa/ ~~(last visited Jan. 29, 2021);~~; *Overview of Longmont, CO, USA Facility,* CAMBREX CORP., https://www.cambrex.com/facilities/longmont-co-usa/ ~~(last visited Jan. 29, 2021);~~; *Overview of Agawam, MA, USA Facility,* CAMBREX CORP., https://www.cambrex.com/facilities/agawam-ma-usa/ ~~(last visited Jan. 29, 2021);~~; *Overview of Edinburgh, UK Facility,* CAMBREX CORP., https://www.cambrex.com/facilities/edinburgh-uk/ ~~(last visited Jan. 29, 2021).~~.

[48] ~~Deniel Mero, *Fennec Delays NDA Due to Manufacturing Facility Change*, PROPTHINK (Mar. 13, 2019 11:48 AM), https://propthink.com/fennec-delays-nda-due-to-manufacturing-facility-change/#.~~ *Supra* n. 40; U.S. FOOD & DRUG ADMIN., CHANGES TO AN APPROVED NDA OR ANDA – GUIDANCE FOR INDUSTRY (April 2004), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/changes-approved-nda-or-anda.

43

publicly announced ~~in~~on November 20, 2018[49] and completed ~~in~~on January 2, 2019.[50] Simply put, for all these reasons, ~~Fennec did not have a~~Defendants had no reasonable basis for targeting the second half of 2019 for completing its rolling NDA submission, much less FDA approval of PEDMARK, despite what it told investors.

~~85.~~89. But it was not until March 13, 2019 that investors learned what Fennec already knew or ~~should have known~~recklessly disregarded by December 20, 2018 which is that "a site transition for the commercial manufacturing site" of PEDMARK was required and that transition was a major change that would delay the Company's full submission to the FDA by at least six months~~,~~ (*see* ¶ 44), and the commercial launch by at least a year. Fennec, however, ~~falsely~~misleadingly blamed the site change on "the drug substance manufacturer for PEDMARK™ [being] recently acquired," and assured investors that "the acquiring company has large scale commercial capabilities and a proven and extensive track record of successful FDA inspections and product launches."[51]

90. Analysts following the Company understood from Fennec "management…

---

[49] *Cambrex to Acquire Avista Pharma Solutions, Adding Early Stage API and Finished Dosage Form Development & Testing Services to its Global Contract Development & Manufacturing Network*, CAMBREX CORP. (Nov. 20, 2018), https://www.cambrex.com/cambrex-to-acquire-avista-pharma-solutions-adding-early-stage-api-and-finished-dosage-form-development-testing-services-to-its-global-contract-development-manufacturing-network/.

[50] *Cambrex Completes Acquisition of Avista Pharma Solutions*, CAMBREX CORP. (Jan. 2, 2019), https://www.cambrex.com/cambrex-completes-acquisition-of-avista-pharma-solutions/.

[51] Fennec Pharmaceuticals Inc., Current Report (Form 8-K) (Mar. 13, 2019), https://www.sec.gov/Archives/edgar/data/0001211583/000114420419013797/tv516205_8k.htm.

that the timeline for the completion of the submission of the New Drug Application (NDA) filing for PEDMARK is now slated to be late this year or early next year … purely due to a necessary change in the contract manufacturer for PEDMARK, as the original manufacturer has been acquired. Due to the change, a new validation batch had to be produced and stability testing is in the process of being carried out—a six-month process."[52] Since Fennec did not raise any other manufacturing issues, analysts "expect[ed] no further setbacks[.]"[53]

86.91. As the Triangle Business Journal reported on April 25, 2019, "according to [Fennec's] CFO Robert Andrade, the FDA process was delayed because the third-party manufacturer the company is using was acquired, meaning their drug would be produced in a different facility – so it needed a review batch from the new facility."[54]

87.92. Conveniently, just over a month *before* announcing the manufacturing site change and delay in the commercial launch of PEDMARK, Defendants were able to secure a $12.5 million senior debt facility with a maturity date of October 1, 2023 from the Bridge Bank ("Loan & Security Agreement") which was to be funded upon NDA approval. The Company intended to use the proceeds from the loan for commercialization activities after

---

[52] Raghuram Selvaraju, Ph.D., *FY2018 Financial Results Reported; PEDMARK Filing Timeline Update; Modulating Target to $17*, H.C. WAINWRIGHT & CO. (Mar. 14, 2019).

[53] David Nierengarten, Ph.D., Jeffrey La Rosa, *FY18; Manufacturing Hiccup to Delay NDA Approval, but Opportunity Unchanged*, WEDBUSH SECURITIES (Mar. 14, 2019).

[54] Seth Thomas Gulledge, *This $90M public company is "set up" for sale, CFO says*, AMERICAN CITY BUSINESS JOURNALS (Apr. 25, 2019 2:30 PM EDT), https://www.bizjournals.com/triangle/news/2019/04/25/this-90m-public-company-is-set-up-for-sale-cfo.html. *Supra* n. 8.

NDA approval.[55] At that time, analysts and investors continued to believe that "the company should announce the completion of the filing and FDA acceptance of the NDA for review within the coming months. We continue to anticipate FDA approval in 2H19."[56]

88.93. Finally, despite the year delay in the commercial launch of Fennec's only lead drug candidate and the "steady drop in stock value from $14.07 a share in April 2018 to trading around $4.40" in April 2019, Defendants Raykov and Andrade received raises of about 15% in April 2019, "continuing their compensation's steady increase since starting with the company."[57]Defendant Raykov's base salary wastotal compensation increased from $350,0001.1 million in 2018 to $400,0001.5 million in 2019 and Defendant Andrade's from $250700,000 to $290864,000. *See* ¶ 198.

> **2.** **Unbeknownst to investors,** there was a high risk that **Fennec's** drug **product manufacturer** would***was* not** pass***cGMP-compliant as required by the* FDA** inspections, which would further delay FDA approval of PEDMARK**.**

89.94. Fennec's disclosures to investors confirm that Defendants knew that a successful inspection of its product manufacturing processes was critical to obtaining FDA

---

[55] The Loan and Security Agreement expired on December 31, 2020 as a result of Fennec failing to obtain NDA approval of PEDMARK[TM] by that date, with no amounts advanced under the facility prior to its termination. The warrant issued to Bridge Bank remains outstanding notwithstanding termination of the facility. Fennec Pharmaceuticals, Inc., Quarterly Report ("Form 10-Q") (Aug. 5, 2020) ("2Q20 10-Q").

[56] Raghuram Selvaraju, Ph.D., *Term Loan Facility Obtained; PEDMARK Filing Completion Approaches; Reiterate Buy*, H.C. WAINWRIGHT & CO. (Feb. 8, 2019).

[57] Seth Thomas Gulledge, *With stock down 68% in past year, RTP outfit's CEO, CFO enjoy 15% bump in compensation*, AMERICAN CITY BUSINESS JOURNALS (Apr. 24, 2019 2:08 PM EDT), https://www.bizjournals.com/triangle/news/2019/04/24/with-stock-down-68-in-past-year-rtp-outfits-ceo.html.

46

approval. Nonetheless, despite leading investors to believe that it would receive FDA approval for PEDMARK in August 2020, Defendants either failed to conduct adequate due diligence into Fennec's third-party product manufacturer or, even worse, ignored the fact that its chosen manufacturer was not cGMP-compliant and thus would likely not pass a pre-approval inspection (PAI). Either way, none of this was disclosed to investors, and as a result, Fennec's stock plummeted in August 2020 *and* November 2021 when investors finally learnedearned that manufacturing issues were *again* delayeddelaying approval of PEDMARK— a drug which still has not received FDA approval.

    a.    *Manufacturing according to cGMP standards is a critical component of gaining FDA approval.*

90.95. Obtaining regulatory approval (by the FDA) for new drugs is essential for any company (such as Fennec) seeking to market a new drug in the United States.[58] Simply put, manufacturing issues found during the FDA's PAI will cause a delay in FDA approval, which will, in turn, negatively impact a company's expected sales and, if investors are caught unaware, the company's stock price.

91.96. The problem of manufacturing is further complicated when a drug company, such as Fennec, outsources manufacturing to a third-party. The drug sponsor must then rely on the manufacturer for quality assurance and cGMP.[59]

---

[58] *See* Penelope Przekop, MSQA, RQAP-GCP, and Valerie Przkob, *How to Improve FDA Inspection Readiness & Outcomes by Mining Publicly Available Data*, CLINICAL LEADER (Oct. 14, 2020), https://www.clinicalleader.com/doc/how-to-improve-fda-inspection-readiness-outcomes-by-mining-publicly-available-data-0001.

[59] Fennec Pharmaceuticals, Inc., Annual Report (Form 10-K) (Mar. 15, 2019) ("2018 10-K"), Fennec Pharmaceuticals, Inc., Annual Report (Form 10-K) (Feb. 14, 2020) ("2019

92.97. Further compounding the issue for Fennec is ~~the fact~~ that manufacturers of sterile parenteral products, such as PEDMARK, are typically more complex than those required for the production of other products, such as oral dosage forms. The stability of parenteral solutions must be assured. The product must be sufficiently stable to remain in solution (or within the freeze-dried cake) for a reasonable amount of time. Therefore, sterile parental products require heightened testing of product packaging, transportation and storage. All of these issues relate directly to product quality; thus, a culture of quality and effective quality systems is essential for successful manufacturing of complex products such as sterile injectables. As the drug sponsor, Fennec is responsible for ensuring that any and all third-party manufacturers of PEDMARK ~~possesses~~possess the necessary knowledge, capability, and experience to successfully produce this complex drug. *Id.*

93.98. Accordingly, in order to make assurances to investors as to when and whether PEDMARK would receive FDA approval, Fennec needed to be hyper-sensitive to quality control and manufacturing issues with any third-party manufacturer with whom it chose to contract to make its drug.[60] The failure to do sufficient due diligence into a third-party manufacturer or double-check the reliability of the manufacturing facility would, in its own words "subject the drug manufacturer to possible legal or regulatory action, such as an *untitled letter, warning letter, recall, suspension of manufacturing or distribution or*

---

10-K"), Fennec Pharmaceuticals, Inc., Annual Report (Form 10-K) (Mar. 30, 2021) ("2020 10-K").

[60] *See supra* n. 52 (describing regulatory and inspection readiness as "key").

***both, suspension of state permit or license, seizure of product, import detention"[61]*** - and would have been material to any investor's decision as to whether and how long to invest in Fennec because failing to detect and remedy deficiencies prior to the FDA's PAI will dramatically and materially ~~delays~~delay a drug's approval.

94.99. So important are the FDA's ~~pre-approval inspections~~PAIs, that as a former Quality Assurance Director at the Longmont Site from June 2015 to July 2019 noted, pharmaceutical companies typically hold a mock inspection of the facilities manufacturing their drug(s) prior to the PAI to try to identify any deficiencies.

100.    Based on the Company's public statements after the substance manufacturing site change, analysts believed that there were no other potential issues with the manufacturing of PEDMARK:

- 5/10/2019: "***Given progress in manufacturing and management guidance, we believe that the company has successfully made batches of PEDMARK at its contract manufacturer*** and will be 'putting them on the shelf' for stability testing for the next six months."[62]

- 8/12/2019: "After the requirement for changing Pedmark manufacture[r] announced earlier this year, FENC has been hard working since to complete NDA filing[.] The Pedmark NDA filing is a rolling submission with three major aspects: preclinical, clinical, and manufacturing[.] ***The manufacturing portion will be filed once the stability test has completed***."[63]

- 8/12/2019: "The ***extended duration*** for a rolling NDA application ***was a result of the drug substance manufacturer for PEDMARK™ being acquired***, where FENC then had to transition to a new manufacturing site and complete manufacturing tests (see note from early this year). ***The narrative remains the***

---

[61] 2018 10-K, 2019 10-K, 2020 10-K.

[62] David Nierengarten, Ph.D., Jeffrey La Rosa, *Firing up the Factory*, WEDBUSH SECURITIES (May 10, 2019).

[63] Yale Jen, Ph.D., *2Q19: Potential Pedmark NDA Filing Remains On-Track for Late 2019/Early 2020*, LAIDLAW & COMPANY (Aug. 12, 2019).

*same, however*[.]"[64]

101.   In addition, because of Fennec's high R&D expenses in 2019 decreased as compared to 2018, (*see discussion infra Section IV.C.2.d.)* analysts presumed the Company had already done what was necessary to ensure FDA approval – including preparing to commercially manufacture PEDMARK under cGMP standards:

- 11/13/2019: **"**For the third quarter of 2019 *research and development expenses were* $0.8M, *down* from $1.8M reported for the same period a year earlier. This comes as a result of having *completed a significant number of activities in support for PEDMARK™ regulatory approval*."[65]

- 12/2/2019: "We believe that the reduced G&A spending reflects the fact that the final submission of the PEDMARK New Drug Application (NDA) is approaching, and work pertaining to the assembly of the filing is now mostly complete. We continue to expect *R&D spending to tail off towards the end of this year and early next year once the PEDMARK NDA has been filed*."[66]

- 2/18/2020: Net loss "was principally driven by higher-than-projected R&D spending of $1.2M in 4Q19 vs. our original expectation of only $750K for the period. However, we note that *the completion of the PEDMARK regulatory filings in the U.S. and Europe should signal rapid reduction in R&D spending* for 2020 vs. 2019[.]"[67]

   b.   *Fennec failed to ensure that its product manufacturer would be able to successfully produce PEDMARK under cGMP standards.*

~~95.~~102.      In February 2020, Fennec announced the completion of the Rolling Review of the PEDMARK NDA submission and that it was eligible for Priority Review

---

[64] David Nierengarten, Ph.D., Jeffrey La Rosa, Matthew Barcus, Ph.D., *Finish Line to NDA Submission in Early 2020*, WEDBUSH SECURITIES (Aug. 12, 2019).

[65] David Nierengarten, Ph.D., Jeffrey La Rosa, Matthew Barcus, Ph.D., *On Pace for a PEDMARK^{TM} Launch in 2020*, WEDBUSH SECURITIES (Nov. 13, 2019).

[66] Raghuram Selvaraju, Ph.D., *Application Submission Nearing Completion; 3Q19 Financials; Reiterate Buy*, H.C. WAINWRIGHT & CO. (Dec. 2, 2019).

[67] Raghuram Selvaraju, Ph.D., *2019 Financials Reported; PEDMARK Approval Decision Approaching; Reiterate Buy*, H.C. WAINWRIGHT & CO. (Feb. 18, 2020).

because the FDA granted PEDMARK Orphan Drug, Breakthrough Therapy, and Fast Track designations.[68] If granted Priority Review, the PDUFA action date was expected in the third quarter of 2020 ("3Q20").

103. Since Defendants announced the completion of Fennec's Pedmark NDA submission "in-line with the [C]ompany['s] prior guidance," without raising any specific issues relating to its product manufacturer, analysts were of the "view this demonstrates the proper execution by the management team" as Fennec had "finally [completed] the manufacturing portion once the stability test [w]as completed."[69] Further, "[g]iven prior initiation of PEDMARK's rolling NDA in December 2018," analysts "expect[ed] a quick turnaround to NDA acceptance (FDA was only waiting on manufacturing and stability testing data) and an announced PDUFA action date for Q3:20 …. As a consequence, we fully expect approval around August [2020]."[70]

---

[68] *Fennec Pharmaceuticals Completes Rolling Submission of New Drug Application (NDA) to U.S. Food and Drug Administration For PEDMARK™ and Also Submits Marketing Authorization Application (~~Maa~~MAA) to European Medicines Agency,* FENNEC PHARMACEUTICALS, INC. (Feb. 11, 2020~~)~~), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-completes-rolling-submission-new-drug.

