# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JIM CHAPMAN, Individually and On  )
Behalf of All Others Similarly Situated,  )
)
           Plaintiff,  )
)
          v.  )          1:20CV812
)
FENNEC PHARMACEUTICALS INC.,  )
et al.,  )
)
          Defendants.  )

## ORDER AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court upon two motions: (1) Lead Plaintiff Daniel Malakoti's

("Lead Plaintiff") motion for post-judgment relief to amend the consolidated amended

complaint (Docket Entry 59) and (2) Defendants' request for judicial notice (Docket Entry

66). In February 2021, Lead Plaintiff filed a Consolidated Amended Class Action Complaint

("Amended Complaint") alleging violations of the federal securities laws on behalf of all

persons and entities who purchased or otherwise acquired Fennec Pharmaceuticals Inc.

("Fennec") securities between December 20, 2018, and August 10, 2020 (the original "Class

Period"). (*See* Amended Complaint ("Am. Compl.") ¶ 1, Docket Entry 30.)[1] Lead Plaintiff

alleged securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act

---

[1]On September 3, 2020, Plaintiff Jim Chapman, individually and on behalf of all others
similarly situated, filed the initial class action Complaint in this action. (*See* Docket Entry 1.) On
December 3, 2020, Daniel Malakoti was appointed Lead Plaintiff in this action (Docket Entry 25) and
then filed the Amended Complaint (Docket Entry 30).

of 1934 (the "Exchange Act") and the United States Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated under Section 10(b). (*Id.*) The named Defendants in this action are Fennec and its corporate insiders: Rostislav Raykov ("Raykov"), Robert Andrade ("Andrade"), Chris A. Rallis, Marco Brughera, Adrian J. Haigh, Khalid Islam, and Jodi Cook (collectively "Defendants"). (*Id.*)

In March 2021, Defendants filed a motion to dismiss Lead Plaintiff's Amended Complaint for failure to state a claim under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure. (Docket Entry 40.) The undersigned recommended that Defendants' motion be granted. (Docket Entry 48.) The recommendation was adopted over Lead Plaintiff's objections, and judgment was entered dismissing Lead Plaintiff's Amended Complaint with prejudice. (*See* Docket Entries 55, 57, 58.)[2] Lead Plaintiff shortly thereafter filed the instant motion seeking post-judgment relief attempting to file an amended pleading once again. (Docket Entry 59; *see also* Proposed Second Amended Complaint ("PSAC"), Docket Entry 61-2.) Defendants oppose such motion. (Docket Entry 63.) Defendants have filed a request for judicial notice, which Lead Plaintiff opposes. (*See* Docket Entries 66, 70.)

---

[2]After the recommendation was entered, Lead Plaintiff sought clarification on whether the undersigned intended to recommend a dismissal with or without prejudice. (*See* Docket Entry 51.) The undersigned denied Lead Plaintiff's motion explaining that a dismissal for failure to state a claim under Rule 12(b)(6) is presumed to be with prejudice. (*See* Text Order dated 1/14/2022.)

2

## I.   FACTUAL BACKGROUND

The allegations in the PSAC are set forth as follows:[3]

### a.  *Fennec and PEDMARK*

Fennec is a Canadian company with its principal place of business in Research Triangle Park, North Carolina. (PSAC ¶ 25.) Fennec is a biopharmaceutical company "solely focused" on developing the new drug PEDMARK, a formulation of Sodium Thiosulfate used to prevent hearing loss in children undergoing certain types of chemotherapy treatment. (*Id.* ¶ 3.) In 2013, Fennec acquired an exclusive licensing agreement with Oregon Health & Science University for the intellectual property directed towards several compounds including Sodium Thiosulfate and their use in oncology. (*Id.* ¶ 73.) In 2017, Fennec announced that clinical trials showed that Sodium Thiosulfate was effective at reducing certain types of hearing loss in childhood cancer patients undergoing chemotherapy treatment. (*Id.* ¶ 78.)[4] In March 2018, the Food and Drug Administration ("FDA") granted PEDMARK Breakthrough Therapy and Fastrack designations, which allowed Fennec to work closely with the FDA's Oncology Division and submit its New Drug Application ("NDA") on a rolling basis with priority review. (*Id.* ¶ 79.) Fennec was also advised that PEDMARK was eligible for submission of an application for a Pediatric Use Marketing Authorization in the European Union with incentives of up to 10 years of data and market protection. (*Id.* ¶ 80.) On December 20, 2018,