[69] Yale Jen, Ph.D., *Pedmark Rolling NDA Submission Completed and Potential Approval Slates to 2H20,* LAIDLAW & COMPANY (Feb. 11, 2020).

[70] David Nierengarten, Ph.D., Jeffrey La Rosa, Matthew Barcus, Ph.D., *PEDMARK Rolling NDA Submission Complete; Approval Anticipated in Q3:20,* WEDBUSH SECURITIES (Feb. 11, 2020). *See also* Raghuram Selvaraju, Ph.D., *PEDMARK Regulatory Submission Complete; Reiterate Buy,* H.C. WAINWRIGHT CO, LLC (Feb. 11, 2020) ("In the wake of these regulatory submission completions, and in anticipation of a timely approval for PEDMARK in the U.S.—given Priority Review's six-month time frame, we estimate that this could occur in early to mid-August 2020[.]"); David Nierengarten, Ph.D., Jeffrey La Rosa, Matthew Barcus, Ph.D., *FY19 Financials; Awaiting FDA Action Following NDA*

96.104. In April 2020, Fennec announced that the FDA had accepted the PEDMARK NDA for filing, granted Priority Review which "shorten[ed] the review period from the standard ten months to six months from the submission of the NDA," and "set a [PDUFA] target action date of August 10, 2020 for the completion of [the] FDA's review."[71] Defendant Raykov noted that "[t]he FDA filing acceptance of our NDA and granting of Priority Review represents a *significant milestone* in the development of PEDMARK and we look forward to *working closely* with the Agency during this review process."

105. Because Defendants again failed to disclose any specific issues relating to its product manufacturer, analysts "view[ed] the announcement as another positive for FENC shares showcasing the execution of management."[72] Analysts also noted how "[t]he acceptance is a significant de-risking event for FENC. Now *with FENC successfully navigating this hurdle*, we fully expect approval based on the strength of its clinical data and Priority Review designation, and *only see labeling risk (i.e. whether a broad indication or tumor-specific label is granted) as a meaningful downside risk* for FENC

*Submission*, WEDBUSH SECURITIES (Feb. 14, 2020) ("Following the recent completion of FENC's rolling NDA submission for PEDMARK … we await FDA acceptance of the application and an announced PDUFA action date in Q3:20 …. We also expect PEDMARK will be approved and a commercial launch likely in September [2020].").

[71] *Fennec Pharmaceuticals Announces FDA Filing Acceptance and Priority Review of New Drug Application For PEDMARK™*, FENNEC PHARMACEUTICALS, INC. (Apr. 13, 2020), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-announces-fda-filing-acceptance-and.

[72] Yale Jen, Ph.D., *The PDUFA Date for Pedmark in the Prevention of Ototoxicity Induced by Cisplatin Chemotherapy is August 10,* 2020, LAIDLAW & COMPANY (Apr. 13, 2020).

shares."[73] Analysts further "anticipate[d] *timely* approval."[74]

97.106.　　　After the FDA accepted the PEDMARK NDA, Defendants knew or should have knownrecklessly disregarded that the FDA would conduct a PAI of the drug product manufacturing facility well in advance of the PDUFA date. Accordingly, as described above, if they had not already, Defendants *should* have conducted due diligence and/or a deep-dive quality audit of the drug product manufacturing facility to ensure that it would pass the inspection.[75] If Fennec chose not to do the required due diligence, it should have disclosed this fact to investors, as it understandably would have been critical to investors' decisions as to whether or not to purchase and/or to sell the stock.

98.107.　　　Instead of focusing on conducting due diligence, a quality audit and/or a mock inspection of its product manufacturer'sPII's facility to ensure FDA approval of its only drug, Fennec wasDefendants were focused on selling the Company. Fennec executives stated in April 2019 that the Company was "set up for the potential – and expectation – of buyout scenarios" so "[w]ho undergoes those commercialization efforts

---

[73] David Nierengarten, Ph.D., Jeffrey La Rosa, Matthew Barcus, Ph.D., *PEDMARK NDA Filing Accepted; Approval Anticipated by August 10 PDUFA Date*, WEDBUSH SECURITIES (Apr. 13, 2020); *see also* David Nierengarten, Ph.D., Jeffrey La Rosa, Matthew Barcus, Ph.D., *Fuel to the Finish Line*, WEDBUSH SECURITIES (May 15, 2020) ("The main unknown impacting FENC shares remains whether PEDMARK is granted a broad label or tumor-specific label upon approval.").

[74] Raghuram Selvaraju, Ph.D., *PEDMARK Application Accepted; Priority Review, as Expected; Reiterate Buy*, H.C. WAINWRIGHT & CO. (Apr. 15, 2020); Raghuram Selvaraju, Ph.D., *1Q20 Financials; Cash Replenished; Modulating PT to $15*, H.C. WAINWRIGHT & CO. (May 15, 2020).

[75] *See e.g.,* n. 52*, supra* (encouraging those establishing a manufacturing operation to use "inspection outcomes data" obtained from previous 483s as part of "inspection readiness strategies").

… remain[ed] to be seen."[76] As Defendant Andrade noted, "[w]e can't say, per [se], when or if we're going to get sold, but certainly we are set up for that potential … obviously you can see how we're set up right now. . . ..... We don't have a lot of employees, we don't have leases, we don't have anything really in the company. We have a great asset in a drug and a great team." *Id.* Andrade further explained that this "'lean and mean' structure compliment[ed] a tight financial strategy" which "rais[ed] only enough capital to reach milestones and kept nearly all of their deals non-dilutive," and as a result, "[w]e've had a lot of interest historically from potential partners" and "[w]e "anticipate as we get closer to approval and to the extent we launch the drug ourselves that will continue to be one of the activities around the company." *Id.*

108. The "tight financial strategy" still included, however, increases in total compensation for Defendant Raykov from $1.5M to $3.4M and for Defendant Andrade from $846,000 to $1.2M from 2019 through 2020. *See infra* ¶ 137.

109. Since Defendants did not ensure that Fennec's product manufacturer met cGMP standards prior to the PAI, the FDA observed numerous deficiencies during its inspection of the manufacturing facility which were discussed with management of Fennec and its manufacturer during and at the conclusion of the inspection. As the former Senior Director of Avista explained, a pharmaceutical company would know before receiving a CRL what deficiencies the FDA found at the manufacturing site *via* the exit interview with the PAI inspector and the Form 483 subsequently issued in relation to the PAI.

---

[76] *Id. atSupra* n.33. 52.

100.110. As a result, instead of announcing FDA approval on August 11, 2020, as investors and analysts expected,[77] Fennec announced it had received a CRL the day before.[78] According to the CRL, which has not been publicly released, the FDA had identified deficiencies resulting in a Form 483, listing conditions or practices requiring resolution prior to PEDMARK's approval, after recently completing a pre-approval inspectionPAI of the product manufacturer's production facility. That morning, "Fennec management hosted a call to discuss the FDA rejection. . . .... [M]anagement disclosed that the issue impacted the manufacturing facility as a whole, not only Fennec."[79]

101.111. Because the deficiencies identified by the FDA impacted the drug product manufacturing facility as a whole, such deficiencies would have been uncovered had Fennec conducted the necessary due diligence, a quality audit and/or a mock inspection of the facility. In short, *either* Fennec had knowledge of such deficiencies and recklessly disregarded them without disclosing them to investors, possibly due to the fact that Fennec was being prepared for sale, *or* recklessly failed to discover these deficiencies prior to the FDA inspection. Moreover, after knowing that the FDA issued its product manufacturer a

---

[77] *See* David Nierengarten, Ph.D., Jeffrey La Rosa, Matthew Barcus, Ph.D., *2Q20 Financials; PEDMARK PDUFA Date Ahead August 10*, WEDBUSH SECURITIES (Aug. 5, 2020) ("The key catalyst for FENC shares remains its August 10 PDUFA date.").

[78] *Fennec Pharmaceuticals Receives Complete Response Letter From the FDA For Its New Drug Application For Pedmark™ To Prevent Ototoxicity Associated With Cisplatin In Pediatric Patients With Localized, Non-Metastatic, Solid Tumors,* FENNEC PHARMACEUTICALS, INC. (Aug. 11, 2020), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-receives-complete-response-letter-fda-its. *Supra* n. 3.

[79] Deniel Mero, *Manufacturing Issue Leads to Fennec CRL*, PROPTHINK (Aug. 11, 2020, 4:14 PM), https://propthink.com/manufacturing-issue-leads-to-fennec-crl/.

Form 483 listing serious deficiencies observed during the pre-approval inspection, Fennec failed to disclose those deficiencies to investors until it received the CRL.

112. ~~c.~~ ~~Fennec's most likely choice of~~ At the same time, Defendant Raykov specifically assured investors that "[w]e will work closely with our manufacturer ~~had~~ as well as the FDA to fully address the issues raised in the letter" as expeditiously as possible.[80]

113. Based on Defendants' statements, analysts "incorporate[ed] a preliminary approval delay of ~10 months, or to mid-2021" in light of the "uncertainty around when the company will next engage with the FDA, what specific conditions will need to be satisfied at the manufacturing facility, and how long it will take to satisfy them."[81] While noting that "the CRL [wa]s clearly disappointing and w[ould] meaningfully delay time to potential PEDMARK approval," analysts still "stress[ed] that the issues were manufacturing site related, and not with the clinical dataset provided. As such, [they] continue[d] to fully expect PEDMARK approval[.]" *Id*.

114. Analysts and investors thus were under the impression that Defendants knew were on top of getting the manufacturing issues resolved quickly. Since Defendants did not change their tune for the rest of the Class Period, analysts continued to anticipate approval this second time around:

- 11/16/2020: "FENC was able to hold a Type A meeting with the FDA. FENC

---

[80] *Supra* n. 7.

[81] David Nierengarten, Ph.D., Jeffrey La Rosa, Matthew Barcus, Ph.D., *PEDMARK Receives FDA Complete Response Letter, Resubmission Timelines Unclear*, WEDBUSH SECURITIES (Aug. 12, 2020).

*plans to continue to work closely with the third-party manufacturer and FDA in addressing the CRL with plans for NDA resubmission as soon as possible.* And as said before, the CRL was based on matters with the manufacturing facility…. No new timelines were disclosed by the company but *we still feel confident FENC will package together the NDA for resubmission quickly* and can still reach market in mid-2021 upon the likely approval."[82]

- 3/30/2021: "[I]n 4Q20 FENC held a type A meeting with the FDA regarding a complete response letter from the FDA the company received last August due to concerns with the third-party manufacturing facility for PEDMARK.… As the FDA's initial concerns were unrelated to clinical safety/efficacy when issuing the CRL, *we anticipate PEDMARK will be approved in short order upon resubmission of the NDA*."[83]

- 5/13/2021: "As the original CRL was focused on the manufacturing facility, *we expect the issues to be resolved and PEDMARK to be approved*."[84]

115. On May 28, 2021, the Company resubmitted its NDA for PEDMARK, which the FDA accepted on June 22, 2021. At no time did Defendants raise any potential issues with the resubmission. As a result, analysts and investors alike believed that Fennec had resolved the deficiencies at its product manufacturer's facility:

- "A resubmission of the original NDA was required following the Complete Response Letter (CRL) FENC received in August 2020, which pointed to deficiencies in the drug manufacturer facility …. *We are pleased to see that FENC has completed this last hurdle* and look forward to the upcoming PDUFA decision. [*W]e are confident in the likelihood of a favorable FDA decision*[.]"[85]

- "*The CRL manufacturing issue has been resolved* and the PEDMARK NDA

---

[82] David Nierengarten, Ph.D., Matthew Barcus, Ph.D., *3Q20 Financials; Type A OK; Waiting on FDA*, WEDBUSH SECURITIES (Nov. 16, 2020).

[83] David Nierengarten, Ph.D., Matthew Barcus, Ph.D., *NDA Resubmission Planned in 2Q*, WEDBUSH SECURITIES (Mar. 30, 2021).

[84] David Nierengarten, Ph.D., Matthew Barcus, Ph.D., *FENC Focusing on FDA*, WEDBUSH SECURITIES (May 13, 2021).

[85] David Nierengarten, Ph.D., *Will FDA Make FENC Thankful Come Thanksgiving?*, WEDBUSH SECURITIES (June 22, 2021).

57

has been accepted.… ***All that was needed was time to clear up the manufacturing site issues.***"[86]

- "***The CRL appears to have been due to manufacturing-related issues that*** Fennec and its contract manufacturer ***should easily have addressed by now***."[87]

116. But before markets opened on November 29, 2021, Fennec announced that it expected to receive ***another*** CRL from the FDA regarding its PEDMARK NDA based on deficiencies identified during the ***re-do*** of the inspection.[88]

117. Then, on November 30, 2021, Fennec confirmed that it had received a CRL from the FDA, which "was issued as a result of identified manufacturing deficiencies which need to be satisfactorily resolved before the Pedmark NDA can be approved."[89] In addition, Defendant Raykov noted that while Fennec "will work closely with [its] current manufacturer as well as the FDA to fully address the issues raised in the letter[,] we continue to advance our second drug product manufacturing facility." *Id*.

118. Analysts expressed "concern[] about the repeated delays" as "[t]his [wa]s the second time PEDMARK approval has been delayed due to deficiencies in product manufacturer's manufacturing facility."[90] But without the identity of the manufacturer or disclosure of the issues, they were unable to research those concerns.

       c.    *Fennec's product manufacturer had multiple* serious *deficiencies identified in* prior ~~issues with passing~~ *FDA inspections and* ~~had not~~

---

[86] *Supra* n. 4.

[87] *Supra* n. 5.

[88] *Supra* n. 6.

[89] *Supra* n. 7.

[90] David Nierengarten, Ph.D., Dennis Pak, *The Fox Went Hungry for Thanksgiving,* WEDBUSH SECURITIES (Nov. 29, 2021).

58

*previously produced PEDMARK; that risk was not disclosed to investors.*three recalls just since its last inspection in 2018 – putting it at high-risk of not passing a PAI.

102.119. Defendants still have not disclosed the identity of Fennec's drug product manufacturer, thus leaving investors guessing at who the likely manufacturer is.[91] Nonetheless, Plaintiff's investigation has uncovered which manufacturers most likely weremanufacturer Fennec contracted to produce PEDMARK by Fennec, and both of those manufacturersthat manufacturer had multiple serious, deficiencies identified in prior issues with FDA inspections, had three drug recalls just since its 2018 FDA inspection, and neither had not previously produced PEDMARK previouslyfor the clinical trials. There was thus a materially high risk of the manufacturer's facility not passing a PAI, which was not disclosed to investors.

103. The FDA has inspected, found deficiencies, and issued a Form 483 to two companies in 2020 that have the ability to commercially manufacture PEDMARK. Because both of those companiesPII, who had prior issues with FDA inspections and neither had previously manufactured PEDMARK for the clinical trials, there was a materially higher risk of their facilities not passing the PAI. But that risk was not disclosed to investors.