---

[3]The allegations as stated in the PSAC largely mirror the allegations in Lead Plaintiff's Amended Complaint which were set out in the undersigned's previous recommendation except that the PSAC attempts to set forth additional allegations to address the shortcomings previously identified by the undersigned. (*Compare* PSAC *with* Amended Complaint and Docket Entry 48 at 2-8.) In addition, the PSAC seeks to extend the Class Period, covering December 20, 2018 to November 28, 2021 (the "New Class Period"). (*See* PSAC ¶ 1.)

[4]Unless otherwise noted, references to footnotes in the PSAC are omitted.

Case 1:20-cv-00812-LCB-JLW   Document 73   Filed 02/15/23   Page 3 of 21

Fennec announced that it initiated a rolling review of the PEDMARK NDA, seeking a target date of approval from the FDA in the second half of 2019. (*Id.* ¶ 81.)

### b. New Drug Application Process

As a new pharmaceutical drug, the FDA requires Fennec to seek approval for PEDMARK through the FDA's NDA process before Fennec can sell, market, and distribute PEDMARK for commercial use in the United States. (*Id.* ¶ 40.) The NDA process allows the FDA to evaluate whether a drug is safe for use, whether the drug labeling contains all necessary information, and whether "the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity." (*Id.*) As part of the NDA process, drug sponsors like Fennec must implement Chemistry, Manufacturing and Controls ("CMC") requirements to ensure the version of the drug produced for consumer use has the same safety, efficacy, and quality as the drug used in clinical trials. (*Id.* ¶ 43.) CMC requirements apply to both the drug itself and the manufacturing facility producing the drug. (*Id.*) If a drug sponsor wishes to change its drug manufacturing process, CMC requires the sponsor or manufacturer to demonstrate to the FDA that the changes will not adversely impact the safety, efficacy, and quality of the drug product. (*Id.* ¶ 44.) Depending on the circumstances surrounding the change in manufacturer, it may cause no delay in the NDA cycle or may cause up to a year of delay. (*Id.* ¶¶ 44-48.)

As part of the NDA process, the FDA determines "whether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity." (*Id.* ¶ 61.) To do this, the FDA tours the manufacturing facility, performing a Pre-Approval Inspection ("PAI") of an NDA

4

applicant's drug manufacturer. (*Id.* ¶¶ 63, 65.) When conducting a PAI, the FDA examines whether the drug manufacturer complies with the FDA's Current Good Manufacturing Practice regulations ("cGMP") and other FDA regulations. (*Id.* ¶¶ 62-63.) At the end of the PAI, the FDA investigators hold an exit interview where they notify the drug sponsor and facility management of any violations of FDA standards. (*Id.* ¶ 65.) The FDA inspectors also memorialize these violations in a Form 483 issued to the manufacturing facility. (*Id.*) Facility management has fifteen days to respond to the Form 483. (*Id.* ¶ 67.) If the FDA decides not to approve a drug sponsor's NDA, it issues the drug sponsor a Complete Response Letter ("CRL") detailing specific deficiencies in the NDA and recommending corrective actions when possible. (*Id.* ¶ 68.) The drug sponsor then has opportunities to resubmit the NDA. (*Id.*)

During the New Class Period between December 20, 2018 and November 28, 2021, Fennec was seeking but had not obtained NDA approval from the FDA for PEDMARK. (*Id.* ¶¶ 1-2.) Despite success in proving the efficacy of PEDMARK, Fennec struggled to secure FDA approval for PEDMARK's manufacturing sites. (*See generally* Compl.) Although Fennec never disclosed to investors the identities of its third-party manufacturers, Lead Plaintiff asserts that at the time Fennec met with the FDA for its pre-submission meeting in December 2018, it planned to use manufacturer Avista Pharma Solutions, Inc. ("Avista") to produce the PEDMARK drug *substance*. (*Id.* ¶¶ 6, 83.) In addition, Pharmaceutics International, Inc. ("PII") was selected to be PEDMARK's drug *product* manufacturer. (*Id.* ¶ 6.) Lead Plaintiff asserts that Defendants, however, were well aware of, or failed to conduct due diligence, with regard to the deficiencies with both manufacturers, and thus "knew, or recklessly disregarded,

that this release date was unfeasible and unlikely when announced to investors." (*Id.* ¶¶ 82-131.)