104. *First,* Pharmaceutics International, Inc. ("PII"), a contract development and manufacturing organization ("CDMO"), with facilities facilities in Hunt Valley, MD

---

[91] Plaintiff has filed a Freedom of Information Act (FOIA) request with the FDA seeking information related to Fennec's manufacturers. In the event Plaintiff receives information from the FDA that is pertinent to this action, Plaintiff reserves the right to amend this complaint.

dedicated manufacturing suites for injectables ("PII Facilitiesand Cockeysville, MD ("Cockeysville Facility")),[92] received a Form 483 for ~~deficiencies from an inspection~~ both its facilities based on inspections which took place July 6-10, 2020.[93] The five cGMP deficiencies ~~highlighted~~observed at the Cockeysville Facility by the FDA ~~included:~~

- 120.  ~~Reports of analysis from component suppliers~~ were ~~accepted in lieu of testing each component for conformity with all appropriate written specifications, without establishing the reliability of the supplier's analyses through appropriate validation of the supplier's test results at appropriate intervals.~~:

- ~~Buildings~~ (1)       Equipment used in the manufacture, processing, packing~~,~~ or holding of ~~a~~ drug ~~product did not have the suitable construction~~products is not of appropriate design and of adequate size to facilitate ~~cleaning, maintenance, and proper~~ operations~~.~~ for its intended use, which "diminishes sterility assurance of drug products manufactured."

- (2)       Equipment and utensils ~~were~~are not maintained at appropriate intervals to prevent malfunctions and contamination that would alter the safety, identity, strength, quality or purity of the drug product.

- (3)       Equipment for adequate control over micro-organisms is not provided when appropriate for the manufacture, processing, packing or holding of a drug product. Specifically, the Cockeysville Facility "failed to adequately demonstrate unidirectional airflow over critical aseptic equipment" used in the manufacturing of PEDMARK.

- (4)       Buildings used in the manufacture, processing, packing, or holding of a drug product do not have the suitable construction to facilitate cleaning, maintenance, and proper operations. The FDA specifically commented "that all these findings indicate a lack of attention to the condition of facilities and equipment and that the observed conditions could lead to ingress of microorganisisms, insect pests, and other contaminants to the cleanrooms

---

[92] About Us, PHARMACEUTICALS INTERNATIONAL, INC., https://www.pharm-int.com/about-us/ ~~(last visited Jan. 29, 2021)..~~

[93] Robert Martin FDA, Edmund Mrak FDA, *483 Pharmaceutics International Jul 2020* (July 10, 2020), https://fdazilla.com/store/form483/1000513101-20200710.

and support areas and result in contamination of the firm's drug products."

- (5) Procedures designed to prevent microbiological contamination of drug products purporting to be sterile ~~were~~are not established.[94]

    - ~~Equipment for adequate control over micro-organisms was not provided when appropriate for the manufacture, processing, packing or holding of a drug product.[95]~~

121. PII received another Form 483 the following year for each of its facilities based on inspections which took place July 26, 2021-September 29, 2021.[96]

~~105.~~122. PII has a documented history of receiving a Form 483 nearly every year for the past decade, specifically for prior inspections of PII Facilities ending on November 9, 2018, November 16, 2017, October 27, 2017, March 24, 2017, April 4, 2016, March 18, 2016, May 29, 2015, May 22, 2015, ~~April 14, 2015,~~ July 17, 2014, September 13, 2013, May 22, 2013, October 22, 2012, May 25, 2011, December 16, 2010, and July 29, 2009.

123. ~~If~~Furthermore, just between the November 9, 2018 and July 2020 FDA inspections, PII ~~is Fennec's~~had had three drug ~~product~~recalls.

124. According to a former Senior Vice President of Operations and Strategic Initiatives at PII ("FE4") from May 2020 to June 2021, PII and its clients formed a "joint

---

[94] U.S. FOOD & DRUG ADMIN., *Inspection Citation* (Dec. 23, 2020), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/inspection-citation.

~~[95] U.S. FOOD & DRUG ADMIN., INSPECTION CITATION (Dec. 23, 2020), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/inspection-citation.~~

[96] Shirshendu Deb FDA, Marcellinus Dordunoo FDA, Kathleen Jordan FDA, Viviana Matta FDA, *483 Pharmaceutics International Sep 2021* (Sept. 29, 2021), https://fdazilla.com/store/form483/3006503102-20210929.

working group" that coordinated and shared all pertinent information at every step of the process from development of a drug to preparing for manufacturing of the drug to audits by government agencies and thus, "there was absolutely no lack of transparency with any interaction" PII had with any of its clients. FE4 further noted that prior to signing a contract with a third-party manufacturer the drug sponsor will do extensive due diligence on the manufacturers it considers using because it is "dealing with bringing drugs to the market."

125. In conducting their due diligence of PII, Defendants knew or would have uncovered the prior Form 483s. In addition, they would have uncovered PII's major difficulties passing regulatory inspections dating back to at least 2015:

- In June 2015, the United Kingdom's Medicines and Healthcare Products Regulatory Agency ("MHRA") inspected the Cockeysville Facility, found several deficiencies, and issued a GMP statement of non-compliance ("SNC").[97] That same month, the European Commission ("EC") referred PII to the European Medicines Agency ("EMA"), which regulates pharmaceuticals in the EU, to assess whether authorizations for the Cockeysville Facility should have known aboutbe maintain, varied, suspended or revoked. *Id*.

- In September 2015, the MHRA inspected PII again and still found it deficient. *Id*.

- In February 2016, the MHRA and FDA jointly conducted a follow up inspection and "found that ***the corrective and preventive measures had not been appropriately implemented***" and PII was "***non-compliant*** with the legal requirements and/or the principles and guidelines of GMP as provided for by Union law as ***critical and major GMP deficiencies remained***" – including failure of quality oversight, failure to qualify the equipment, and data integrity failures. *Id*. Consequently, the EMA withdrew manufacturing certifications for PII's Hunt Valley and Cockeysville facilities and recommended a recall of medicinal products manufactured at those sites unless they were "critical to public health[.]" Even where a drug was found

---

[97] EUROPEAN MEDICINES AGENCY, *CHMP Assessment Report* (Oct. 13, 2016), https://www.ema.europa.eu/en/documents/variation-report/ammonaps-epar-assessment-report-article-31_en.pdf.

critical to public health and therefore permitted to be maintained where "no alternative options [we]re available to patients", "*serious concern*" was raised about "*[t]he consistent and continuous lack of adequate quality assurance since before* 2015[.]"

- In June 2016, the MHRA issued another SNC to the Cockeysville Facility, finding among other deficiencies a "*gross failure*" of the change management, which allowed use of an unqualified high-pressure liquid chromatography system. The EC again referred PII to the EMA to assess whether authorizations for the site should be maintained, varied, suspended or revoked. *Id*.

- In August 2016, another inspection of PII was conducted which "concluded that the *deficiencies previously identified* at the site were *still present*" and "there [we]re *still significant issues* with regard to assurance on the quality standards." *Id*.

- In September 2016, the EMA "recommended that medicines manufactured by [PII] should no longer be available in the EU", a "restriction of supply in the EU and the recall of the medicinal products manufactured at this site" (except one which was considered critical for public health) as the EMA "*found that corrective measures previously agreed had not been appropriately implemented*. In particular, several manufacturing shortcomings had not been resolved."[98]

- In October 2016 Teva recalled a drug PII had manufactured for it "because the products failed stability testing for impurity levels."[99]

- During inspections in February 2020, MHRA regulators flagged two critical deficiencies, including an organizational failure to minimize cross contamination between hazardous and non-hazardous products, and identified a "*gross failure*" of the change management, which allowed the

---

[98] *Pharmaceutics International Inc, US: supply of non-critical medicines to EU stopped due to manufacturing failings*, EUROPEAN MEDICINES AGENCY (Sept. 16, 2016, updated Dec. 14, 2016), https://www.ema.europa.eu/en/medicines/human/referrals/pharmaceutics-international-inc; *Ammonaps – Procedural steps taken and scientific information after the Authorization*, EUROPEAN MEDICINES AGENCY (2020), https://www.ema.europa.eu/en/documents/procedural-steps-after/ammonaps-epar-procedural-steps-taken-scientific-information-after-authorisation_en.pdf.

[99] Eric Palmer, *Manufacturing – UPDATED: Pii produced products recalled by Teva*, QUESTEX LLC (Oct. 20, 2016, 9:04 AM), https://www.fiercepharma.com/manufacturing/pii-problems-result-teva-recall.

use of an unqualified high-pressure liquid chromatography system. *Id*.

126. Another former PII employee ("FE5") confirmed that PII's regulatory problems began with the EMA, but then the FDA "joined the investigation" of PII and also identified problems. FE5 stated that the regulatory issues at PII dragged on for a few years but had been corrected before FE4 left. FE5 held several different positions while at PII, Project Management Support/Coordinator (7/2009 – 8/2017), Regulatory Affairs Associate (9/2017 – 10/2017), BD Proposal Development Specialist (11/2017 – 8/2019), and Business Management Associate (1/2020 – 5/2020).

127. Recommended practices when establishing a manufacturing operation includes to "mine" publicly available data, "us[ing] inspection outcomes data to drive prioritization of inspection readiness focus" and use 483s and warning letters available on the FDA's website so that "[d]etails can then be explored to clarify why the FDA deemed the observation necessary."[100]

128. In addition, according to a former Senior Director of Regulatory Affairs at PII from October 2017 to August 2021 ("FE6") from the time a contract with Fennec was signed in 2019, Fennec employees began meeting on a regular basis and working closely with the PII employees responsible for the PEDMARK project. Specifically, FE6 stated that "R&D from Fennec were directly involved with the R&D team and manufacturing team" at PII and that Fennec employees had come to the manufacturing site and met with PII's R&D teams "to discuss the manufacturing operations, all the logistics."

---

[100] *See supra* n. 52.

64

129. Between 2020 and 2021 Defendants Raykov and Andrade's compensation increased from $2.1 million to $3.4 million and $1.2 million to $1.5 million respectively. infra ¶ 198;

106.130. Defendants thus knew about, or recklessly disregarded, the deficiencies previously identified by the FDA at PII Facilities, as well as the prior drug recalls, through their discussions with PII and publicly available sources like the FDA's website. and news outlets. This risk, together with the name of the manufacturer, should have been disclosed to investors.

107. Second, Bayer AG ("Bayer"), a global pharmaceutical company which manufactures drug products out of its headquarters in Leverkusen, Germany ("Leverkusen Site"), received a Form 483 from an inspection that took place July 20-27, 2020.[101] The deficiencies highlighted by the FDA included:

- Control procedures were not established which monitor the output and validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product.

- Laboratory controls did not include the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.

- Written procedures for cleaning and maintenance failed to include description in sufficient detail of methods, equipment and materials used.

- Written records of investigations into unexplained discrepancies did not always include the conclusions and follow-up.

- There was insufficient physical or spatial separation from operations and

---

[101] Michael Charles FDA, Wayne Mcgrath FDA, *483 Bayer AG Jul 2020* (July 27, 2020), https://fdazilla.com/store/form483/3002806462-20200727.

65

other drug products to prevent mix-ups and cross-contamination.[102]

108. Not only had Bayer previously received a Form 483, but the deficiencies raised therein escalated into a warning letter from the FDA on November 14, 2017, after an inspection of the Leverkusen Site that had taken place January 12-27, 2017.[103] Bayer had also received a Form 483 from other inspections of the Leverkusen Site which had ended on March 22, 2019, July 9, 2012, and February 23, 2010.

109. If Bayer was Fennec's product manufacturer, Defendants knew or should have known about the deficiencies previously identified by the FDA at the Leverkusen Site not only through publicly available sources like the FDA's website, but through its Chief Commercial Officer, Shubh Goel, who had previously served as Head of Global Launch Team at Bayer. This risk should have also been disclosed to investors.

110.131. Because Defendants did not disclose the identity of Fennec's product manufacturer and/or other material facts about that manufacturer's prior issues with FDA inspections and/or, commercial product launches, and/or product recalls, and instead touted the Company's successful manufacturing and preparedness for the commercial launch of PEDMARK, investors had no reason to expect a CRL and a *second* delay in the launch due to manufacturing deficiencies. Furthermore, after the first CRL, since Defendants assured investors that they were working closely with the Company's manufacturer and the FDA to fully address the CRL, and only resubmitted after a Type A meeting with the FDA during

---

[102] *Id.* at n.43.
[103] Justin Boyd FDA, *483 Bayer AG Jan 2017* (Jan. 20, 2017), https://fdazilla.com/store/form483/3002806462-20170120.

which manufacturing deficiencies are addressed, investors had no reason to expect a *second* CRL and a *third* delay in the launch due to manufacturing issues from a *different* manufacturer.

        d.    ~~FALSE AND~~*Instead of investing in R&D, Defendants were lining their own pockets.*

132. Fennec had only two expenses: R&D and General and Administration Expenses ("G&A"). R&D included "expenses associated with our clinical trials, drug manufacturing to support clinical programs, *salaries for research and development personnel, stock-based compensation*, [and] consulting fees[.]"[104] G&A included "*expenses associated with the compensation of employees, stock-based compensation*, professional fees, consulting fees, insurance and other administrative matters associated in support of our drug development programs." *Id*.

133. During the Class Period the Company repeatedly told investors that "*[c]urrent liabilities increased primarily due to manufacturing* and pre-commercialization activities associated with production and marketing of PEDMARK™ and related regulatory expenses."[105] Similarly, increases in cash outlays were also attributed "to the formulation and *manufacturing of registration batches* for PEDMARK™,"[106] or "relate to the pre-commercialization activities of PEDMARKTM

---

[104] 1Q19 10-Q, 2Q19 10-Q, 3Q19 10-Q, 1Q20 10-Q, 2Q20 10-Q, 3Q20 10-Q.

[105] 2Q20 10-Q, 3Q20 10-Q.

[106] 2Q18 10-Q, 3Q18 10-Q, Fennec Pharmaceuticals, Inc., Quarterly Report (Form 10-Q) (May 10, 2019) ("1Q19 10-Q"), Fennec Pharmaceuticals, Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2019) ("2Q19 10-Q"), Fennec Pharmaceuticals, Inc., Quarterly Report (Form 10-Q) (Nov. 12, 2019) ("3Q19 10-Q").

and regulatory submission activities relating to the rolling NDA,"[107] or "regulatory submission activities relating to the rolling NDA and MAA, and the execution of the Company's pre-commercialization strategy,"[108]

134. Thus, investors expected R&D to increase in advance of each of the NDAs. And they did, which Fennec consistently attributed to drug manufacturing activities:

- "This increase relates primarily to drug manufacturing activities and preparations for registration activities with the pending regulatory filings in 2018."[109]

- "This increase *relates primarily to drug manufacturing activities* and regulatory registration activities."[110]

- "We have increased our research and development expenses related to PEDMARKTM as a result of our drug manufacturing activities related to the preparation for registration batches and NDA and MAA submission."[111]

- "The Company has increased its research and development expenses related to PEDMARKTM as a result of the Company's drug manufacturing activities related to the preparation for registration batches and regulatory expenses associated with the rolling NDA submission of PEDMARKTM."[112]

- "This increase relates primarily to drug manufacturing activities and regulatory registration activities." and "The Company has increased its research and development expenses related to PEDMARKTM as a result of the Company's drug manufacturing activities related to the preparation for registration batches and regulatory expenses associated with the rolling NDA submission of PEDMARKTM."[113]

---

[107] Fennec Pharmaceuticals, Inc., Quarterly Report (Form 10-Q) (May 14, 2020) ("1Q20 10-Q")

[108] 2Q20 10-Q, 3Q20 10-Q.

[109] 1Q18 10-Q.

[110] 2Q18 10-Q, 3Q18 10-Q.

[111] 2018 10-K.