First, Lead Plaintiff alleges that Avista did not have the capability to manufacture PEDMARK for commercial use. (*Id.* ¶ 84.) In asserting that Avista was not capable of producing PEDMARK which Fennec knew and recklessly disregarded, Lead Plaintiff relies on statements from three former employees at Avista. (*See id.* ¶ 86.) In March 2019, Fennec announced to investors that it would need to change its commercial manufacturing facility, allegedly misleading investors and blaming the facility change on the fact that PEDMARK's substance manufacturer was being acquired by another company. (*Id.* ¶¶ 88-89.) This change in the substance manufacturing facility would delay Fennec's NDA submission by at least six months and would delay the commercial launch of PEDMARK by at least a year. (*Id.* ¶ 89.) Analysts expected no further setbacks as Fennec did not raise any other manufacturing issues. (*Id.* ¶ 90.) Fennec then experienced a drop in stock value, but Defendants Raykov and Andrade's total compensations were increased from Fennec. (*Id.* ¶¶ 93, 137-138.)

Next, Lead Plaintiff alleges that Defendants did not conduct due diligence into PEDMARK's product manufacturer, or simply ignored the fact that it had chosen a manufacturer that was not cGMP-compliant, which would likely cause issues with the PAI. (*Id.* ¶ 94). The PSAC asserts that Defendants should have conducted a quality audit of the product manufacturer's facility to ensure that it would pass inspection, or otherwise informed investors. (*Id.* ¶ 106). Lead Plaintiff asserts that Defendants were instead focused on selling Fennec. (*Id.* ¶ 107.)

6

Since Defendants' focus was allegedly elsewhere, the FDA found deficiencies during its inspection of the manufacturing facility and issued a Form 483 in relation to the PAI. (*Id.* ¶¶ 109, 111.) Fennec did not notify investors of the Form 483 until it received a CRL. (*Id.* ¶ 111.) On August 11, 2020, Fennec announced to investors that it had received a CRL from the FDA on August 10, 2020, which noted deficiencies requiring resolution prior to PEDMARK's approval. (*Id.* ¶ 110.)

Defendant Raykov assured investors that the issues raised in the CRL would be addressed quickly as possible, of which analysts anticipated a delay of 10 months. (*Id.* ¶¶ 112-113.) Then on May 28, 2021, Fennec resubmitted its PEDMARK NDA which was accepted on June 22, 2021. (*Id.* ¶ 115.) Defendants did not raise any potential issues with the resubmission, but on November 29, 2021, Fennec announced that it expected to receive another CRL due to deficiencies identified during another inspection. (*Id.* ¶¶ 115-116.) Fennec did receive another CRL regarding its manufacturing deficiencies and Defendant Raykov stated that Fennec would work closely with its current manufacturer and the FDA to address those issues. (*Id.* ¶ 117.)

### c. *Prior Deficiencies with Fennec's Drug Product Manufacturer*

Lead Plaintiff alleges that PII, Fennec's drug manufacturer, had multiple prior serious deficiencies identified from prior FDA inspections, had three drug recalls since its 2018 FDA inspection, and had not previously produced PEDMARK for clinical trials making the facility a high risk for PAI failure. (*Id.* ¶ 119.) Lead Plaintiff points to cGMP deficiencies at PII's facilities in Maryland, including equipment and building inadequacies; PII's documented history of receiving Form 483s; and PII's difficulty in passing regulatory inspections. (*Id.* ¶¶

7

119-127.) Ultimately, Lead Plaintiff alleges that because Fennec failed to disclose PII and material facts about the manufacturer's prior issues to investors, the investors had no reason to expect neither the first nor second CRL, thus causing more delays in PEDMARK's approval. (*Id.* ¶ 131.)