[112] 1Q19 10-Q.

[113] 2Q19 10-Q.

68

- "This increase *relates primarily to drug manufacturing activities* and preparations for registration batches necessary for regulatory approvals."[114]

- "This increase *relates primarily to drug manufacturing activities* and preparations for registration batches necessary for regulatory approvals." *Id.*

- "Research and development expenses increased by $573 for the three months ended September 30, 2020 over the same period in 2019 as *the Company's activities increased after the CRL from the FDA related to manufacturing and regulatory*."[115]

135. Correspondingly, R&D decreased after the necessary manufacturing activities for regulatory approval were purportedly completed:

- "Research and development expenses *decreased* by $1,003 for the three months ended September 30, 2019 over the same period in 2018 as the Company completed a significant part of the activities needed for regulatory approval of PEDMARK[TM] in the first six months of 2019. The *decrease* in the three months ended September 30, 2019 *primarily relates to a decrease in manufacturing activities necessary for regulatory submission*s."[116]

- "Research and development expenses *decreased* by $278 for the three months ended March 31, 2020, over the same period in 2019 *as the Company finalized preparation for regulatory approval* of PEDMARK[TM]. Research and development expenses are *expected to decrease further as the Company's begins to focus on the commercialization* of PEDMARK[TM]." [117]

- "The Company has *continued to decrease its research and development expenses* related to PEDMARK[TM] *as it approaches potential regulatory approval* of PEDMARK[TM]." *Id.*

- "Research and development expenses *decreased* by $848 for the three months ended June 30, 2020 over the same period in 2019 *as the Company's activities shifted from research and development expenses to product launch readiness and pre-commercial development* of PEDMARK[TM]." [118]

---

[114] 3Q19 10-Q.

[115] 3Q20 10-Q.

[116] 3Q19 10-Q.

[117] 1Q20 10-Q.

[118] 2Q20 10-Q.

- "***This decrease relates primarily to the shift from research and development to pre-commercialization and product launch efforts*** for PEDMARK™." *Id.*

- "The Company has ***decreased its research and development expenses related to PEDMARK™ as the Company's efforts have shifted to pre-commercialization with some continued regulatory expenses associated with the rolling NDA submission*** of PEDMARK™." *Id.*

- "For the three-months ended September 30, 2020 the Company has ***decreased its research and development expenses*** related to PEDMARK™ ***as the Company's efforts have shifted to pre-commercialization activities with some continued regulatory expenses associated with the rolling NDA submission of PEDMARK™***."[119]

136. But while Defendants were purportedly focusing time and money on manufacturing activities, they were increasing their own compensation at investors' expense as the Company had no significant revenue. The Company generally noted the increased compensation to directors and officers in explaining the increased G&A:

- "The overall increase was a result of increases in non-cash equity compensation, cash expenses for drug and patient advocacy, legal and consulting expenses, director payments, employee wages and benefits, and investor relations expenses as compared with the same period in 2017." [120]

- "The overall ***increase was a result of increases in non-cash equity compensation***, legal and consulting expenses, ***director payments***, employee wages and benefits, and investor relations expenses."[121]

- The "***increase*** in general and administrative expenses ***is attributed to a small rise in compensation to officers, directors*** and key contract employees in fiscal 2018 as compared to fiscal 2017."[122]

---

[119] 3Q20 10-Q.

[120] 1Q18 10-Q.

[121] 2Q18 10-Q.

[122] 2018 10-K

70

137.    Indeed, Defendants Raykov and Andrade received substantial raises annually, "continuing their compensation's steady increase since starting with the company."[123]

| | Raykov[124] | | | | Andrade | | | |
|---|---|---|---|---|---|---|---|---|
| | *Salary* | *Bonus* | *Option Awards* | *Total* | *Salary* | *Bonus* | *Option Awards* | *Total* |
| 2018 | $350,000 | $160,000 | $562,261 | $1,072,261 | $250,000 | $110,000 | $309,099 | $669,099 |
| 2019 | $400,000 | $157,500 | $830,944 | $1,388,444 | $290,000 | $100,000 | $438,555 | $828,555 |
| 2020 | $430,000 | - | $1,694,216 | $2,124,216 | $311,750 | - | $847,108 | $1,158,858 |
| 2021 | $458,402 | - | $2,951,923 | $3,410,325 | $332,075 | - | $1,006,364 +$153,000 Restricted Shares Unit Awards | $1,491,439 |

138.    As a result, every year during the Class Period, Defendants' compensation was at least 17% of the Company's G&A:

| | **Total Expenses (R&D+G&A)** | **Total Compensation of Individual Defendants** | **% of Compensation to Expenses** |
|---|---|---|---|
| 2018 | $10,409,000 | $1,741,360 | 17% |
| 2019 | $13,009,000 | $2,216,999 | 17% |
| 2020 | $18,055,000 | $3,283,074 | 18% |
| 2021 | $17,223,000 | $4,901,764 | 28% |

---

[123] Seth Thomas Gulledge, *With stock down 68% in past year, RTP outfit's CEO, CFO enjoy 15% bump in compensation*, AMERICAN CITY BUSINESS JOURNALS (Apr. 24, 2019 2:08 PM EDT), https://www.bizjournals.com/triangle/news/2019/04/24/with-stock-down-68-in-past-year-rtp-outfits-ceo.html.

[124] 2018 10-K, 2019 10-K, 2020 10-K, Fennec Pharmaceuticals, Inc., Annual Report (Form 10-K) (Feb. 28, 2022) ("2021 10-K").

## V.I. MATERIALLY MISLEADING STATEMENTS DURING THE CLASS PERIOD[125]

111.139.     The Class Period begins on December 20, 2018 when Fennec issued a press release before markets opened announcing it "hasha[d] initiated a rolling New Drug Application (NDA) for PEDMARK™ (a unique formulation of sodium thiosulfate (STS) to be administered by infusion) for the prevention of ototoxicity induced by cisplatin chemotherapy in patients 1 month to < 18 years of age with localized, non-metastatic, solid tumors. *The Company is targeting U.S. approval of PEDMARK™ in the second half of 2019*." On this news, Fennec's stock price increased nearly 20% on heavy trading to close at $6.43 on December 20, 2018.

112.140.     The statementsstatement contained in ¶ 111139 *supra* werewas materially false and misleading because Defendants knew, or recklessly disregarded, the fact that because Fennec's drug substance manufacturer was in the process of being acquired, and that manufacturer's facility did not have large scale commercial capabilities or a proven and extensive track record of successful FDA inspections and product launches, the Company's commercial manufacturing site would need to be changed which would necessitate 6 months of stability data from the new site and thus the Company couldwould not possiblybe able to complete its rolling NDA submission, much less achieve approval of PEDMARK, in the second half of 2019.

113.141.     Then, before markets opened on March 13, 2019, Fennec issued a

---

[125] The particular portions of the statements alleged to be false or misleading are in bold and italicized herein.

press release providing a business update and announcing fiscal year 2018 ("FY2018") financial results. Despite announcing a minimum six-month delay in the full submission to the FDA, and as a result, the delayed commercialization of PEDMARK because "the drug substance manufacturer for PEDMARK™ [being] recently acquired requiring a site transition for the commercial manufacturing site," the Company assured investors ~~that:~~of a "commercial launch for PEDMARK in the second half of 2020." As a result, there was an "*increase in R&D expenses [] primarily due to the manufacturing and regulatory expenses associated with the preparation for regulatory approval* and planned commercialization of PEDMARK™.[126]

> The *~~new facility~~* ~~of the acquiring company~~ *~~has large scale commercial capabilities and a proven and extensive track record of successful FDA inspections and product launches~~*~~. As such, full submission is targeted for late 2019 to early 2020. If approved,~~ *~~Fennec expects a first commercial launch for PEDMARK in the second half of 2020~~*~~.~~

> ~~114.~~142.    The statements contained in ¶ ~~113~~141 *supra* were materially ~~false and~~ misleading because Defendants knew, or recklessly disregarded, that: despite a delayed commercial launch resulting from their failure to conduct sufficient due diligence to ensure that the substance manufacturing site would not need to change: (i) ~~Defendants failed to conduct~~they were not spending money on conducting adequate due diligence into Fennec's product manufacturer to ensure that it complied with cGMP and/or ~~Defendants ignored red flags indicating that~~were ignoring deficiencies previously found at the product

---

[126] *Fennec Provides Business Update and Announces Fiscal Year 2018 Financial Results*, FENNEC PHARMACEUTICALS, INC. (Mar. 13, 2019), https://fennecpharma.com/fennec-provides-business-update-and-announces-fiscal-year-2018-financial-results/.

manufacturing site ~~would not pass a pre-approval inspection because~~ indicating it was not in compliance with cGMP~~, unlike the substance manufacturer;~~; and (ii) as a result, the FDA would, and did, observe deficiencies at the product manufacturing site warranting a Form 483 and the denial of Fennec's NDA for PEDMARK~~; and (iii) as a result, Fennec did not have a reasonable basis for expecting a commercial launch of PEDMARK in the second half of 2020.~~ twice. To date, the FDA has still not approved, and the Company has still not commercially launched, PEDMARK.

~~115.~~143.    On March 15, 2019, Fennec filed its annual report for FY2018 ~~("2018 10-K")~~ with the SEC which was signed by Defendant Raykov, as appointed and executed by Defendants Andrade, Haigh, Islam, Rallis and Brughera as their attorney-in-fact and agent with power of substitution. The 2018 10-K warned that:

> We and ***our third-party manufacturers are also required to comply with the applicable current FDA Good Manufacturing Practices regulations***, which include requirements relating to quality control and quality assurance, as well as the corresponding maintenance of records and documentation. Further, manufacturing facilities must be approved by the FDA before they can be used to manufacture our product, and they are subject to additional FDA inspection. ***If we fail to comply with any of the FDA's continuing regulations, we could be subject to reputational harm and sanctions, including:***
>
> - ***delays, warning letters and fines~~;~~[.]***
>
> - ~~product recalls or seizures and injunctions on sales;~~
> - ~~refusal of the FDA to review pending applications;~~
> - ~~total or partial suspension of production;~~
> - ~~withdrawals of previously approved marketing applications; and~~
> - ~~civil penalties and criminal prosecutions.~~

2018 10-K.

~~116.~~144.    In addition, the 2018 10-K warned that "[o]ur product candidates

74

could fail to receive marketing approval for many reasons, including the following … ***the FDA or comparable foreign regulatory authorities may find inadequate the manufacturing processes or facilities of third-party manufacturers with which we contract for clinical and commercial supplies***." *Id.*

~~117.~~145.    The statements contained in ¶¶ ~~115-116~~143-44 *supra* were materially ~~false and~~ misleading because Defendants knew, or recklessly disregarded the fact that, that: these risks had already materialized at the start of the Class Period because Defendants had failed to conduct adequate due diligence into Fennec's third-party product manufacturer to ensure that it complied with cGMP or, at minimum, Defendants ignored red flags indicating that the product manufacturing site would likely not pass a pre-approval inspection because it was not in compliance with cGMP, including at least one drug recall since its November 2018 FDA inspection, and, as a result, the FDA would, and did, observe deficiencies at the manufacturing site warranting a Form 483 and the denial of the Company's NDA for PEDMARK. To date, the Company has still not confirmed when it will resubmit the NDA and the FDA has still not approved PEDMARK.

~~118.~~146.    Additionally, the 2018 10-K included certifications under Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Raykov and Andrade attesting, in relevant part, that "[b]ased on my knowledge, this Annual Report does not contain any untrue statement of a material fact or ***omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this Annual Report." *Id.*

~~119.~~147.    The statements contained in ¶ ~~118~~146 *supra* were materially ~~false and~~

misleading because Defendants knew, or recklessly disregarded, that: (i) they ~~had failed to conduct~~were not spending money on conducting adequate due diligence into Fennec's third-party drug product manufacturer to ensure that it complied with cGMP and/or ~~Defendants ignored red flags indicating that~~were ignoring deficiencies previously found at the product manufacturing site ~~would likely not pass a pre-approval inspection because~~ indicating it was not in compliance with cGMP~~;~~, including at least one drug recall since its November 2018 FDA inspection; and (ii) as a result, the FDA would, and did, observe deficiencies at the manufacturing site warranting a Form 483 and the denial of the Company's ~~NDA or PEDMARK; and (iii) thus, the Company did not have a reasonable basis for a commercial launch of PEDMARK in the second half of 2020.~~PEDMARK NDA. To date, the FDA has still not approved, and the Company has still not commercially launched, PEDMARK.

~~120.~~148. On May 9, 2019, Fennec issued a press release providing a business update and announcing first quarter 2019 ("1Q19") financial results.[127] The press release ~~quotes Defendant Raykov as stating that "[w]e were very pleased with *the production transition of PEDMARK™ API to the new commercial drug substance manufacturing site during the first quarter*."~~explains that "[t]he reduction in cash balance over the quarter ended March 31, 2019, is the result of *cash used for operating activities including the manufacturing and regulatory expenses associated with the regulatory submissions of*

---

[127] *Fennec Provides Business Update and Announces First Quarter 2019 Financial Results,* FENNEC PHARMACEUTICALS, INC. (May 9, 2019, 6:00 AM ET), https://www.globenewswire.com/news-release/2019/05/09/1820548/0/en/Fennec-Provides-Business-Update-and-Announces-First-Quarter-2019-Financial-Results.html.

*PEDMARK$^{TM}$*" and that "[t]he increase in *R&D expenses for the comparative three months, is primarily due to activities associated with the regulatory approvals of PEDMARK$^{TM}$*." *Id*.

~~121.~~149. By this point, as noted, the commercial launch of PEDMARK had been delayed because of Defendants' failure to conduct sufficient due diligence to ensure that the substance manufacturing site would not need to change. Despite disclosing this delay due to the site transition, Defendants continued to fail to adequately monitor their manufacturers and to disclose that failure to investors. Specifically, the statements contained in ¶ ~~120~~148 *supra* were materially ~~false and~~ misleading because Defendants knew, or recklessly disregarded the fact that: (i) Defendants ~~did~~were not ~~conduct~~spending money on conducting adequate due diligence into Fennec's product manufacturer to ensure that it complied with cGMP or ~~ignored red flags~~ were ignoring deficiencies previously found at the product manufacturing site indicating ~~that the product manufacturing site would not pass a pre-approval inspection because~~ it was not in compliance with cGMP, ~~unlike the substance manufacturer~~including at least one drug recall since its November 2018 FDA inspection; and, (ii) as a result, the FDA would, and did, observe deficiencies at the product manufacturing site warranting a Form 483 and the denial of Fennec's NDA for PEDMARK~~. In short, Fennec did not have a reasonable basis to tell investors that it expected a commercial launch of PEDMARK in the second half of 2020.~~ twice. To date, the FDA has still not approved, and the Company has still not commercially launched, PEDMARK.