### d. Statements and Press Releases

Fennec released statements and press releases throughout the Class Period that contain statements that Lead Plaintiff contends are materially misleading. (*Id.* ¶¶ 139-173.) Lead Plaintiff states that Defendants made materially misleading statements in press releases, the annual report for fiscal years 2018 and 2019, and quarterly reports. (*Id.*) Among others, Lead Plaintiff's allegations regarding misleading statements include: Fennec's statement that it was "targeting U.S. approval of PEDMARK in the second half of 2019" (*id.* ¶ 139); a March 2019 statement about the increase in Research and Development ("R&D") expenses "primarily due to the manufacturing and regulatory expenses associated with the preparation for regulatory approval" and commercialization of PEDMARK (*id.* ¶ 141); annual reports warning about being subject to "delays, warning letters[,] and fines" by the FDA if there was noncompliance with cGMP regulations or FDA's continuing regulations, or failure in product approval for inadequacies with Fennec's third-party manufacturers (*id.* ¶¶ 143-44, 154-55); statements concerning the reduction in cash balance during two quarters in 2019, which said reductions were the result of cash used for "regulatory submissions" of PEDMARK, in addition to the increase in "R&D expenses" primarily related to "regulatory approvals of PEDMARK" (*id.* ¶¶ 148, 152); certifications under Section 302 of the Sarbanes-Oxley Act of 2002 (*id.* ¶¶ 146, 157); a statement in March 2021 that "meaningful progress" was made with the FDA and

8

Fennec's third-party drug manufacturer "towards fully addressing" the August 2020 CRL (*id.* ¶ 159); a statement in May 2021 announcing Fennec's resubmission of the PEDMARK NDA to the FDA (*id.* ¶ 161); a June 2021 statement that the FDA had "accepted for filing" the resubmission of the PEDMARK NDA and reiterating that the August 2020 CRL "referred to deficiencies with the facility of the drug product manufacturer" (*id.* ¶ 163); 2021 statements regarding cash reductions "related to the development and preparation" of the resubmission of the PEDMARK NDA, and decreased R&D expenses (*id.* ¶¶ 165, 170); and statements regarding the decrease in current liabilities "primarily due to the completion of manufacturing and pre-commercialization activities and regulatory expenses" related to the resubmission of the PEDMARK NDA (*id.* ¶ 167; *see also id.* ¶ 172).

### e. *Allegations of Scienter*

In the PSAC, Lead Plaintiff asserts additional allegations of scienter. (*Id.* ¶¶ 174-205.) Specifically, Lead Plaintiff asserts that PEDMARK was Fennec's only potential revenue source, thus when Defendants gave assurances to investors that the focus was on this product's development, Defendants knew compliance with cGMP was critical as evidenced by Fennec's own filings, and they were aware of the FDA approval process. (*Id.* ¶¶ 174-179.) Further, Defendants were aware of the need for Fennec's third-party manufacturers to be cGMP-compliant and the consequences of non-compliance. (*Id.* ¶ 180.) Lead Plaintiff alleges that Defendants were in close relationship with the FDA and PII throughout the New Class Period, those Defendants were well aware of the manufacturing concerns raised by the FDA even before the issuance of the CRLs. (*Id.* ¶¶ 181-185.) Lead Plaintiff further states that Defendants maintained the appearance that PEDMARK's approval was imminent in order to

9

keep raising capital. (*Id.* ¶ 186.) One example is the February 2019 Loan and Security Agreement Fennec entered with Bridge Bank, which the releasing of capital was subject to PEDMARK's NDA approval prior to September 30, 2020. (*Id.* ¶ 187.) The agreement was later amended, and even under the amendment, Bridge Bank did not provide the funds because Fennec had not obtained PEDMARK's NDA approval by December 31, 2020. (*Id.* ¶¶ 190-191.) Lastly, Lead Plaintiff alleges that the individually-named Defendants were responsible for the due diligence of Fennec's manufacturers, and thus they knew and recklessly disregarded both Avista's inability to commercially manufacture PEDMARK, and PII's history of manufacturing deficiencies raised by the FDA and other agencies. (*Id.* ¶¶ 193-204.) Lead Plaintiff points to statements from former employees of PII to support his argument. (*Id.* ¶¶ 195, 204-205.)