~~122.~~150. On August 9, 2019, Fennec issued a press release providing a business

update and announcing second quarter 2019 ("2Q19") financial results. The press release quotes Defendant Raykov as stating that "[d]uring the quarter, *we* are pleased to *have successfully manufactured PEDMARK and are working closely with the FDA on our rolling NDA submission*" and "*we plan to launch PEDMARK in the second half of 2020*."."[128]

~~123.~~151.    By this point, as noted, the commercial launch of PEDMARK had been delayed because of Defendants' failure to conduct sufficient due diligence to ensure that the *substance* manufacturing site would not need to change. Despite disclosing this delay due to the site transition and updating investors as to the successful manufacturing of PEDMARK, the Defendants continued to fail to adequately monitor their manufacturers and to disclose that failure to investors. Specifically, the statements contained in ¶ ~~122~~150 *supra* were materially ~~false and~~ misleading because Defendants knew, or recklessly disregarded the fact that: (i) ~~Defendants did~~they were not ~~conduct~~spending money on conducting adequate due diligence into Fennec's product manufacturer to ensure that it complied with cGMP ~~and/~~or ~~ignored red flags indicating that~~were ignoring deficiencies previously found at the product manufacturing site ~~would not pass a pre-approval inspection because~~ indicating it was not in compliance with cGMP, ~~unlike the substance manufacturer~~including at least one drug recall since its November 2018 FDA inspection; and, (ii) as a result, the FDA would, and did, observe deficiencies at the product

---

[128] Fennec Pharmaceuticals Inc., Fennec Provides Business Update and Announces Second Quarter 2019 Financial Results (Ex-99.1) (Aug. 9, 2019), https://www.sec.gov/Archives/edgar/data/1211583/000114420419038760/tv526697_99-1.htm.

manufacturing site warranting a Form 483 and the denial of Fennec's NDA for PEDMARK. In short, Fennec did not have a reasonable basis to tell investors that it expected a commercial launch of PEDMARK in the second half of 2020. twice. To date, the FDA has still not approved, and the Company has still not commercially launched, PEDMARK.

124.152.    On November 12, 2019, Fennec issued a press release providing a business update and announcing third quarter 2019 ("3Q19") financial results. The press release quotes Defendant Raykov as stating explains that "*we are focused on building*"[t]he reduction in cash balance over the *necessary* teamquarter is the result of *cash used for operating activities including the manufacturing* and *infrastructure to support a rapid commercial launch of PEDMARK*, if approved, in the second half *regulatory expenses associated with the regulatory submissions of* 2020."*PEDMARK$^{TM}$*."[129]

125.    The statements contained in ¶ 124 *supra* were materially false and misleading because Defendants knew, or recklessly disregarded, that: (i) their focus on the "rapid commercial launch of PEDMARK" did not include adequate due diligence into Fennec's product manufacturer to ensure that it complied with cGMP or ignored red flags indicating that the product manufacturing site would not pass a pre-approval inspection because it was not in compliance with cGMP; (ii) as a result, the FDA would, and did, observe deficiencies at the product manufacturing site warranting a Form 483 and the denial of

---

[129] Fennec Pharmaceuticals Inc., Current Report (Form 8-K) (Nov. 12, 2019), https://www.sec.gov/Archives/edgar/data/0001211583/000110465919062306/tm1922388 d1_8k.htm.

~~Fennec's NDA for PEDMARK; and (iii) thus, Fennec did not have a reasonable basis for a commercial launch of PEDMARK in the second half of 2020. To date, the FDA has still not approved, and the Company has still not commercially launched PEDMARK.~~

~~126.    Before markets opened on February 11, 2020, Fennec issued a press release announcing the completion of its rolling NDA to the FDA for PEDMARK.[130] The press release quotes Defendant Raykov as stating that "*[w]e are well underway with commercialization readiness activities to support the potential launch of PEDMARK and our transition to becoming a commercial-stage organization*." On this news, Fennec's stock price increased nearly 14% on heavy trading to close at $7.55 on February 13, 2020.~~

~~127.~~153.    ~~The statements contained in ¶ 126~~The statements contained in ¶ 152 *supra* were materially false and misleading because Defendants knew, or recklessly disregarded, that: (i) ~~their "commercialization readiness activities" did~~they were not ~~include~~spending money on conducting adequate due diligence into Fennec's product manufacturer to ensure that it complied with cGMP <u>and</u>/or ~~ignored red flags indicating that~~were ignoring deficiencies previously found at the product manufacturing site ~~would not be pass a pre-approval inspection because~~ indicating it was not in compliance with cGMP, including at least one drug recall since its November 2018 FDA inspection; (ii) as

---

[130] ~~*Fennec Pharmaceuticals Completes Rolling Submission of New Drug Application (NDA) to U.S. Food and Drug Administration for PEDMARK™ and Also Submits Marketing Authorization Application (MAA) to European Medicines Agency*, FENNEC PHARMACEUTICALS INC. (Feb. 11, 2020 6:00 AM ET), https://www.globenewswire.com/news-release/2020/02/11/1982856/0/en/Fennec-Pharmaceuticals-Completes-Rolling-Submission-of-New-Drug-Application-NDA-to-U-S-Food-and-Drug-Administration-for-PEDMARK-and-Also-Submits-Marketing-Authorization-Application.html.~~

a result, the FDA would, and did, observe deficiencies at the product manufacturing site warranting a Form 483 and the denial of Fennec's NDA for PEDMARK; and (iii) thus, Fennec did not have a reasonable basis for a commercial launch of PEDMARK in the second half of 2020. twice. To date, the FDA has still not approved, and the Company has still not commercially launched, PEDMARK.

128. Before markets opened on February 14, 2020, Fennec issued a press release providing a business update and announcing fiscal year 2019 ("FY2019") financial results.[131] The press release quotes Defendant Raykov as stating that "*[d]uring the year, we also made solid progress in preparing for the potential launch of PEDMARK including* the hiring of a chief commercial officer and *the preparation and execution of our commercial readiness plan*." On this news, Fennec's stock price increased over 7% on heavy trading to close at $8.10 on February 20, 2020.

129. The statements contained in ¶ 128 *supra* were materially false and misleading because Defendants knew, or recklessly disregarded, that: (i) their "solid progress in preparing for the potential launch of PEDMARK … and the preparation and execution of our commercial readiness plan" did not include adequate due diligence into Fennec's product manufacturer to ensure that it complied with cGMP or ignored red flags indicating that the product manufacturing site would not pass a pre-approval inspection because it was not in compliance with cGMP; (ii) as a result, the FDA would, and did, observe

[131] *Fennec Provides Business Update and Announces Fiscal Year 2019 Financial Results*, FENNEC PHARMACEUTICALS INC. (Feb. 14, 2020 6:00 AM ET), https://www.globenewswire.com/news-release/2020/02/14/1985166/0/en/Fennec-Provides-Business-Update-and-Announces-Fiscal-Year-2019-Financial-Results.html.

deficiencies at the product manufacturing site warranting a Form 483 and the denial of Fennec's NDA for PEDMARK; and (iii) thus, Fennec did not have a reasonable basis for a commercial launch of PEDMARK in the second half of 2020. To date, the FDA has still not approved, and the Company has still not commercially launched PEDMARK.

130.154. Also onOn February 14, 2020, Fennec filed with the SEC its annual report for FY2019 ("2019 10-K") signed by Defendant Raykov, as appointed and executed by Defendants Andrade, Haigh, Islam, Rallis, Brughera and Cook as their attorney-in-fact and agent with power of substitution. The 2019 10-K warned that:

> We and our third-party manufacturers are also required to comply with the applicable current FDA Good Manufacturing Practices regulations, which include requirements relating to quality control and quality assurance, as well as the corresponding maintenance of records and documentation. Further, manufacturing facilities, which we outsource to third parties, must be approved by the FDA before they can be used to manufacture our product, and they are subject to additional FDA inspection. ***If we fail to comply with any of the FDA's continuing regulations, we could be subject to reputational harm and sanctions, including***:
>
> - ***delays, warning letters and fines;[.]***
>
> - product recalls or seizures and injunctions on sales;
> - refusal of the FDA to review pending applications;
> - total or partial suspension of production;
> - withdrawals of previously approved marketing applications; and
> - civil penalties and criminal prosecutions.

2019 10-K.

131.155. In addition, the 2019 10-K warned that "[o]ur product candidate could fail to receive marketing approval for many reasons, including the following...***the FDA or comparable foreign regulatory authorities may find inadequate the manufacturing processes or facilities of third-party manufacturers with which we contract for clinical***

*and commercial supplie*s." *Id.*

132.156.     The statements contained in ¶¶ 130-131154-55 *supra* were materially false and misleading because Defendants knew, or recklessly disregarded the fact that: while the 10-K portrayed these risks as risks that could evolve in the future, in fact, these risks had *already* materialized by the start of the Class Period because the Defendants had failed to conduct adequate due diligence into Fennec's third-party product manufacturer to ensure it complied with cGMP or ignored red flags indicating that the product manufacturing site would likely not pass a pre-approval inspection because it was not in compliance with cGMP, including at least one drug recall since its November 2018 FDA inspection, and, as a result, the FDA would, and did, observe deficiencies at the product manufacturing site warranting a Form 483 and the denial of PEDMARK's NDA. To date, the Company has still not confirmed when it will resubmit the NDA and the FDA has still not approved PEDMARK.

133.157.     Additionally, the 2019 10-K included SOX certifications under Section 302 by Defendants Raykov and Andrade attesting, in relevant part, that "[b]ased on my knowledge, this Annual Report does not contain any untrue statement of a material fact or *omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this Annual Report." *Id.*

134.158.     The statements contained in ¶ 133157 *supra* were materially false and misleading because Defendants knew, or recklessly disregarded, that: (i) they had failed to conductwere not spending money on conducting adequate due diligence into Fennec's

third-party product manufacturer to ensure that it complied with cGMP and/or were ignoring ~~red flags indicating that~~deficiencies previously found at the product manufacturing site ~~would likely not pass a pre-approval inspection because~~ indicating that it was not in compliance with cGMP~~;~~, including at least one drug recall since its November 2018 FDA inspection; and (ii) as a result, the FDA would, and did, observe deficiencies at the manufacturing site warranting a Form 483 and the denial of the Company's ~~NDA or PEDMARK; and (iii) thus, the Company did not have a reasonable basis for a commercial launch of PEDMARK in the second half of 2020.~~PEDMARK NDA. To date, the FDA has still not approved, and the Company has still not commercially launched, PEDMARK.

~~135. Before markets opened on April 13, 2020, Fennec issued a press release announcing that the FDA had accepted for filing and granted Priority Review for the PEDMARK NDA. The press release quotes Defendant Raykov as stating that "[t]he *FDA filing acceptance of our NDA and granting of Priority Review represents a significant milestone in the development of PEDMARK* and we look forward to working closely with the Agency during this review process." On this news, Fennec's stock price increased nearly 12% on heavy trading to close at $7.23 on April 13, 2020.~~

~~136. The statements contained in ¶ 135 *supra* were materially false and misleading because Defendants knew, or recklessly disregarded the fact that: the risk of the FDA denying the PEDMARK NDA was high despite the FDA filing acceptance and granting of Priority Review because Defendants had failed to conduct adequate due diligence into Fennec's third-party product manufacturer to ensure it complied with cGMP or ignored red flags indicating that the product manufacturing site would likely not pass a pre-approval~~

inspection because it was not in compliance with cGMP and, as a result, the FDA would, and did, observe deficiencies at the product manufacturing site warranting a Form 483 and the denial of PEDMARK's NDA. To date, the Company has still not confirmed when it will resubmit the NDA and the FDA has still not approved PEDMARK.

159. ~~Before markets opened on May 14, 2020~~On March 30, 2021, Fennec issued a press release providing a business update and announcing ~~first quarter~~fiscal year ended December 31, 2020 ("~~1Q20~~FY20") financial results. The press release quotes Defendant Raykov as stating that "~~*we continue to make*~~*"[w]e have made meaningful* progress ~~*on*~~ *working with the FDA and* our ~~*commercial readiness plan*~~*third-party drug product manufacturer towards fully addressing the Complete Response Letter (CRL) received* in ~~*preparation*~~*August 2020* for ~~*the potential launch*~~*PEDMARK*<sup>TM</sup>."[132]

160. The statements contained in ¶ 159 *supra* were materially misleading because Defendants knew, or recklessly disregarded, that despite being aware of the manufacturing deficiencies underlying the August 2020 CRL and working closely with the FDA and PII to resolve the deficiencies since then, Defendants had not "made meaningful progress" in "fully addressing" the CRL and as a result, the deficiencies still existed at the Cockeysville Facility which would warrant another Form 483 and another denial of the Company's PEDMARK~~, *if*~~ NDA. To date, the FDA has still not approved, ~~*in*~~and the ~~*second half*~~Company has still not commercially launched, PEDMARK.

---

[132] *Fennec Announces Fiscal Year 2020 Financial Results And Provides Business Update*, FENNEC PHARMACEUTICALS, INC. (Mar. 30, 2021), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-announces-fiscal-year-2020-financial-results-and-provides.

137.161.    On May 28, 2021, Fennec issued a press release announcing resubmission of its NDA to the FDA for PEDMARK. The press release states that "*[t]he resubmission for PEDMARK follows receipt of final minutes from a Type A meeting with the FDA*. Importantly, *the Complete Response Letter (CRL) received on August 10, 2020*" *referred to deficiencies with the facility of the drug product manufacturer*."[133] On this news, Fennec's stock price increased over 5% on heavy trading13% to closeopen at $7.4678 on May 18, 2020.June 1, 2021.

162.    The statements contained in ¶ 137161 *supra* were materially false and misleading because Defendants knew, or recklessly disregarded, that despite being aware of the fact that: (i) their "progress on our commercial readiness plan" did not include adequate due diligence into Fennec's product manufacturer to ensure that it complied with cGMP or ignored red flags indicating that the product manufacturing site would not pass a pre-approval inspection because it was not in compliancedeficiencies underlying the August 2020 CRL and working closely with cGMP; (ii) as a result, the FDA would, and did, observe deficiencies at the product manufacturing site warranting a and PII to resolve the deficiencies since then, the deficiencies still existed at the Cockeysville Facility at the time of the PEDMARK resubmission, which would warrant another Form 483 and the denial of Fennec's NDA for another denial of the Company's PEDMARK NDA. To date, the FDA has still not approved, and the Company has still not commercially launched,

---

[133] *Fennec Pharmaceuticals Resubmits New Drug Application to U.S. Food and Drug Administration For PEDMARK*^(TM), FENNEC PHARMACEUTICALS, INC. (May 28, 2021), https://fennecpharma.com/fennec-pharmaceuticals-resubmits-new-drug-application-to-u-s-food-and-drug-administration-for-pedmarktm/.

PEDMARK~~;~~.

163.   On June 22, 2021, Fennec issued a press release announcing that the FDA "has ***accepted for filing the resubmission of its [NDA] for PEDMARK^(TM)***" and reiterated that "***[t]he Complete Response Letter (CRL) received on August 10, 2020, referred to deficiencies with the facility of the drug product manufacturer.***" On this news, Fennec's stock price increased nearly 10% to close at $7.29 on June 24, 2021.[134]

~~138.~~164.       The statements contained in ¶ 163 *supra* were materially misleading because Defendants knew, or recklessly disregarded, that despite being aware of the manufacturing deficiencies underlying the August 2020 CRL and working closely with the FDA and ~~(iii) thus, Fennec did not have a reasonable basis for a commercial launch of~~ PII to resolve the deficiencies since then, the deficiencies still existed at the Cockeysville Facility at the time the FDA accepted the PEDMARK ~~in the second half of 2020.~~resubmission, which would warrant another Form 483 and another denial of the Company's PEDMARK NDA. To date, the FDA has still not approved, and the Company has still not commercially launched, PEDMARK.

165.   On August ~~5, 2020~~10, 2021, Fennec issued a press release providing a business update and announcing second quarter ~~2020 ("2Q20~~2021 ("2Q21") financial results. The press release also stated that "[t]he decrease in cash and cash equivalents between June 30, 2021 and December 31, 2020, is the result of ***expenses related to the***

---

[134] Fennec Pharmaceuticals Inc., Current Report (Form 8-K) (June 22, 2021), https://www.sec.gov/Archives/edgar/data/0001211583/000110465921083941/tm2120370 d1_8k.htm.