## II. DISCUSSION

### a. Post-Judgment Motion to Amend Complaint

Lead Plaintiff moves for post-judgment relief seeking to file the PSAC. (Docket Entry 59.) In light of the procedural posture here, the Court must vacate its March 2, 2022 Judgment pursuant to Federal Rules of Civil Procedure 59(e) or 60(b) prior to granting Lead Plaintiff's motion to amend. *See Bond v. United States*, 742 F. App'x 735, 736 (4th Cir. 2018). The Fourth Circuit has further explained:

> To determine whether vacatur is warranted, however, the court need not concern itself with either of [Rules 59(e) or 60(b)'s] legal standards. The court need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to Fed. R. Civ. P. 15(a). In other words, a court should evaluate a postjudgment motion to amend the complaint "under the same legal standard as a similar motion filed before judgment was entered—for prejudice, bad faith, or futility." *Laber*

10

> [v. Harvey, 438 F.3d 404, 427 (4th Cir. 2006); *accord Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.,* 576 F.3d 172, 193 (4th Cir. 2009). Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards: "[A] district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 376 (4th Cir. 2008) (internal quotation marks omitted).

*Katyle v. Penn Nat. Gaming, Inc.,* 637 F.3d 462, 471 (4th Cir. 2011). Ultimately, "where a motion to alter judgment seeks to set aside the judgment of dismissal and, at the same time, to file an amended complaint, the court need only ask whether the amendment should be granted under Federal Rule of Civil Procedure 15." *Midgett v. Cooper,* No. 1:20-CV-00941, 2022 WL 17839906, at *2 (M.D.N.C. Mar. 23, 2022) (unpublished) (internal citation, quotations, and brackets omitted).

"Rule 15(a) is designed to allow parties the opportunity to amend pleadings to assert matters which were overlooked or were unknown at the time the party interposed the original complaint[,]" *Logar v. W. Virginia Univ. Bd. of Governors,* No. CIV.A. 1:10CV201, 2012 WL 243692, at *9 (N.D.W. Va. Jan. 25, 2012) (internal quotations and citation omitted), *aff'd,* 493 F. App'x 460 (4th Cir. 2012), and "is intended to advance a basic goal . . . to allow maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities," *id.* Granting a motion to amend a complaint is within the discretion of the Court, "but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion." *Foman v. Davis,* 371 U.S. 178, 182 (1962). A motion to amend is futile "if the proposed amended complaint could not satisfy the appropriate requirements of the Federal Rules of Civil Procedure and Article III[,]" *Hill v. AQ Textiles*

11

*LLC*, 582 F. Supp. 3d 297, 308 (M.D.N.C. 2022), and the Court may deny the motion if the proposed amended complaint cannot withstand a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), *see Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995) ("the district court was justified in denying [the plaintiff's] motion to amend her complaint because the proposed amendments could not withstand a motion to dismiss."); *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019) ("A proposed amendment is also futile if the claim it presents would not survive a motion to dismiss.").

A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Id.* The "court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, and bare assertions devoid of factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted). In other words, the standard requires a plaintiff to articulate facts, that, when accepted as true, demonstrate the plaintiff has stated a claim that makes it plausible he is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 557). Plaintiffs alleging fraud must also meet the pleading standards of Federal Rule of Civil Procedure 9(b), which provides that "[i]n alleging fraud or

12

mistake, a party must state with particularity the circumstances constituting the fraud or mistake." Fed. R. Civ. P. 9(b).

Further, plaintiffs bringing a claim of securities fraud under Section 10(b) must meet the PSLRA's heightened pleading standards. *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 173 (4th Cir. 2007). Congress enacted the PSLRA "to prevent Securities Exchange Act claims from being 'employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law.'" *In re Novan, Inc.*, No. 1:17CV999, 2018 WL 6732990, at *4 (M.D.N.C. Nov. 30, 2018) (quoting *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018)). The PSLRA requires plaintiffs bringing Section 10(b) claims to

> include "*each statement* alleged to have been misleading, *the reason* or reasons why the statement is misleading, and if an allegation regarding the statement . . . is made on information and belief, the complaint shall state *with particularity all facts* on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). And in alleging scienter, the plaintiff must, "with respect to each act or omission alleged to violate this chapter, state with particularity *facts giving rise to a strong inference* that the defendant acted with the required state of mind." *Id.* 15 U.S.C. §78u-4(b)(2).