*development and preparation of [inter alia] our [NDA] resubmission of PEDMARK™*[,]" and that "*R&D expenses decreased by $0.3 million for the three months ended June 30, 2021 over the same period in 2020 as the Company's development activities shifted back* to essential activities in preparation for the launch of PEDMARK™."[135]

166.　Also on August 10, 2021, Fennec filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2021 (the "2Q21 10-Q"). That filing stated, inter alia, that "*[i]n the fourth quarter of 2020, we engaged in a Type A meeting with the FDA concerning the CRL* [for the Initial Pedmark NDA] that we believe was constructive and collaborative[,]" and that, "*[i]n May 2021, we announced the resubmission of our NDA for PEDMARK and in June 2021 we further announced that the FDA accepted for filing the resubmission of our NDA* and set a PDUFA target action date of November 27, 2021."[136]

167.　The 2Q21 10-Q also assured investors that "[c]urrent liabilities decreased sharply, primarily due to the *completion of manufacturing and pre-commercialization activities and regulatory expenses associated with the PEDMARK™ NDA resubmission*[,]" and that "*[w]e have decreased our research and development expenses*

---

[135] *Fennec Pharmaceuticals Announces Second Quarter 2021 Financial Results And Provides Business Update*, FENNEC PHARMACEUTICALS, INC., (Aug. 10, 2021), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-announces-second-quarter-2021-financial

[136] Fennec Pharmaceuticals Inc., Quarterly Report (Form 10-Q) (Aug. 10, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001211583/000155837021011098/fencf-20210630x10q.htm.

*related to PEDMARK™ as our efforts have shifted* to pre-commercialization activities after the NDA resubmission in May 2021." *Id*.

168. The statements contained in ¶¶ 165-67 *supra* were materially misleading because Defendants knew, or recklessly disregarded, that despite being aware of the manufacturing deficiencies underlying the August 2020 CRL, working closely with the FDA and PII to resolve the deficiencies since then, and purportedly completing the manufacturing and regulatory activities associated with meeting the FDA's requirements, the deficiencies still existed at the Cockeysville Facility at the time the FDA accepted the PEDMARK resubmission, which would warrant another Form 483 and another denial of the Company's PEDMARK NDA. To date, the FDA has still not approved, and the Company has still not commercially launched, PEDMARK.

~~139.~~169. On November 10, 2021, Fennec issued a press release providing a business update and announcing third quarter 2021 ("3Q21") financial results. The press release quotes Defendant Raykov as stating that "*[w]e continue to work with the FDA ~~as a part of~~on their review ~~process~~of our NDA application*, in advance of the pending ~~PEDMARK™~~ PEDMARK™ PDUFA target action date of *~~August 10~~*" and "*~~[o]ur organization and commercial team have been actively preparing for launch readiness~~*, and, as we await the FDA's decision, we believe that *~~we are well positioned to commercialize PEDMARK, if approved, during the third quarter of 2020~~*."November

89

27th."[137]

170. The press release also stated that, "[t]he *decrease* in cash and cash equivalents between September 30, 2021, and June 30, 2020 *is the result of expenses related to the development and preparation of [inter alia] the NDA resubmission* of PEDMARK™[,]" and that "*R&D expenses decreased* by $0.2 million for the three months ended September 30, 2021 over the same period in *2020 as the Company's development activities shifted back to essential activities in preparation for the launch* of PEDMARK™". *Id.*

171. Also on November 10, 2021, Fennec filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q contained the same statements as referenced in ¶ 166, supra, regarding the purportedly "constructive and collaborative" Type A meeting that the Company held with the FDA regarding the CRL for the Initial Pedmark NDA, as well as the regulatory milestones achieved for the Resubmitted Pedmark NDA.[138]

172. The 3Q21 10-Q also assured investors that "[c]urrent liabilities *decreased primarily due to the reduction in manufacturing* and regulatory *expenses associated with* the PEDMARK™ *NDA resubmission*[,]" and that "[w]e have *decreased our research and*

---

[137] *Fennec Pharmaceuticals Announces Third Quarter 2021 Financial Results and Provides Business Update*, FENNEC PHARMACEUTICALS INC., (Nov. 10, 2021), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-announces-third-quarter-2021-financial.

[138] Fennec Pharmaceuticals Inc., Quarterly Report (Form 10-Q) (Nov. 10, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001211583/000155837021015417/fencf-20210930x10q.htm.

*development expenses* related to PEDMARK™ as *our efforts have shifted to pre-commercialization activities* after the NDA resubmission in May 2021."

~~140.~~173.    The statements contained in ~~¶ 139~~¶¶ 169-72 *supra* were materially ~~false and~~ misleading because Defendants knew, or recklessly disregarded ~~the fact~~, that~~:~~ despite ~~"continuing to work with the FDA as part of their review process in advance of the … PDUFA date:" (i) their "active[] prepar[ation] for launch readiness" did not include adequate due diligence into Fennec's product manufacturer to ensure that it complied with cGMP, or the Company ignored red flags indicating that the product manufacturing site would not pass a pre-approval inspection because it was not in compliance with cGMP; (ii) as a result of these failures, the FDA observed~~ being aware of the manufacturing deficiencies underlying the August 2020 CRL, working closely with the FDA and PII to resolve the deficiencies since then, and purportedly completing the manufacturing and regulatory activities associated with meeting the FDA's requirements, the deficiencies still existed at the ~~product manufacturing site warranting a~~ Cockeysville Facility at the time the FDA accepted the PEDMARK resubmission, which would warrant another Form 483 and ~~the~~another denial of ~~Fennec's NDA for PEDMARK; and (iii) in short, Fennec did not have a reasonable basis for a commercial launch of PEDMARK during the third quarter of 2020.~~the Company's PEDMARK NDA. To date, the FDA has still not approved, and the Company has still not commercially launched, PEDMARK.

## I. ADDITIONAL ALLEGATIONS OF SCIENTER

### A. PEDMARK Was Fennec's Only Potential Revenue Source

174. PEDMARK was Fennec's raison d'être. Fennec did not earn any significant revenue during the Class Period. In every quarterly and annual filing with the SEC during the Class Period, Fennec stated PEDMARK *"is our only lead product candidate* in the clinical stage of development" and therefore "*d[id] not expect to have significant revenues* from our product candidate *until we are either able to sell our product candidate after obtaining applicable regulatory approvals or we establish collaborations that provide us with* up-front payments, licensing fees, *milestone payments*, royalties or other revenue." As such, Fennec "*continue[s] to focus* the Company's resources *on the development of PEDMARK™*."[139]

175. Thus when the first delay occurred due to the site change for the substance manufacturer, investors and analysts were concerned about – and Defendants assured them that – there were no other manufacturing issues impeding sales. *See supra* ¶ 88. The delay simply appeared to push what would have been PEDMARK sales in 2019 into "the second half of 2020"[140] or "early Q4:2020."[141]

---

[139] 3Q18 10-Q, 1Q19 10-Q, 2Q19 10-Q, 3Q19 10-Q, 1Q20 10-Q, 2Q20 10-Q, 3Q20 10-Q.

[140] Raghuram Selvaraju, Ph.D., *FY2018 Financial Results Reported: PEDMARK Filing Timeline Update; Modulating Target to $17*, H.C. WAINWRIGHT & CO. (Mar. 14, 2019); Raghuram Selvaraju, Ph.D., *1Q19 Financial Results Reported; PEDMARK Filing Near Term; Reiterate Buy*, H.C. WAINWRIGHT & CO. (May 28, 2019).

[141] David Nierengarten, Ph.D. and Jeffrey La Rosa, *FY18; Manufacturing Hiccup to NDA Approval, but Opportunity Unchanged*, WEDBUSH SECURITIES (Mar. 14, 2019).

176.    Defendants further assured investors quarter after quarter that Fennec was "*focused on the development of PEDMARK[TM] since 2013*"[142] and "[t]o date, we have been *engaged primarily in research and development activities*."[143]

177.    Defendants maintained the same messaging in press releases throughout the rest of the Class Period, confirming that they were "focused on," "dedicated to" and "committed to " developing PEDMARK. [144]

**B.      Defendants Knew Compliance with cGMP was Critical**

178.    Fennec's own SEC filings indicate Defendants' knowledge of the strenuous regulatory process and requirements that had to be met in order for the Company to obtain FDA approval for PEDMARK:

> We *anticipate substantial regulatory review prior to the commercialization* of PEDMARK[TM].
>
> * * *
>
> The *production and manufacture of our product* candidate and our research and development activities *are subject to significant regulation for* safety, efficacy and quality *by various governmental authorities* around the world.
>
> * * *
>
> *The FDA reviews an NDA to determine*, among other things, whether the drug is safe and effective for its intended use and *whether the facility in which it is manufactured, processed, packaged or held meets standards* designed to assure the product's continued safety, quality and purity.
>
> * * *

---

[142] *Supra* n. 126.

[143] 2018 10-K, 2019 10-K, 2020 10-K, 2021 10-K.

[144] *See e.g.*, *Fennec Pharmaceuticals Announces FDA Acceptance of New Drug Application Resubmission for PEDMARK™*, FENNEC PHARMACEUTICALS, INC. (June 22, 2021, 06:00 ET), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-announces-fda-acceptance-new-drug; *supra* n. 7, 62, 120, 122, 124.

93

*[D]rug manufacturers and other entities involved in the manufacture and distribution of approved drugs* are required to register their establishments with the FDA and register or obtain permits or licenses in states where they do business, and *are subject to periodic unannounced inspections by the FDA and state regulatory authorities* with jurisdiction over their activities *to determine compliance with regulatory requirements*…. *The failure of a drug manufacturer or any of its third-party contractors to comply* with federal or state laws or regulations *may subject the drug manufacturer to* possible legal or regulatory action, such as *an untitled letter, warning letter, recall, suspension of manufacturing or distribution or both*, suspension of state permit or license, seizure of product, import detention, injunctive action, and civil and criminal penalties.[145]

179. In addition, the Company's SEC filings specifically reflect Defendants' awareness of the FDA inspection process and requirements for approval, including compliance with cGMP standards and the management of a manufacturing site change.

Before approving an NDA, *the FDA may inspect the facility or facilities where the product is manufactured. The FDA will not approve an application unless it determines that the manufacturing processes and facilities are in compliance with current Good Manufacturing Practices (cGMP) requirements* and adequate to assure consistent production of the product within required specifications.

\* \* \*

*After the FDA* evaluates the NDA and *conducts its inspections, it may issue* an approval letter or *a Complete Response Letter*.

\* \* \*

*Drugs manufactured or distributed pursuant to FDA approvals are subject to pervasive and continuing regulation* by the FDA, *including*, among other things… *compliance with* requirements regarding *cGMP[.]*

\* \* \*

*Changes to the manufacturing process are strictly regulated and often require prior FDA approval* before being implemented. *FDA regulations also require a drug manufacturer to conduct investigations and implement appropriate corrective actions to address any deviations from cGMP requirements* and impose reporting and documentation requirements *upon the manufacturer and any third-party contractors*

---

[145] 2018 10-K, 2019 10-K, 2020 10-K, 2021 10-K.

*(including contract manufacturers and laboratories) involved in the manufacture* of a drug product. Accordingly, *manufacturers must* continue to expend significant time, money and effort to *maintain and ensure ongoing cGMP compliance and to confirm and ensure ongoing cGMP compliance of their third-party contractors*.

* * *

*The FDA and other regulatory agencies regulate and inspect equipment, facilities and processes used in the manufacture of pharmaceutical and biological products prior to approving a product. If, after receiving approval from regulatory agencies, a company makes a material change in manufacturing equipment, location or process, additional regulatory review and approval may be required.* All facilities and manufacturing techniques that may be used for the manufacture of our *products must comply with applicable regulations* governing the production of pharmaceutical products *known as "Good Manufacturing Practices."*

* * *

*The NDA must also include significant information regarding the chemistry, manufacturing, and controls for the product*. After the submission of an NDA, but *before approval of the NDA, the manufacturing facilities* used to manufacture a product candidate *generally must be inspected by the FDA to ensure compliance with the* applicable Current Good Manufacturing Practice, or *cGMP, requirements*[.]

*If the FDA approves* any of our product candidates, *the manufacturing processes,* labeling, packaging, distribution, adverse event reporting, storage, advertising, promotion and recordkeeping for the product *will be subject to extensive and ongoing regulatory requirements*. *These requirements include* submissions of safety and other post-marketing information and reports, registration, as well as *continued compliance with cGMP regulations* and GCP for any clinical trials that we conduct post-approval.

*Id.*

180. Fennec's SEC filings further confirmed Defendants' awareness of the need for the Company's third-party manufacturers to be cGMP-compliant and the ramifications of a failure to do so:

*Significant additional time and expense would be required to effect a transition to a new contract manufacturer*.

***

95

We plan to ***continue to rely on contract manufacturers for the foreseeable future to produce quantities of products and substances*** necessary for … product commercialization, and ***to perform*** their obligations in a timely manner and ***in accordance with applicable government regulations****…* We or our contract manufacturers ***may also fail to meet required manufacturing standards, which could result in*** delays or failures in product delivery, increased costs, injury or death to patients, ***product recalls or withdrawals and other problems that could significantly hurt our business.*** We intend to maintain a second source for back-up commercial manufacturing, wherever feasible. However***, if a replacement to our future internal or contract manufacturers were required, the ability to establish second-sourcing or find a replacement manufacturer may be difficult due to*** the lead times generally required to manufacture drugs and ***the need for FDA compliance inspections and approvals of any replacement manufacturer, all of which factors could result in production delays and additional commercialization costs***.

* * *

We may ***rely on third parties*** to commercialize the products we develop, ***and our success will depend in large part on the efforts and competitive merit of these collaborative partners***.[146]

* * *

In order to achieve profitable operations, ***we***, alone ***or in collaboration with others, must successfully*** fund, develop, ***manufacture***, introduce and market ***our product*** candidate.[147]

* * *

We and ***our third-party manufacturers are also required to comply with the applicable current FDA Good Manufacturing Practices regulations,*** which include requirements relating to quality control and quality assurance, as well as the corresponding maintenance of records and documentation. Further, ***manufacturing facilities must be approved by the FDA*** before they can be used to manufacture our product, and they are subject to additional FDA inspection. ***If we fail to comply with any of the FDA's continuing regulations, we could be subject to*** reputational harm and sanctions, including: ***delays, warning letters and fines; product recalls or seizures and injunctions on sales; refusal of the FDA to review pending applications***; total or partial suspension of production; withdrawals of previously approved marketing applications; and civil penalties and criminal prosecutions. *Id.*

---

[146] 2018 10-K, 2019 10-K.

[147] 2018 10-K, 2019 10-K, 2020 10-K, 2021 10-K.