*Teachers' Ret. Sys. of LA*, 477 F.3d at 172 (emphasis in original). A complaint that does not meet the PSLRA's heightened pleading standard must be dismissed. *See id.*; *Singer*, 883 F.3d at 439.

Section 10(b) of the Exchange Act and SEC Rule 10b-5 prohibits fraud "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To make out a claim of fraud under Section 10(b), a plaintiff must sufficiently plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

13

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (internal citation omitted). "To establish an actionable false or misleading statement or omission, the challenged statement or omission must be *factual* i.e., one that is demonstrable as being true or false; it must be *false*, or the omission must render public statements misleading; and any statement or omission of fact must be *material*." *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 553 (M.D.N.C. 2018), *aff'd sub nom. Janies v. Cempra, Inc.*, 816 F. App'x 747 (4th Cir. 2020) (internal quotations and citation omitted). This Circuit has held that

> a fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.

*Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (citations omitted). There is no affirmative duty to disclose material information under Section 10(b) unless disclosure is "necessary to make . . . statements made, in the light of the circumstances they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (internal quotations and citations omitted).

Regarding scienter, the PSLRA requires plaintiffs to show that a defendant acted with a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). "A plaintiff may meet this requirement by pleading recklessness." *In re Novan*, 2018 WL 6732990, at *5 (citation omitted). Recklessness has been defined in the Section 10(b) context as "one so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of

14

misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Matrix Cap. Mgmt. Fund*, 576 F.3d at 181 (internal quotations and citation omitted). Conclusory allegations that Defendants knew or were recklessly unaware "do not raise a strong inference of conscious misbehavior or recklessness" and are "so broad and conclusory as to be meaningless." *Krim v. Coastal Physician Grp., Inc.*, 81 F. Supp. 2d 621, 632 (M.D.N.C. 1998), *aff'd*, 201 F.3d 436 (4th Cir. 1999) (internal quotations and citations omitted).

Here, Lead Plaintiff contends that the motion to amend is warranted as the PSAC adequately alleges material omissions on the part of Defendants, and the PSAC sets forth more particularized facts supporting a strong inference of scienter. (Docket Entry 60 at 11-12.) Among other things, Defendants oppose the motion on grounds of futility, arguing that the proposed additional allegations do not cure the deficiencies in the Amended Complaint. (Docket Entry 63 at 8-15.)[5] The additional allegations in the PSAC are primarily set out in three categories: (1) allegations surrounding Defendants' continued misleading statements leading up to the resubmission of the PEDMARK NDA and second CRL; (2) noted deficiencies with PII and statements from former employees of PII; and (3) compensation of Defendants Raykov and Andrade. (*See* PSAC ¶¶ 93, 112-118, 119-121, 123-129, 132-138, 141, 148-149, 152-153, 159-173.) In addition, the PSAC sets forth additional allegations of scienter. (*See id.* ¶¶ 174-205.)

---

[5]Defendants do not raise arguments for dismissal based on bad faith or prejudice. (*See* Docket Entry 63.)

Case 1:20-cv-00812-LCB-JLW    Document 73    Filed 02/15/23    Page 15 of 21

### i. Allegations surrounding Defendants' continued misleading statements leading up to the resubmission of the PEDMARK NDA and second CRL

Upon review of the PSAC, the undersigned concludes that it fails to meet the heightened pleading standards of the PSLRA and Rule 9(b).[6] Lead Plaintiff has not alleged that any of Defendants' statements, including those leading up to the resubmission of the PEDMARK NDA and second CRL, were either false or misleading. To correct the deficiencies in the Amended Complaint, Lead Plaintiff relies on Defendants' statements, for example, after issuance of the first CRL in August 2020 Defendant Raykoz stated that Fennec would "work closely with [its] manufacturer and the FDA to fully address the issues raised in the letter as expeditiously as possible," (PSAC ¶ 14), and Defendant Raykoz's March 2021 statement regarding "meaningful progress working with the FDA and our third-party drug product manufacturer towards fully addressing the [August 2020 CRL]," (*id.* ¶ 159). In addition, on May 28, 2021, Fennec stated that the resubmission of the PEDMARK NDA "follows receipt of final minutes from a Type A meeting with the FDA," (*id.* ¶ 161); on June 22, 2021, there was a statement that the FDA "ha[d] accepted for filing the resubmission of its [NDA] for PEDMARK" (*id.* ¶ 163); and there were statements regarding increased expenses in 2019 and decreased expenses in 2021 (*id.* ¶¶ 141, 148, 152, 165, 167, 170, 172). However, the PSAC does not allege a material misrepresentation or omission that contradicts Defendants' assertions that Fennec "work[ed] closely" with PII and the FDA, made "meaningful progress" on the issues with PII by March 30, 2021, and that Fennec's R&D