96

## C.      Defendants Touted Their Close Relationship with the FDA and PII.

181.    Throughout the Class Period, Defendants touted their close relationship with the FDA as well as PII. For example, the November 2020 Press Release quotes Defendant Raykov as stating that "*[w]e are working closely with the FDA and our third-party drug product manufacturer to fully address the CRL*[.]"[148]

182.    In announcing the resubmission of the PEDMARK NDA, the May 2021 Press Release quoted Defendant Raykov as confirming that that Defendants will be "*working with the FDA through the review process*[.]"[149]

183.    Similarly, in announcing that the resubmission of the PEDMARK NDA had been accepted, the June 2021 Press Release quoted Defendant Raykov as confirming that Defendants will be "working closely with the FDA through the review process."[150]

184.    The August 2021 Press Release likewise quoted Defendant Raykov as affirming that "*we [are] work[ing] closely with the Agency through the review process*[.]"[151]

185.    Since Defendants had such a close relationship with the FDA and PII, they

---

[148] *Fennec Pharmaceuticals Announces Third Quarter 2020 Financial Results and Provides Business Update*, FENNEC PHARMACEUTICALS, INC. (Nov. 16, 2020), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-announces-third-quarter-2020-financial.

[149] *Supra* n. 120.

[150] *Supra* n. 131.

[151] *Fennec Pharmaceuticals Announces Second Quarter 2021 Financial Results and Provides Business Update*, FENNEC PHARMACEUTICALS, INC. (Aug. 10, 2021), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-announces-second-quarter-2021-financial.

97

were well aware of the manufacturing concerns the FDA was raising before issuing each of the CRLs. And after receipt of the first CRL, there is no question that the FDA put Defendants on notice of the manufacturing issues preventing approval.

### D. That Fennec Had Sufficient Cash to Develop and Commercialize PEDMARK was Key to Investors and Analysts

186. In order to keep raising capital, and continue handsomely compensating themselves, Defendants had to maintain the appearance that FDA approval of PEDMARK was imminent.

187. For example, the Loan and Security Agreement Fennec entered into with Bridge Bank on February 1, 2019 made $12.5M available to the Company, but only ***upon NDA approval*** of PEDMARK ***no later than September 30, 2020***.[152] As one analyst approvingly noted, this was a "prudent[]…backstop in order to ensure sufficient availability of capital to fund the launch of PEDMARK."[153]

188. That analysts paid attention to and relied upon Fennec's representations regarding capital as a basis for their financial models was known throughout the Class Period. After the Company "ended 4Q18 with total cash of ~$22.8MM," analysts believed that was "enough to support[] its operations into 2H2020" through "potential approval."[154]

---

[152] 2Q20 10-Q.

[153] Raghuram Selvaraju, Ph.D., *Term Loan Facility Obtained; PEDMARK Filings Completion Approaches; Reiterate Buy*, H.C. WAINWRIGHT & CO. (Feb. 8, 2019).

[154] Yale Jen, Ph. D., *4Q18: Rolling NDA Submission Underway, Slight Push Out to Late 2019/Early 2020-Not a Major Concern,* LAIDLAW & CO. (Mar. 13, 2019); *see also* Raghuram Selvaraju, Ph.D., *FY2018 Financial Results Reported: PEDMARK Filing Timeline Update; Modulating Target to $17*, H.C. WAINWRIGHT & CO. (Mar. 14, 2019);

And after the Company ended 1Q19 "with over $20M in cash and equivalent," which appeared to be "sufficient to fund operations through the regulatory submission and launch of Fennec's lead drug candidate, PEDMARK…. Fennec's debt facility stipulates that PEDMARK approval should occur by September 30, 2020[,]" analysts commented that "the NDA filing timeline should provide Fennec with a reasonable cushion to meet this requirement."[155]

189. Defendants demonstrated that they too kept an eye on Fennec's cash. As Defendant Raykov stated *via* the Company's May 9, 2019 Press Release, "[t]he ***strength of our cash balance is of utmost importance to us*** while ***we remain on track*** to complete our submission of the NDA for PEDMARK™ in late 2019 to early 2020."[156]

190. On June 26, 2020, before disclosing the first CRL, Fennec announced an amendment to the Loan and Security Agreement with Bridge Bank which extended the date by which the Company was to obtain FDA approval. Specifically, this amendment provided the Company with an $18M debt facility comprised of ***two term loans***: ***Term Loan A*** consisted of $12.5M to ***be funded upon NDA approval*** of PEDMARK™ in the

---

David Nierengarten, Ph.D. and Jeffrey La Rosa, *FY18; Manufacturing Hiccup to NDA Approval, but Opportunity Unchanged*, WEDBUSH SECURITIES (Mar. 14, 2019).

[155] Raghuram Selvaraju, Ph.D., *1Q19 Financial Results Reported; PEDMARK Filing Near Term; Reiterate Buy*, H.C. WAINWRIGHT & CO. (May 28, 2019); *see also* David Nierengarten, Ph.D. and Jeffrey La Rosa, *Fennec Pharma Firing up the Factory*, WEDBUSH SECURITIES (May 10, 2019); Yale Jen, Ph. D., *Fennec Pharmaceuticals (FENC - $3.96) Model Update,* LAIDLAW & CO. (May 22, 2019).

[156] Fennec Pharmaceuticals Inc., Fennec Provides Business Update and Announces First Quarter 2019 Financial Results (Ex-99.1) (May 9, 2019), https://www.sec.gov/Archives/edgar/data/1211583/000114420419024918/tv521214_ex99-1.htm.

U.S. ***by no later than December 31, 2020*** and ***Term Loan B*** consists of $5.5M to be funded upon the occurrence of a revenue event in 2021.[157]

191.  Following the first CRL in August 2020, Fennec obviously did not launch PEDMARK™ and thus Bridge Bank did not fund the Term Loan A. The Company still had not obtained NDA approval by December 31, 2020, so the Loan and Security Agreement fully expired on that date. Bridge Bank had advanced no funds prior to the termination of the debt facility, though the warrant issued to Bridge Bank remains outstanding.[158]

192.  In order to raise more funds, on October 30, 2020, Fennec filed a S-3 registration of common shares (File No. 333-249775) pursuant to which it may offer shares of common stock having an aggregate offering price of up to $90.0 million.[159] The S-3 (File No. 333-249775) was declared effective on November 10, 2020.

**E.      The Individual Defendants Had Access To and Responsibility for the Due Diligence of Fennec's Manufacturers and Thus Were Aware of, or Reckless to, Their Shortcomings**

193.  Fennec relied on each of the Individual Defendants' extensive qualifications, skills and experiences to "strengthen[] the Board's collective" abilities. *See* ¶¶ 24-30. As

---

[157] Fennec Pharmaceuticals Inc., Fennec Pharmaceuticals Announces Amendment To Increase Existing Senior Debt Facility (Ex-99.1) (June 26, 2020), https://www.sec.gov/Archives/edgar/data/0001211583/000110465920077460/tm2023488 d1_ex99-1.htm.

[158] 2Q20 10-Q.

[159] Under the Sale Agreement, Fennec may sell shares by any method permitted by law, deemed to be an "at-the-market" offering as defined in Rule 415 promulgated under the Securities Act, as amended, including sales made directly on the NASDAQ, on any other existing trading market for Fennec common stock or to or through a market maker.

100

Defendant Andrade confirmed in April 2019, as part of its "*lean and mean*" structure of *three employees*, the Company "*leaned heavily* on its board of directors, *who remain[ed] intimately involved*."[160] Notably, "[r]esearch and development issues are reviewed internally by our executive management and supporting scientific team," which included Defendants Raykov and Andrade.[161]

194.    Analysts recognized Fennec's "rather lean operation," but viewed it favorably because it meant that "the company should have sufficient cash toward potential approval."[162]

195.    As FE4 noted, prior to signing a contract with a third-party manufacturer, a drug sponsor (like Fennec) will do extensive due diligence on the manufacturers it considers using because it is "dealing with bringing drugs to the market." While the Individual Defendants were intimately involved in vetting and selecting Fennec's third-party manufacturers, they did not give investors insight into the issues which they were discovered in their due diligence with both of their chosen manufacturers which likely would and did prevent the Company from obtaining FDA approval.

### 1.    *The Individual Defendants Were Knowledgeable About Fennec's Substance Manufacturer: Avista*

196.    As a result of their due diligence, the Individual Defendants knew or recklessly disregarded that when they selected Avista to be the substance manufacturer for

---

[160] *Supra* n. 8.

[161] 2018 10-K, 2019 10-K, 2020 10-K, 2021 10-K.

[162] Yale Jen, Ph. D., *4Q18: Rolling NDA Submission Underway, Slight Push Out to Late 2019/Early 2020-Not a Major Concern,* LAIDLAW & CO. (Mar. 13, 2019).

PEDMARK, it was not capable of manufacturing PEDMARK for commercial use so it was inevitable that Fennec would transition production to another site for commercial manufacturing. But Defendants said nothing about Avista's inability to commercially manufacture PEDMARK to investors.

197. And as a result of their oversight of Avista, the Individual Defendants knew or recklessly disregarded the public announcement in November 2018 that Cambrex was in the process of acquiring Avista. Further, after the acquisition was announced, Cambrex's CDMO business development global team reached out to Avista's customers – including Fennec – about its commercial manufacturing services.[163] But Defendants said nothing about Avista being acquired to investors.

198. Instead, in March 2019, Fennec disclosed that it did not have the required long-term manufacturing stability data at the time it had initiated its rolling NDA of PEDMARK in December 2018; nor did it know when it would be able to obtain such data because Avista was in the process of being acquired by Cambrex.

199. Due to the fact that none of Avista's facilities – then or now – are capable of large-scale commercial manufacturing, at all relevant times, Fennec knew or recklessly disregarded that it would have to manufacture PEDMARK for commercial use – meaning using the drug substances to make drug products – at another facility. And because "NDA submissions require … long-term manufacturing stability data (up to 6 months)," Fennec

---

[163] *See Cambrex Corporation's (CBM) CEO Steve Klosk on Acquisition of Avista Pharma Solutions – Transcript*, SEEKING ALPHA (Nov. 20, 2018, 08:30 AM ET), https://seekingalpha.com/article/4223656-cambrex-corporations-cbm-ceo-steve-klosk-on-acquisition-of-avista-pharma-solutions-transcript.

also knew or recklessly disregarded that for FDA approval, it had "to show that [any] new manufacturing facility can produce a stable commercial batch of Pedmark."

### 2. The Individual Defendants Were Knowledgeable About Fennec's Product Manufacturer: PII

200. Based on the Individual Defendants' due diligence, they knew or recklessly disregarded PII's history of significant manufacturing issues as raised by the FDA, EMA and MHRA as well as the continuous failure to correct those sissues when selecting it as Fennec's product manufacturer. After all, the recommended practices when establishing a manufacturing operation includes to "mine" publicly available data, "us[ing] inspection outcomes data to drive prioritization of inspection readiness focus" and use 483s and warning letters available on the FDA's website so that "[d]etails can then be explored to clarify why the FDA deemed the observation necessary."[164]

201. Not only was PII the subject of a recall "because the products failed stability testing for impurity levels" in October 2016, but PII had had three drug recalls just between its 2018 FDA inspection and the 2020 FDA inspection for PEDMARK.

202. PII also had a documented history of Form 483s nearly every year for the past decade, specifically for prior inspections of PII Facilities ending on July 10, 2020, November 9, 2018, November 16, 2017, October 27, 2017, March 24, 2017, April 4, 2016, March 18, 2016, May 29, 2015, May 22, 2015, July 17, 2014, September 13, 2013, May 22, 2013, October 22, 2012, May 25, 2011, December 16, 2010, and July 29, 2009.

203. From the EMA and MHRA, PII received multiple SNCs. The regulatory

---

[164] *See supra* n. 52.

agencies, *inter alia*, found that PII was "***non-compliant*** with the legal requirements and/or the principles and guidelines of GMP as provided for by Union law as ***critical and major GMP deficiencies remained***" because "***corrective and preventive measures had not been appropriately implemented***" and raised "***serious concern***" about "[t]he ***consistent and continuous lack of adequate quality assurance***[.]" The regulatory agencies found certain deficiencies to be a "***gross failure***" and that "***deficiencies previously identified*** at the site were ***still present***" so "there [we]re ***still significant issues*** with regard to assurance on the quality standards."

204. Then, after Fennec became one of PII's clients, the Individual Defendants had full access to every communication PII had with the FDA. As FE6 confirmed, from the time a contract with Fennec was signed in 2019, PII employees responsible for PEDMARK and Fennec employees began meeting on a regular basis and working closely. Specifically, FE6 stated that "R&D from Fennec were directly involved with the R&D team and manufacturing team" at PII and that Fennec employees had come to the manufacturing site and met with PII's R&D teams "to discuss the manufacturing operations, all the logistics."

205. Supporting FE6, FE4 confirmed that PII and its clients formed a "joint working group" that coordinated and shared all pertinent information at every step of the process from development of a drug to preparing for manufacturing of the drug to audits by government agencies and thus, "there was absolutely no lack of transparency with any interaction" PII had with any of its clients.

104

## ~~VI.~~II. LOSS CAUSATION

~~141.~~206.     The ~~two~~three declines in Fennec's share price during the Class Period as alleged herein are actionable. The timing and magnitude of the Company's share price declines on each of those days negates any inference that the losses suffered by Lead Plaintiff and the Class was caused by changed market conditions, macroeconomic or industry factors or Fennec-specific facts unrelated to Fennec and the Individual Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Fennec and the Individual Defendants' fraudulent statements and the corresponding artificial inflation in Fennec's securities prices and the subsequent significant decline in the value of Fennec's securities when Fennec and the Individual Defendants' prior acts of misconduct were revealed.

~~142.~~207.     At all relevant times, Fennec and the Individual Defendants' materially ~~false and~~ misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and the putative Class. Those statements were materially ~~false and~~ misleading due to their failure to disclose a true and accurate picture of Fennec's ability to commercially manufacture PEDMARK. Throughout the Class Period, Defendants publicly issued materially ~~false and~~ misleading statements and omitted material facts necessary to make Defendants' statements not ~~false or~~ misleading, causing Fennec securities to be artificially inflated. Plaintiff and other Class members purchased and/or acquired Fennec securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

~~143.~~208.     Fennec and the Individual Defendants were deliberately reckless in

105

not knowing or turning a blind eye to the fact that the Company's business model was not sustainable as it was struggling to compete for advertisers. Nonetheless, Fennec and the Individual Defendants made materially ~~false and~~ misleading public statements that provided ~~false~~misleading information to investors about the Company's ability to commercially manufacture PEDMARK. Thus, shares of the Company's securities continued to trade at levels artificially inflated by Fennec and the Individual Defendants' misleading justifications for the negative information was revealed on March 13, 2019 and August 11, 2020, which maintained the artificial inflation in the Company's share price until it was fully removed on ~~August 11, 2020~~November 29-30, 2021.

**Fennec's March 13, 2019 Partial Disclosure**

~~144.~~209.  Before the markets opened on March 13, 2019, Fennec issued a press release providing a business update and announcing FY18 financial results. Fennec surprised investors by announcing that the Company had "notified the FDA that the drug substance manufacturer for PEDMARK™ was recently acquired requiring a site transition for the commercial manufacturing site. . . . As such, full submission is targeted for late 2019 to early 2020. If approved, Fennec expects a first commercial launch for PEDMARK™ in the second half of 2020."[165] Despite the delay, Fennec assured investors that "[t]he new facility of the acquiring company has large scale commercial capabilities and a proven and extensive track record of successful FDA inspections and product launches." *Id.* On this news, because of this lengthy delay (which obviously impacted

---

[165] *Supra* n. 115.

106

projected drug sales and target revenues) the Company's stock price fell over 14% to close at $5.83 on March 14, 2019, after two days of heavy trading.