---

[6]The undersigned recognizes that the allegations added in the PSAC must be viewed in light of the PSAC in its entirety. *See Matrix Cap. Mgmt. Fund*, 576 F.3d at 196 n.12 ("[T]he allegations added to any amended complaint . . will . . . require a fresh look at whether *all* of the complaint's allegations, viewed holistically, establish a strong inference of scienter.") (emphasis in original).

expenses did not increase in 2019 and decrease in 2021. Indeed, the PSAC itself points to Defendants' "close relationship with the FDA and PII." (*Id.* ¶ 185.)

ii. Deficiencies with PII and statements from former employees of PII

Moreover, while Defendants confirmed in November 2021 that there were more "manufacturing deficiencies" in the second CRL (*id.* ¶ 117), which further delayed approval of the PEDMARK NDA, the PSAC does not allege any statements from Defendants surrounding the second CRL that were false or materially misleading. Lead Plaintiff's attempt to rely on "deficiencies [that] still existed at [PII's] Cockeysville Facility" is insufficient. (*See e.g., id.* ¶¶ 160, 162, 164.) There are no facts supporting an inference that Defendants did not believe that any deficiencies had not been addressed prior to the second CRL, or would not otherwise be corrected after issuance of the CRL. Further, the noted deficiencies with PII, including the drug recalls, fall short of alleging facts which would show that Defendants were aware of deficiencies "so serious that they were likely to cause serious problems" during the PEDMARK NDA approval process. *Fisher v. Fennec Pharms. Inc.*, No. 1:22-CV-115, 2022 WL 7108945, at *5 (M.D.N.C. Oct. 12, 2022) (unpublished).[7]

---

[7]In their brief in opposition to Lead Plaintiff's motion to amend, Defendants argue that the motion should be denied because the PSAC extends the class period and "include[s] a time period, purported misstatements, and events already at issue in a separate, pending securities class action." (Docket Entry 63 at 15.) That separate pending litigation is *Fisher*, and it has been decided. 2022 WL 7108945, at *7. The amended complaint in that action covered alleged misstatements about PEDMARK made between May 28, 2021 through November 26, 2021. *Id.* at 4. The Court found that the plaintiff's allegations did "not raise a strong inference that the alleged misrepresentations or omissions were in fact false, or that defendants acted with scienter as to any misrepresentation or omission." *Id.* at *7. While the undersigned finds that ruling both instructive and persuasive as it dealt with similar statements at issue here, the PSAC as a whole here includes alleged misstatements occurring prior to May 2021, therefore the undersigned concludes that Defendants' argument is unpersuasive.

Lead Plaintiff suggests that allegations regarding statements from former employees of PII further support scienter on the part of Defendants. (*See* Docket Entry 64 at 5-6.) Similar to the inadequacies with the former employees of Avista, the former employees of PII, none of these individuals themselves are alleged to have a connection to Fennec, nor are there allegations that they worked on PEDMARK at PII, or worked in PII's facility in Cockeysville, Maryland where PEDMARK was allegedly manufactured. (*See* PSAC ¶¶ 124, 126, 128.) The allegations consist of one of PII's former employee's general reference to a "joint working group" between PII and its clients such that there would be "no lack of transparency" regarding preparation for drug development and manufacturing, another former employee's confirmation that some regulatory problems existed at PII but were corrected, and yet another former employee's statement that unidentified Fennec and PII employees responsible for PEDMARK met and regularly and worked closely beginning in 2019, which at one time Fennec employees came to the manufacturing site to discuss manufacturing operations with PII's R&D teams. (*See id.*) However, there are no allegations that these former employees interacted or communicated with Defendants, or statements from these individuals that PII's "transparency" put Defendants on notice that the PEDMARK NDA and its second submission would not be accepted. Therefore, such allegations do not speak to Defendants' state of mind, and do not create a strong inference that Defendants acted with an "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319; *see also KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021) ("[G]eneral lack of direct contact with Defendants weakens the inference of scienter, as Lawrie and Saleh may have been unaware of the problems, the causes of the problems, or the extent of the problems."); *In re Conventry*