145.210.    As SeekingAlphaSeeking Alpha noted in an article titled "Fennec Pharma down 9% on Pedmark filing delay" on March 13, 2019 that the Company's stock price was "down on more than 70% higher volume … in apparent response to its announcement that it now expects to complete the rolling submission of its U.S. marketing application for lead candidate PEDMARK near year-end or early 2020, a delay of six months or more."[166] Fennec "had already started the process, but its contract ingredient manufacturer was acquired which necessitated a facility change."

### Fennec's August 11, 2020 Class Period EndingPartial Disclosure

146.211.    Before the markets opened on August 11, 2020, Fennec issued a press release announcing receipt of a CRL the prior day from the FDA in which "the FDA identified deficiencies resulting in a Form 483, which is a list of conditions or practices that are required to be resolved prior to the approval of PEDMARK™."[167] That morning, "Fennec management hosted a call to discuss the FDA rejection. It was disclosed that the FDA found deficiencies during the pre-approval inspection of the manufacturing facility. This resulted in a Form 483. The FDA generally will issue a Form 483 if it finds issues with respect to the manufacturing procedure & cGMP standards."[168] *Id.* at n.39. Further,

---

[166] Douglas W. House, *Fennec Pharma down 9% on Pedmark filing delay*, SEEKING ALPHA (Mar. 13, 2019, 12:31 PM ET), https://seekingalpha.com/news/3442370-fennec-pharma-down-9-on-pedmark-filing-delay.

[167] *Supra* n. 3.

[168] *Id.* at n.39.

107

"FENC management disclosed that the issue impacted the manufacturing facility as a whole, not only Fennec." As noted by PropThink, "[t]his is the second time that manufacturing issues have pushed back potential approval. We think *submission* will be delayed **at least** 6 months, which means that an *approval* decision will be delayed at least 12 months." (italics and bold in original).

147.212. Wedbush analyst David Nierengarten similarly incorporated a preliminary approval delay of about 10 months, or to mid-2021, and lowered Fennec's price target to $11 from $18 "[g]iven uncertainty around when the company will next engage with the FDA, what specific conditions will need to be satisfied at the manufacturing facility, and how long it will take to satisfy them."[169]

148.213. On this news, the Company's stock price plummeted over *44%* to close at $5.67 on August 13, 2020, after three days of heavy trading.

149.214. On August 11, 2020, SeekingAlphaSeeking Alpha published an article titled "Fennec Pharma craters on FDA rejection of Pedmark application" confirming that "[t]hinly traded micro cap Fennec" was "slump[ing] 32% premarket … in response to its announcement that it received" a CRL "cit[ing] deficiencies at its manufacturing facility" for PEDMARK.[170]

150.215. SeekingAlphaSeeking Alpha published another article on November

---

[169] *Fennec price target lowered to $11 from $18 at Wedbush*, THE FLY (Aug. 12, 2020), https://thefly.com/news.php?symbol=FENC.

[170] Douglas W. House, *Fennec Pharma craters on FDA rejection of Pedmark application*, SEEKING ALPHA (Aug. 11, 2020, 6:34 AM ET), https://seekingalpha.com/news/3603898-fennec-pharma-craters-on-fda-rejection-of-pedmark-application.

5, 2020 noting that Fennec's stock price had "tanked in August [2020] on the back of the FDA Complete Response Letter it received for Pedmark. This was critical for FENC, as shares were trading at all-time highs in anticipation for the FDA approval."[171] The article highlighted that:

> The issues identified by the FDA . . . were related to the manufacturing facility for the drug, which is concerning. We firmly believe that these risks will create further value erosion to shareholders, due to costs associated with re-fitting of facilities, revenue setbacks and additional oversight from the FDA. What's more, **there's been little to no transparency from management on resolving this issue to date**.

151.216. Not until November 16, 2020 did Fennec issue a press release revealing that it had to have a "Type A meeting with the FDA to discuss the path forward for resubmission" of the NDA for PEDMARK[172] and to increase its R&D expenses for the quarter "due to an increase in R&D expenses after the Complete Response Letter."[173] Fennec further stated that it was "working closely with the FDA and [its] third-party drug product manufacturer to fully address the CRL and plan[ned] to resubmit the NDA for PEDMARK™ with the goal of achieving regulatory approval and making PEDMARK™

---

[171] Zach Bristow, *Fennec Pharmaceuticals: The Compensation Is What's Missing*, SEEKING ALPHA (Nov. 5, 2020, 11:17 AM ET), https://seekingalpha.com/article/4385272-fennec-pharmaceuticals-compensation-is-missing.

[172] The goal of Type A meetings is to help a stalled product development program proceed, and such a meeting will occur within 30 days of the FDA receiving a written meeting request. Type A meetings include, *inter alia*, special protocol assessment meetings requested by sponsors after receipt of the FDA's evaluation of protocols under the special protocol assessment procedures. *See* https://www.fda.gov/media/72253/download.

[173] *Fennec Pharmaceuticals Announces Third Quarter 2020 Financial Results and Provides Business Update*, FENNEC PHARMACEUTICALS INC. (Nov. 16, 2020), https://investors.fennecpharma.com/news-releases/news-release-details/fennec-pharmaceuticals-announces-third-quarter-2020-financial.

commercially available to patients in need as quickly as possible."

217.   In its third-quarter 2020 Form 10-Q also filed that day, Fennec confirmed that it did "not believe it will receive FDA approval by December 31, 2020," that its R&D expenses increased by $573,000 "over the same period in 2019 as the Company's activities increased after the CRL from the FDA related to manufacturing and regulatory," and that it was "working with our third-party drug product manufacturer to be ready for re-inspection by the FDA."[174] Defendants did not provide any additional detail on the timing of a resubmission to the FDA or the what R&D Fennec had to do to address the FDA's concerns in the CRL.

218.   After the Type A meeting with the FDA, Defendants knew or recklessly disregarded what the manufacturing issues were and how to resolve them to the FDA's satisfaction. As Seeking Alpha explains it:

> [Because] Fennec had a Type A meeting with the FDA to discuss these specific issues, and to me, it seems very unlikely that a company like Pharmaceutics would be unable to get their act together and resolve the issues raised in the inspection. The only one that seems like it could be difficult is that the building wasn't of "suitable construction to facilitate cleaning, maintenance, and proper operations." That said, a big company like Pharmaceutics could almost certainly either make whatever modifications to the building that were necessary to address the FDA's concerns or they could move this particular manufacturing line to a different, more suitable building. These are the exact type of things that would have been addressed at the Type A meeting.[175]

**Fennec's November 29-30, 2021 Class Period Ending Disclosure**

---

[174] Fennec Pharmaceuticals Inc., Quarterly Report (Form 10-Q) (Nov. 16, 2020), https://investors.fennecpharma.com/sec-filings/sec-filing/10-q/0001104659-20-125638. ("3Q20 10-Q").
[175] *Supra* n. 5.

219. Before markets opened on November 29, 2021, Fennec announced that "it expects to receive a Complete Response Letter (CRL) after the PDUFA target action date of November 27, 2021"[176] from the FDA regarding its PEDMARK NDA. The Company disclosed that the FDA identified deficiencies "following a recent completion of a pre-approval inspection of the manufacturing facility of drug product manufacturer." *Id*.

220. Seeking Alpha noted on November 29, 2021 that premarket, "Fennec Pharma [was] down 40% as company expects to receive FDA Complete Response Letter for Pedmark."[177] Seeking Alpha further noted on November 30, 2021 that the prior day, "FENC [had] lost nearly 50% in anticipation of receiving FDA CRL for Pedmark."[178]

221. On November 30, 2021, Fennec confirmed that it had received a CRL from the FDA that "was issued as a result of identified manufacturing deficiencies which need to be satisfactorily resolved before the Pedmark NDA can be approved."[179] In addition, Defendant Raykov noted that while Fennec "will work closely with [its] current manufacturer as well as the FDA to fully address the issues raised in the letter[,] we continue to advance our second drug product manufacturing facility." *Id*.

~~152.~~222. As a result of the news on November 29 and 30, the Company's stock

---

[176] *Supra* n. 6.
[177] *Fennec Pharma down 40% as company expects to receive FDA Complete Response Letter for Pedmark*, SEEKING ALPHA (Nov. 29, 2021, 06:39 AM ET), https://seekingalpha.com/news/3774763-fennec-pharma-down-40-as-company-expects-to-receive-fda-complete-response-letter-for-pedmark.
[178] *Fennec Pharma receives FDA CRL for Pedmark application in solid tumors*, SEEKING ALPHA (Nov. 30, 2021, 06:14 AM ET), https://seekingalpha.com/news/3775212-fennec-pharma-receives-fda-crl-for-pedmark-application-in-solid-tumors.
[179] *Supra* n. 7.

111

price plummeted over **59%** to close at $3.89 on December 1, 2021, after three days of heavy trading. To date, the FDA still has not approved PEDMARK.

## ~~VII.~~I.  PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

~~153.~~223.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts; (b) the omissions and misrepresentations were material; (c) the Company's securities traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and (e) Lead Plaintiff and the other members of the Class purchased Fennec securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

~~154.~~224.    At all relevant times, the market for Fennec's securities was efficient for the following reasons, among others: (a) Fennec's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market; (b) during the Class Period, shares of Fennec's securities were actively traded, demonstrating a strong presumption of efficiency; (c) Fennec was followed by securities analysts employed by brokerage firms who wrote reports about the Company which were distributed to their sales force and certain customers, were publicly available, and entered

the public marketplace;[180] (d) as regulated issuer, Fennec filed periodic public reports with the SEC and/or NASDAQ; (e) Fennec regularly communicated with public investors, including through regular disseminations of press releases on the major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (f) unexpected material news about Fennec was rapidly reflected in and incorporated into Fennec's securities price during the Class Period.

155.225. As a result, the market for Fennec securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Fennec's share price. Under these circumstances, all purchasers or acquirers of Fennec's securities during the Class Period suffered similar injury through their purchase or acquisition of Fennec's securities at artificially inflated prices, and a presumption of reliance applies.

156.226. In addition, a Class-wide presumption of reliance is appropriate in this action under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this Action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be

---

[180] *Analyst Coverage*, FENNEC PHARMACEUTICALS, INC. https://investors.fennecpharma.com/index.php/financial-information/analyst-coverage (last visited Feb. 1, 2021). .

material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VIII.I.   INAPPLICABILITY OF SAFE HARBOR

157.227.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly falsemisleading statements pleaded in this Complaint. All of the specific statements pleaded herein were not identified as, and/or were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those falsemisleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was falsemisleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Fennec named under the Exchange Act who knew that those statements were materially false and misleading when made.

## IX.I.   CLASS ALLEGATIONS

158.228.   Lead Plaintiff brings this Action as a class action, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), on behalf of a class, consisting of all persons and entities that purchased, or otherwise acquired, Fennec securities during the Class

Period, and were damaged by the conduct asserted herein. Defendants, the officers and directors of the Company, at all relevant times, and their immediate families and legal representatives, heirs, successors or assigns and any entity in which the Defendants named herein have, or had, a controlling interest, are excluded from the Class.

159.229. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Fennec's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands, of members of the proposed Class. Millions of Fennec common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Fennec or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

160.230. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to Class members that predominate over questions that may affect individual Class members include whether:

(a) Defendants violated the federal securities laws;

(b) Defendants omitted and/or misrepresented material facts;

(c) Defendants' statements omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading;

115

(d)     The Company and the Individual Defendants with deliberate recklessness, disregarded or turned a blind eye toward the fact that their Class Period statements were ~~false and~~ misleading;

(e)     The price of Fennec securities was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

~~161.~~231.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

~~162.~~232.     Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced in securities class action litigation. Lead Plaintiff has no interests that conflict with those of the Class.

~~163.~~233.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. Lead Plaintiff knows of no difficulties in the management of this Action that would preclude its maintenance as a class action.

116

## X.I.   CLAIMS FOR RELIEF

### COUNT I
**Violations of § 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

164.234.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is brought pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Fennec and the Individual Defendants.

165.235.   The Defendants in this Count, carried out a plan, scheme, and course of conduct which was intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; and (ii) cause Lead Plaintiff and the other members of the Class to purchase Fennec securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Fennec and the Individual Defendants took the actions set forth herein.

166.236.   During the Class Period, Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Fennec's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

167.237. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Fennec's financial well-being and prospects, as specified herein.

168.238. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fennec's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fennec and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

169.239. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants

118

and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially ~~false and~~ misleading.

~~170.~~240. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Those material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Fennec's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were ~~false or~~ misleading.

~~171.~~241. As a result of the dissemination of the materially ~~false and/or~~ misleading information and/or failure to disclose material facts, as set forth above, the market price of Fennec's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the ~~false and~~ misleading statements made by

119

Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Fennec's securities during the Class Period at artificially high prices and were damaged thereby.

172.242. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsitymisleading nature, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Fennec was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Fennec securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

173.243. By virtue of the foregoing, Defendants violated Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

174.244. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
### Violations of § 20(a) of the Exchange Act
### (Against the Individual Defendants)

175.245. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. As members of Fennec's executive team and/or

the Company's Board of Directors, the Individual Defendants acted as controlling persons of Fennec within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

176.246. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Fennec's operations and/or intimate knowledge of the falsemisleading information filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Fennec, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to Fennec's reports, press releases, public filings and other statements, alleged by Lead Plaintiff to have been misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

177.247. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operation of the Company and, therefore, are presumed to have had the power to control and/or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

178.248. As set forth above, Fennec and the Individual Defendants each violated Sections 10(b) and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint and the Class was damaged thereby. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

121

179.249. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Fennec securities during the Class Period.

## XI.I. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff on behalf of himself and the Class, prays for relief and judgment, as follows:

a. Declaring this Action is a proper class action and certifying Lead Plaintiff as class representative pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein and Lead Plaintiff's counsel as Class Counsel;

b. Awarding Lead Plaintiff and the other members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' conduct, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

d. Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## XII.I. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all triable claims.

DATED: February 1, 2021 March 30, 2022        Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Ivy T. Ngo*
Ivy T. Ngo
Velvel (Devin) Freedman
Constantine P. Economides
1 SE 3rd Ave.
Suite 1240
Miami, Florida 33131
Telephone: (786) 924-2900
Email: ingo@rochefreedman.com
Email: vel@rochefreedman.com
Email: ceconomides@rochefreedman.com

Eric Rosen
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Email: erosen@rochefreedman.com

*Counsel for Lead Plaintiff Daniel Malakoti and Lead Counsel for the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Jay Chaudhuri*
Jay Chaudhuri
150 Fayetteville Street
Suite 980
Raleigh, NC 27601
Telephone: (919) 890-0560
Email: jchaudhuri@cohenmilstein.com

*Counsel for Lead Plaintiff Daniel Malakoti and Liaison Counsel for the Class*

**~~ROCHE CYRULNIK FREEDMAN LLP~~**

~~*/s/ Ivy T. Ngo*~~
~~Ivy T. Ngo~~
~~Velvel (Devin) Freedman~~
~~Constantine P. Economides~~
~~200 South Biscayne Boulevard~~
~~Miami, Florida 33131~~
~~Telephone: (305) 971-5943~~
~~Email: ingo@rcfllp.com~~

123

Email: vel@rcfllp.com
Email: ceconomides@rcfllp.com

Eric Rosen (*pro hac forthcoming*)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Email: erosen@rcfllp.com

*Counsel for Lead Plaintiff Daniel Malakoti and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac forthcoming*)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Daniel Malakoti*

124

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on ~~February 1, 2021~~March 30, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

/s/ Ivy T. Ngo
Ivy T. Ngo

125