18

*Healthcare, Inc. Sec. Litig.*, No. 08:09-CV-2337-AW, 2011 WL 1230998, at *6 (D. Md. Mar. 30, 2011) ("None of these witnesses are alleged to have had any direct contact with the Defendants, and accordingly, it defies logic to conclude that these witnesses knew what the Defendants knew or recklessly disregarded."); *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 475 (M.D.N.C. 2004) (determining confidential witnesses do not support a strong inference of scienter where witnesses' statements require the court to infer defendants' knowledge of facts alleged). Again, the PSAC as a whole more plausibly suggests that Defendants' failure to more closely monitor PII or to perform "due diligence" (*see e.g.*, PSAC ¶¶ 142, 147, 149, 156) was innocent or negligent. *See In re Novan*, 2018 WL 6732990, at *14 ("The facts as a whole more plausibly suggest that Defendants were acting innocently or negligently rather than deliberately misreporting material information or recklessly disregarding the truth.").

### iii. Compensation of Defendants Raykov and Andrade

To the extent Lead Plaintiff attempts to bolster its allegations concerning the compensation of Defendants Raykov and Andrade (*see* PSAC ¶¶ 93, 137-138) and infers that Defendants' "tight financial strategy" includes such compensation (*see id.* ¶ 108), that too is insufficient. As previously stated concerning the Amended Complaint, "the motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) (internal citation omitted); *see also Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 560–61 (M.D.N.C. 2018) ("Every for-profit company is motivated by financial gain in our free enterprise system."), *aff'd sub nom. Janies v. Cempra, Inc.*, 816 F. App'x 747 (4th Cir. 2020); *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("[A]n allegation that defendants were motivated

19

by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers."). There are no allegations of insider trading or that Defendants Raykov and Andrade sold stock during the New Class Period. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 622 (4th Cir. 1999) ("To support a claim of motive based on the benefit a defendant derives from an increase in the value of his holdings, a plaintiff must demonstrate some sale of 'personally-held stock' or 'insider trading' by the defendant."). Ultimately, these bare allegations of motive fail to support a strong presumption of scienter as required by the PSLRA.

In sum, the facts alleged in the PSAC fail to meet the heightened pleading requirements of Rule 9(b) and the PSLRA. For the same reasons, the PSAC has necessarily failed to state a claim under Section 20(a). *See KBC Asset Mgmt. NV*, 19 F.4th at 614 n.4 (4th Cir. 2021) ("Because § 20(a) liability 'is derivative of § 10(b)' liability, Plaintiffs' failure to adequately plead a § 10(b) claim dooms their § 20(a) claim."). Therefore, Lead Plaintiff's motion should be denied.

### b. Defendants' Request for Judicial Notice

Defendants have filed a request for judicial notice, asking the Court to take judicial notice of an FDA press release announcing approval of PEDMARK on September 20, 2022. (*See* Docket Entries 66, 68-1.) Consideration of this document is not necessary for a ruling on Lead Plaintiff's motion. *See Sanchez v. Truse Trucking, Inc.*, 74 F. Supp. 3d 716, 729 (M.D.N.C. 2014); *Fisher*, 2022 WL 7108945, at *3 n.2. Therefore, the motion will be denied.

## III.  CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that Defendants' motion requesting judicial notice (Docket Entry 66) is **DENIED**.

**IT IS RECOMMENDED** that Lead Plaintiff Daniel Malakoti's motion for post-judgment relief to amend the consolidated amended complaint (Docket Entry 59) be **DENIED**.

Joe L. Webster
United States Magistrate Judge

February 15, 2023
Durham, North Carolina

21